1

2

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

3

4

LISA LOTTE-LUBLIN, *et al.*,

5                    Plaintiffs,

6          vs.

7    WILLIAM COSBY, JR.,

8                    Defendant.

Case No.: 2:23-cv-00932-GMN-DJA

**ORDER CERTIFYING QUESTION TO THE SUPREME COURT OF NEVADA UNDER NRAP 5**

9          Plaintiffs initiated this action against Defendant, William Cosby, Jr., for tort claims

10   arising out of sexual assault allegations. (*See generally* First Am. Compl. ("FAC"), ECF No.

11   26).  Plaintiffs are a group of ten women who allege that, from the early 1970s through the

12   early 1990s, Defendant lured them into an isolated environment, drugged, or attempted to drug

13   them, and then sexually assaulted them. (FAC ¶¶ 16–20).  Each of the alleged sex acts took

14   place in Nevada and arose out of similar events. (*Id.* ¶¶ 18–20).  Plaintiffs bring their claims

15   under NRS 11.217, as amended and enacted by Nevada Senate Bill 129 (2023) ("SB 129"),

16   which abolished the statute of limitations for civil actions involving sexual assault against

17   victims over 18 years old.[1]  The certified question at issue involves the claims of only one of

18   those Plaintiffs, Angela Leslie.  Plaintiff Leslie claims she was sexually assaulted, and therefore

19   has standing to bring a claim under SB 129, when Defendant allegedly forced Leslie to

20   masturbate him.

21

22

23

24

25

---

[1] S.B. 129, 2023 Leg., 82nd Sess. (Nev. 2023).

Because this case turns on a question of Nevada law, and it appears that there is no controlling precedent in the decisions of the Supreme Court or Court of Appeals of this state, the Court certifies the following question to the Honorable Supreme Court of Nevada under Rule 5 of the Nevada Rules of Appellate Procedure:

> **Whether a person sexually assaults another, pursuant to NRS 200.366, when a perpetrator forces a victim to masturbate them with the victim's hand without their consent?**

## I.    Statement of relevant facts and nature of this controversy

Plaintiff Leslie alleges that she met Cosby in "the late 1980s or early 1990s" when he invited her to Las Vegas, Nevada, "under the pretense that he wanted to mentor Ms. Leslie, including by helping her with her acting skills." (FAC ¶ 107).  Leslie claims that she arrived at Cosby's suite, and he instructed her to act like she was intoxicated as an acting exercise. (*Id.* ¶ 108).  Cosby allegedly offered Leslie an alcoholic beverage so that she would perform better. (*Id.* ¶ 109).  Leslie claims that Cosby "had placed or caused to have placed an intoxicant in the beverage, without Ms. Leslie's knowledge or consent," prior to giving her the beverage. (*Id.* ¶ 110).  Leslie then sipped some of the drink. (*Id.* ¶ 111).  Leslie claims that Cosby directed her to wet her hair, which she did in the bathroom, "assuming it would be for another acting scene." (*Id.* ¶ 112).  When she returned from the bathroom, Cosby was sitting on his bed, wearing only a white robe. (*Id.*).  Leslie claims that "without [her] consent, [Cosby] grabbed [her] hand, cover[ed] it in lotion," and then "forced Ms. Leslie's hand onto his penis and forced her to masturbate him, by holding and moving her hand on his penis. (*Id.* ¶ 113–14).  Cosby tried to climb atop her, but she fought him off. (*Id.* ¶ 115).  Cosby went to the bathroom and when he returned, he told Leslie she needed to leave because he had a phone call. (*Id.* ¶ 116).  She then left the hotel room. (*Id.*).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cosby moved to dismiss all of Leslie's claims[2], arguing, in part, that forcing a woman to touch a man's genitals to masturbate him does not constitute sexual assault under Nevada state law.    SB 129 removes the statute of limitations for claims arising out of an underlying sexual assault, as defined by NRS 200.366(1)(a), so a plaintiff must allege that a sexual assault occurred in order for them to bring an action for tort claims, such as battery. S.B. 129, 2023 Leg., 82nd Sess. (Nev. 2023).  Under NRS 200.366(1)(a), a person is guilty of sexual assault if the person:

> [s]ubjects another person to sexual penetration, or forces another person to make a sexual penetration on themselves or another . . . against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of the perpetrator's conduct.

NRS 200.364(9) defines "sexual penetration" as "cunnilingus, fellatio, or any intrusion, however slight, of any part of a person's body or any object manipulated or inserted by a person into the genital or anal openings of the body of another, including sexual intercourse in its ordinary meaning."

Plaintiff contends that "forced masturbation of a penis constitutes an 'intrusion, however, slight, of any part of a person's body,' under NRS § 200.364 based on a plain reading of the statutory language." (Pls.' Certification Br. 4:8–10, ECF No. 54).  Plaintiff further argues that "the modifying language, 'manipulated or inserted by a person into the genital or anal openings of the body of another,' is applicable to the immediately preceding language, 'any object' because it is intended to clarify that the use of an object can also be sexual assault, provided that the object is inserted into a genital or anal opening." (*Id.* 4:14–18).

---

[2] Leslie, along with the other Plaintiffs, brings claims for sexual assault, battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment. (*See generally* FAC).  This Court dismissed Plaintiffs' claims for sexual assault because sexual assault is not considered a tort under Nevada law. (*See generally* Order Adopting R&R, ECF No. 53).

Defendant's position is that "'any person's body' refers to the perpetrator's body, not the victim's body." (Def.'s Certification Br. at 3, ECF No. 55). Defendant contends that "a penetration is an intrusion, by way of the perpetrator's body or the perpetrator's use of an object, into the victim's genital or anal opening." (*Id.*). Defendant further argues that "the language 'forces another person to make a sexual penetration on themselves or another' means that the perpetrator would have to force the victim to penetrate the victim themselves, or penetrate 'another' meaning the perpetrator or a third person." (*Id.*).

No case answers the question of whether forced masturbation of the perpetrator is a sexual assault under NRS 200.366. Clarification from the Supreme Court of Nevada about this question will be outcome determinative in the viability of Leslie's claims.

## II.    Parties' names and designation of appellant and appellee

| Plaintiff/Appellee | Angela Leslie |
|---|---|
| Defendant/Appellant | William Cosby, Jr. |

Because the most recent adverse order was the Court's Order, (ECF No. 53), adopting in part the report and recommendation, Defendant should be the Appellant.[3]

## III.    Names and addresses of counsel for the parties

| Counsel for Plaintiff/Appellee Angela Leslie | Jordan K. Merson<br>Jordan K. Rutsky<br>Nathan E. Werksman<br>Alice A. Bohn<br>Manraj S. Sekhon<br>Merson Law, PLLC<br>950 Third Ave, 18th Floor<br>New York, NY 10022<br><br>Brian J. Panish<br>Rahul Ravipudi |

---

[3] The parties agree that Defendant should be the Appellant in this matter. (Pls.' Certification Br. 5:15–17); (Def.'s Certification Br. at 6).

|  | Robert Glassman<br>Julya Armendariz<br>Panish, Shea, Boyle, Ravipudi LLP<br>300 South Fourth Street<br>Suite 710<br>Las Vegas, NV 89101 |
|---|---|
| Counsel for Defendant/Appellant<br>William Cosby, Jr. | Jennifer Bonjean<br>Ashley Cohen<br>Bonjean Law Group, PLLC<br>303 Van Brunt Street, 1st Floor<br>Brooklyn, New York 11231 |

**IV.    Any other matters the certifying court deems relevant to a determination of the questions certified**

The Court defers to the Supreme Court of Nevada to decide whether it requires any other information to answer the certified question.  The Court does not intend its framing of the question to limit the Supreme Court of Nevada's consideration of the issue.  Nevertheless, for the Court's convenience, the crossbriefing by the parties is attached.

**V.    Conclusion**

Having complied with the provisions of the Nevada Rule of Appellate Procedure 5(c), the Court hereby kindly directs the Clerk of Court for the U.S. District Court for the District of Nevada to **FORWARD this order and its attachments under official seal to the Supreme Court of the State of Nevada, 201 South Carson Street, Suite 201, Carson City, Nevada, 89701-4702.**

**DATED** this __7__ day of November, 2024.

_____
Gloria M. Navarro, District Judge
United States District Court

| Exhibit | Document | Fed. Ct. Dkt. No. |
|---------|----------|-------------------|
| A | First Amended Complaint | ECF No. 26 |
| B | Defendant's Motion to Dismiss | ECF No. 39 |
| C | Plaintiffs' Response | ECF No. 42 |
| D | Defendant's Reply | ECF No. 46 |
| E | Plaintiffs' Certification Brief | ECF No. 54 |
| F | Defendant's Certification Brief | ECF No. 55 |

# Exhibit A

Jordan K. Merson, Esq., (To Be Admitted *Pro Hac Vice*)
jmerson@mersonlaw.com
Jordan K. Rutsky, Esq., (To Be Admitted *Pro Hac Vice*)
jrutsky@mersonlaw.com
Nathan E. Werksman, Esq., NV bar No. 15117
nwerksman@mersonlaw.com
Alice A. Bohn, Esq., (To Be Admitted *Pro Hac Vice*)
abohn@mersonlaw.com
Manraj S. Sekhon, Esq., (To Be Admitted *Pro Hac Vice*)
msekhon@mersonlaw.com
**Merson Law, PLLC.**
950 Third Ave, 18th Floor
New York, NY 10022

Brian J. Panish, Esq., NV bar No. 16123
panish@psbr.law
Rahul Ravipudi, Esq., NV bar No. 14750
ravipudi@psbr.law
Robert Glassman Esq., (To Be Admitted *Pro Hac Vice*)
rglassman@psbr.law
**Panish, Shea, Boyle, Ravipudi LLP.**
300 South Fourth Street, Suite 710
Las Vegas, NV 89101
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA, SOUTHERN DIVISION

| | |
|---|---|
| LISE-LOTTE LUBLIN, LILI BERNARD, JANICE BAKER-KINNEY, REBECCA COOPER, LINDA KIRKPATRICK, JANICE DICKINSON, ANGELA LESLIE, PAM JOY ABEYTA, HEIDI THOMAS, AND JANE FAZZARI,<br><br>              Plaintiffs,<br><br>      vs.<br><br>WILLIAM COSBY, JR.,<br><br>              Defendant. | Case No.: 2:23-cv-00932-DJA<br><br>**AMENDED COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

1

# INTRODUCTION

Plaintiffs Lise-Lotte Lublin, Lili Bernard, Janice Baker-Kinney, Rebecca Cooper, Linda Kirkpatrick, Janice Dickinson, Angela Leslie, Pam Joy Abeyta, Heidi Thomas, and Jane Fazzari (hereinafter jointly referred to as "Plaintiffs"), by and through their attorneys, Merson Law, PLLC, and Panish, Shea, Boyle, Ravipudi, LLP, respectfully allege as follows:

## JURISDICTION, VENUE, AND INTERDISTRICT ASSIGNMENT

1.    Plaintiff Lise-Lotte Lublin resides in Las Vegas, Nevada.

2.    Plaintiff Lili Bernard resides in Los Angeles, California.

3.    Plaintiff Janice Baker-Kinney resides in Rohnert Park, California.

4.    Plaintiff Rebecca Cooper resides in Las Vegas, Nevada.

5.    Plaintiff Janice Dickinson resides in Tarzana, California.

6.    Plaintiff Linda Kirkpatrick resides in Mesa, Arizona.

7.    Plaintiff Angela Leslie resides in Theodore, Alabama.

8.    Plaintiff Pam Joy Abeyta resides in Atwater, California.

9.    Plaintiff Heidi Thomas resides in Castle Rock, Colorado.

10.    Plaintiff Jane Fazzari resides in Cathedral City, California.

11.    Defendant William Cosby, Jr. (hereinafter, "Cosby") resides in Elkins Park, Pennsylvania and/or Shelburne Falls, Massachusetts.

12.    This Court has jurisdiction under 28 U.S.C. § 1332.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Clark County, Nevada.

14. Venue in the Southern Division of the United States District Court, District of Nevada is proper under Rule 1-6 of the Local Rules of Practice for the District of Nevada because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Clark County, Nevada.

15. Plaintiffs bring this action under Nevada Revised Statutes, Chapter 11; Added by 2023 Nev. SB 129, § 1, which eliminated the statute of limitations for a victim of a sexual assault to commence an action against the alleged perpetrator for damages arising from sexual abuse.

### GENERAL FACTUAL ALLEGATIONS

16. For decades, defendant Cosby engaged in the serial sexual assault of dozens of women for his sexual gratification by drugging women and using unknown substances to incapacitate them.

17. Each Plaintiff was sexually battered, assaulted, and abused by defendant Cosby in the same or similar manner, as a part of the same conduct, occurrence, plan, or scheme that was perpetrated, conducted, organized, and/or performed in Nevada by defendant Cosby.

18. All these sexual assaults and batteries took place in a similar manner from approximately the early 1970s through the early 1990s in Nevada. Several of the incidents took place in Cosby's suite in the same Las Vegas hotel.

19.    For each of these Plaintiffs, defendant Cosby used his enormous power, fame, and prestige, and claimed interest in helping them and/or their careers as a pretense to isolate and sexually assault them.

20.    Defendant Cosby drugged or attempted to drug each of these women before sexually assaulting them.

21.    In a deposition filed in the Eastern District of Pennsylvania, defendant Cosby admitted to obtaining drugs to use on women with whom he wanted to engage in sex.

22.    Now, these Plaintiffs have come forward to stand up for themselves, after they were sexually abused and assaulted by defendant Cosby.

23.    In performing the sexual assaults and batteries set forth above, defendant Cosby committed multiple torts, including, but not limited to, sexual assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment pursuant to Nevada law, including Nevada Revised Statutes, Chapter 11; Added by 2023 Nev. SB 129, § 1.

### PLAINTIFF LISE-LOTTE LUBLIN

24.    In or around 1989, Ms. Lublin met Cosby at Cosby's request, under the pretense that he wanted to mentor her and her career.

25.    Following their initial meeting, Ms. Lublin met with Cosby multiple times for mentoring during which Cosby acted interested in Ms. Lublin's career development as a model and actress.

26.     On one such occasion, in or around 1989, Cosby invited Ms. Lublin to his hotel suite in Las Vegas, Nevada, under the pretense that he wanted to assess her acting skills.

27.     During the mentoring session in Cosby's suite, Cosby provided Ms. Lublin with two beverages and instructed her to drink the beverages to help her relax and improvise more effectively.

28.     Ms. Lublin drank the beverages at Cosby's direction.

29.     Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverages, without Ms. Lublin's knowledge or consent, prior to giving the beverages to Ms. Lublin.

30.     After drinking the beverages, Ms. Lublin felt dizzy and became incapable of moving of her own volition.

31.     As Ms. Lublin began to feel the effects of the beverages, Cosby grabbed her wrists, pulled her between his legs, and held her in place with his legs. He then began stroking Ms. Lublin's hair while masturbating.

32.     Once incapacitated, Cosby dragged Ms. Lublin to the bedroom of the suite.

33.     While incapacitated, Ms. Lublin felt forcible vaginal pressure and penetration from Cosby's hand and fingers.

34.     Once Cosby had isolated and incapacitated Ms. Lublin, Cosby engaged in sexual acts with Ms. Lublin, including penetration, without her consent and against her will.

5

35.     Ms. Lublin did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

36.     Cosby knew or should have known that Ms. Lublin was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF LILI BERNARD

37.     Beginning in or around 1990, Cosby acted as Ms. Bernard's mentor for her acting career.

38.     In or around the Fall of 1990, Cosby arranged for and induced Ms. Bernard to travel interstate from New York to Nevada under the pretense that he was arranging a meeting between Ms. Bernard and producers from *A Different World* to cast her in the show.

39.     Once in Las Vegas, Nevada, Cosby told Ms. Bernard that the producers could not attend the meeting but offered to engage in a mentoring session in his hotel suite.

40.     While in Cosby's suite, Cosby offered and provided Ms. Bernard with a beverage that he claimed was non-alcoholic sparkling cider to celebrate her future success as an actress.

41.     Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Bernard's knowledge or consent, prior to giving the beverage to Ms. Bernard.

42. When Ms. Bernard drank the beverage, Cosby, in a joking manner, encouraged her to drink faster and forcibly tilted the glass as she brought it to her mouth to ensure that she drank quickly and fully from the beverage.

43. Shortly after drinking the beverage, Ms. Bernard felt dizzy, disoriented, and giddy.

44. Because of the effects of the beverage, Ms. Bernard fell while in the suite.

45. After falling, Ms. Bernard was unable to move and lost consciousness because of the effects of the beverage.

46. When Ms. Bernard awoke, she was naked, lying on her back, and had difficulty moving; Cosby was naked by her feet.

47. Ms. Bernard told Cosby that she did not want to have sex and cried out for help.

48. Despite her pleas, Cosby raped her by penetrating her vagina with his penis.

49. Ms. Bernard attempted to fight off Cosby during the rape but was unable to stop him because of the effects of the beverage he had provided to her earlier that evening.

50. To silence Ms. Bernard's protests, Cosby placed a pillow over her face, preventing Ms. Bernard from breathing.

51.     After removing his penis from Ms. Bernard's vagina and ejaculating on Ms. Bernard, Cosby removed the pillow from Ms. Bernard's face. Ms. Bernard remained incapacitated by the beverage and lost consciousness again.

52.     When Ms. Bernard next awoke, she was still incapacitated, and Cosby, who was naked, was cleaning Ms. Bernard with a wet towel. She lost consciousness again.

53.     When Ms. Bernard awoke again, it was morning and Cosby was gone.

54.     Cosby engaged in sexual acts with Ms. Bernard, including penetration, without her consent and against her will.

55.     Ms. Bernard did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

56.     Cosby knew or should have known that Ms. Bernard was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF JANICE BAKER-KINNEY

57.     In or around 1982, Ms. Baker-Kinney was invited by her co-worker to a party that Cosby was hosting in a private home in Reno, Nevada.

58.     Upon arrival at the home with her co-worker, Ms. Baker-Kinney discovered that there was no party, and Cosby was alone.

59.     With only Ms. Baker-Kinney, her co-worker, and Cosby present, Cosby offered Ms. Baker-Kinney two pills, which she believed to be barbiturates.

60.     Cosby insisted Ms. Baker-Kinney swallow the two pills and assured her that she would be fine.

61.     Ms. Baker-Kinney swallowed the pills at Cosby's insistence.

62.     When Ms. Baker-Kinney swallowed the pills, she was not anticipating nor was she consenting to any sexual acts between her and Cosby.

63.     Shortly after swallowing the pills, Ms. Baker-Kinney lost consciousness.

64.     When Ms. Baker-Kinney regained consciousness, she was unable to focus or walk a straight line due to the continued effects of the pills. Cosby was sitting next to her, with his hand in her open blouse. Her pants were also undone.

65.     Cosby took Ms. Baker-Kinney, who was still incapacitated, into a bedroom, where she lost consciousness again.

66.     When Ms. Baker-Kinney regained consciousness, she was naked in bed next to Cosby, with wetness between her legs, while he was groping her body and genital area.

67.     Cosby engaged in sexual acts with Ms. Baker-Kinney, including penetration, without her consent and against her will.

68.     Ms. Baker-Kinney did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

69.     Cosby knew or should have known that Ms. Baker-Kinney was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

**PLAINTIFF REBECCA COOPER**

70.     In the mid-1980s, Rebecca Cooper met Cosby at a health club where she worked as a masseuse in Las Vegas, Nevada.

71.     After Ms. Cooper and Cosby developed a professional, but friendly, relationship, Cosby invited Ms. Cooper to his shows several times.

72.     On one such occasion, Cosby invited Ms. Cooper to attend his show, have dinner, and provide masseuse services to him because of a tennis injury.

73.     While at dinner, Cosby offered Ms. Cooper a beverage, which she accepted.

74.     The beverage was brought to the table by an employee of Cosby.

75.     Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Cooper's knowledge or consent, prior to giving the beverage to Ms. Cooper.

76.     After Ms. Cooper sipped the beverage, Cosby insisted that she drink it all, to which she complied.

77.     Before Ms. Cooper had a chance to eat dinner, Cosby informed her that they did not have time, and escorted her to his dressing room.

78.     As she was being escorted to the dressing room, Ms. Cooper felt disoriented, wobbly, and uncoordinated.

79.     Once isolated in his dressing room, Cosby vaginally raped Ms. Cooper with his penis.

80.     Ms. Cooper resisted and told Cosby to stop, but he did not.

81.     When Cosby raped Ms. Cooper, she was still feeling the effects of the beverage, including an inability to move.

82.     Cosby engaged in sexual acts with Ms. Cooper, including penetration, without her consent and against her will.

83.     Ms. Cooper did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

84.     Cosby knew or should have known that Ms. Cooper was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF LINDA KIRKPATRICK

85.     In or around 1981, Ms. Kirkpatrick met Cosby when playing tennis in Las Vegas, Nevada.

86.     After they met, Cosby invited Ms. Kirkpatrick to attend one of his shows in Las Vegas, and she accepted his invitation.

87.     When she arrived at the show, Ms. Kirkpatrick was invited backstage.

88.     Once backstage, Cosby gave Ms. Kirkpatrick a beverage, which she partially drank.

89.     Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Kirkpatrick's knowledge or consent, prior to giving the beverage to Ms. Kirkpatrick.

90.    After Ms. Kirkpatrick drank the beverage provided by Cosby, she blacked out, and was in and out of consciousness.

91.    During a moment of consciousness, Ms. Kirkpatrick found herself lying on the floor of Cosby's dressing room, incapacitated, with Cosby atop her, forcefully kissing her and reaching into her pants, with his penis pressed against her. She was unable to resist due to incapacitation and paralysis from the beverage.

92.    Cosby engaged in sexual acts with Ms. Kirkpatrick, including penetration, without her consent and against her will.

93.    Ms. Kirkpatrick did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby in his suite.

94.    Cosby knew or should have known that Ms. Kirkpatrick was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF JANICE DICKINSON

95.    In or around 1982, Ms. Dickinson was invited by Cosby to Lake Tahoe, Nevada, under the pretense that he wanted to discuss a potential role on his television show and other employment opportunities.

96.    When Ms. Dickinson arrived, Cosby took Ms. Dickinson to dinner.

97.    While at dinner, Ms. Dickinson complained of menstrual cramps, to which Cosby offered a pill under the pretense that it would be helpful for her cramps.

98.    Shortly after ingesting the pill provided by Cosby, Ms. Dickinson felt woozy, dizzy, and disoriented.

99.    After dinner, Cosby invited Ms. Dickinson to his suite to finish their conversation.

100.    Ms. Dickinson continued to feel the effects of the pill, including weakness and disorientation, in Cosby's suite.

101.    Once isolated in Cosby's suite, Cosby vaginally and anally raped Ms. Dickinson with his penis.

102.    During the rape, Ms. Dickinson told Cosby to stop, but Cosby ignored her.

103.    During the rape, Ms. Dickinson attempted to fight Cosby off, but was unable to do so because of the pill that she had received from Cosby.

104.    Cosby engaged in sexual acts with Ms. Dickinson, including penetration, without her consent and against her will.

105.    Ms. Dickinson did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

106.    Cosby knew or should have known that Ms. Dickinson was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

13

## PLAINTIFF ANGELA LESLIE

107.    In or around the late 1980s or early 1990s, Cosby invited Ms. Leslie to travel to Las Vegas, Nevada under the pretense that he wanted to mentor Ms. Leslie, including by helping her with her acting skills.

108.    When Ms. Leslie arrived in Las Vegas, she met Cosby at his suite, where Cosby directed Ms. Leslie to act like she was intoxicated under the pretense that this was an acting exercise.

109.    After Ms. Leslie did the exercise, Cosby offered Ms. Leslie an alcoholic beverage under the pretense that she would perform better if she had a sip of the drink.

110.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Leslie's knowledge or consent, prior to giving the beverage to Ms. Leslie.

111.    Ms. Leslie sipped some of the drink at Cosby's direction.

112.    Cosby then directed Ms. Leslie to wet her hair, which she did in the bathroom, assuming it would be for another acting scene. When she returned from the bathroom, Cosby was sitting on his bed, wearing only a white robe.

113.    Cosby then, without Ms. Leslie's consent, grabbed Ms. Leslie's hand, covering it in lotion.

114.    Cosby then, without Ms. Leslie's consent, forced Ms. Leslie's hand onto his penis and forced her to masturbate him, by holding and moving her hand on his penis.

115.    Cosby then tried to climb atop Ms. Leslie, but she fought him off.

116.    Cosby briefly went to the bathroom, and when he returned, told Ms. Leslie that she needed to leave because he had a phone call; Ms. Leslie fled the suite.

117.    Cosby engaged in sexual acts with Ms. Leslie without her consent and against her will.

118.    Ms. Leslie did not consent to any sexual acts that were perpetrated against her by Cosby in his suite.

### PLAINTIFF PAM JOY ABEYTA

119.    In or around 1979, Ms. Abeyta traveled with a friend and colleague of Cosby from California to Las Vegas, Nevada to meet Cosby for professional networking purposes.

120.    Ms. Abeyta was first introduced to Cosby in Cosby's dressing room, while other people were present, after Cosby performed a show in Las Vegas, Nevada.

121.    During their initial meeting, Cosby had his friend/colleague bring Ms. Abeyta to his suite under the pretense that they could continue their initial meeting that began in the dressing room.

122.    While in his suite that evening, Cosby invited Ms. Abeyta to attend a dinner show with him and others the next evening.

123.    That evening, Ms. Abeyta slept alone in one of the several bedrooms within Cosby's suite.

124.    The next evening, at the dinner show, Ms. Abeyta was provided with a beverage.

125.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Abeyta's knowledge or consent, prior to giving the beverage to Ms. Abeyta.

126.    After Ms. Abeyta drank the beverage, she felt dizzy and required assistance to return to the suite.

127.    After the dinner show ended, Cosby returned to the suite, where Ms. Abeyta was alone, sitting in the living room area.

128.    When Cosby returned, he put a pill in Ms. Abeyta's mouth without her consent, under the pretense that it would relax her.

129.    Shortly after swallowing the pill, Ms. Abeyta blacked out.

130.    When Ms. Abeyta awoke, she was in Cosby's bedroom, within the suite, with Cosby naked and atop her.

131.    Ms. Abeyta also recalls touching Cosby's penis in her compromised state, and the bed being wet, potentially from Cosby's ejaculate.

132.    That same evening, as Ms. Abeyta was regaining her consciousness and clarity of mind, Cosby placed a second pill in her mouth, without her consent, causing her to black out again.

133.    The next morning, Ms. Abeyta's legs were sore, and she had bruises on her legs, including on her inner thighs.

134.   Upon information and belief, Cosby engaged in sexual acts with Ms. Abeyta, including penetration, without her consent and against her will.

135.   Ms. Abeyta did not consent to and did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby in his suite.

136.   Cosby knew or should have known that Ms. Abeyta was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

## PLAINTIFF HEIDI THOMAS

137.   In or around 1984, Cosby invited Ms. Thomas to travel from Denver, Colorado to Reno, Nevada, under the pretense that he wanted to coach and mentor her as an actress.

138.   When Ms. Thomas arrived in Reno, Nevada, she was taken by car to a private property where Cosby was staying.

139.   As part of the supposed mentoring session, Cosby asked Ms. Thomas to read a monologue of a character who was intoxicated.

140.   When Ms. Thomas told Cosby that she did not drink alcohol, Cosby insisted that she try an alcoholic beverage to aid her acting.

141.   Cosby provided Ms. Thomas with a beverage under that pretense.

142.   Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Thomas' knowledge or consent, prior to giving the beverage to Ms. Thomas.

143.    Ms. Thomas sipped the beverage provided to her by Cosby.

144.    After Ms. Thomas drank the beverage provided to her by Cosby, Ms. Thomas blacked out, and was in and out of consciousness for several days.

145.    During one moment of consciousness, Ms. Thomas found herself in bed with Cosby, who was naked and forcing his penis into her mouth.

146.    Cosby engaged in sexual acts with Ms. Thomas, including penetration, without her consent and against her will.

147.    Ms. Thomas did not consent to and did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

148.    Cosby knew or should have known that Ms. Thomas was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF JANE FAZZARI

149.    In the early 1970s, in Lake Tahoe, Nevada, Cosby invited Ms. Fazzari and her friend to a party under the false pretense that there would be celebrities at the party.

150.    After Cosby transported Ms. Fazzari and her friend by car to a house in Zephyr Cove, Nevada, Ms. Fazzari and her friend learned that there were no party or other guests at the house.

151.    While at the house, Cosby prepared a beverage and provided it to Ms. Fazzari.

152.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Fazzari's knowledge or consent, prior to giving the beverage to Ms. Fazzari.

153.    After Ms. Fazzari consumed the beverage provided by Cosby, she lost consciousness.

154.    As Ms. Fazzari went in and out of consciousness, she found herself naked, with Cosby vaginally raping her.

155.    Cosby engaged in sexual acts with Ms. Fazzari, including penetration, without her consent and against her will.

156.    Ms. Fazzari did not consent to and did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

157.    Cosby knew or should have known that Ms. Fazzari was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

## AS AND FOR A FIRST CAUSE OF ACTION
## BY ALL PLAINTIFFS FOR SEXUAL ASSAULT

158.    Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

159.    Cosby's conduct constituted sexual assault under Nevada Revised Statutes, Chapter 11; Added by 2023 Nev. SB 129, § 1.

160.   Cosby forcefully sexually penetrated or otherwise sexually assaulted Plaintiffs against their will, all while Cosby knew they were mentally and physically incapable of resisting or consenting.

161.   As a direct, proximate, and legal result of Cosby's sexual assault of Plaintiffs, Plaintiffs suffered horrific injuries, including, but not limited to, severe physical injury, emotional distress, and lifelong psychological trauma.

162.   At all times mentioned herein, Cosby intended to cause Plaintiffs injury and/or his acts constituted despicable conduct with a willful and conscious disregard of the rights or safety of Plaintiffs and others.

163.   As a direct and proximate result of the sexual assaults, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, mental anguish, embarrassment, and humiliation.

164.   As a direct and proximate result of the aforementioned sexual assaults, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

165.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

166.    By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate, to deter said Defendant and others from future similar misconduct.

167.    Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

### As and For A Second Cause of Action
### By All Plaintiffs for Battery

168.    Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

169.    Cosby's unlawful, abusive, manipulative, and predatory acts against Plaintiffs amounted to harmful and offensive contacts to Plaintiffs' persons, each of which was done intentionally by Cosby without Plaintiffs' consent.

170.    Cosby willfully and lawfully used force or violence upon Plaintiffs.

171.    Cosby touched Plaintiffs with the intent to harm or offend Plaintiffs.

172.    Plaintiffs did not consent to the touching.

173.    Cosby's conduct in touching Plaintiffs was harmful and offensive.

174.    As a direct and proximate result of the batteries, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

175.   As a direct and proximate result of the aforementioned batteries, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

176.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

177.   By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate, to deter said Defendant and others from future similar misconduct.

178.   Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

### AS AND FOR A THIRD CAUSE OF ACTION
### BY ALL PLAINTIFFS FOR ASSAULT

179.   Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

180.   Cosby's predatory, abusive, manipulative, and unlawful acts against Plaintiffs created a reasonable apprehension in Plaintiffs of immediate harmful or offensive contact as to Plaintiffs' persons, all of which was done intentionally by Cosby to Plaintiffs without Plaintiffs' consent.

181.   Cosby unlawfully attempted to use physical force against Plaintiffs.

182.    Cosby intentionally placed Plaintiffs in reasonable apprehension of immediate bodily harm.

183.    Plaintiffs were in reasonable apprehension of immediate bodily harm because of the conduct of Cosby.

184.    As a direct and proximate result of the aforementioned assaults, Plaintiffs sustained in the past and will continue to sustain in the future serious and severe psychological injuries and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

185.    As a direct and proximate result of the aforementioned assaults, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

186.    By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

187.    By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

188.    Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

## AS AND FOR A FOURTH CAUSE OF ACTION
## BY ALL PLAINTIFFS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

189.   Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

190.   Cosby engaged in outrageous and extreme conduct toward Plaintiffs with the intention to cause, or with reckless disregard for the probability of causing, Plaintiffs to suffer severe emotional distress.

191.   Cosby knew Plaintiffs were incapacitated and could not consent, and he intended to sexually batter Plaintiffs with a complete disregard of the physical and emotional trauma caused to Plaintiffs.

192.   As a proximate result of the outrageous and extreme conduct of Cosby in assaulting and battering Plaintiffs, Plaintiffs suffered and continue to suffer extreme mental distress, humiliation, anguish, and emotional and physical injuries, as well as economic losses, in amounts to be proven at trial.

193.   Cosby committed the acts alleged herein maliciously, fraudulently, and oppressively with the wrongful intention of injuring Plaintiffs from an improper or evil motive amounting to malice and/or in conscious disregard of Plaintiffs' rights, entitling Plaintiffs to recover punitive damages from Cosby in such sums as a jury would find fair, just, and appropriate, to deter Cosby and others from future similar misconduct.

194.   As a direct and proximate result of the intentional infliction of emotional distress, Plaintiffs sustained in the past and will continue to sustain in

the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

195.   As a direct and proximate result of the aforementioned intentional infliction of emotional distress, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation. By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

196.   By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

197.   Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

**As and For A Fifth Cause of Action**
**By All Plaintiffs for Negligent Infliction of Emotional Distress**

198.   Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

199.   Cosby's conduct created a risk of physical harm to Plaintiffs.

200.   Cosby failed to exercise the degree of care that an ordinarily careful and prudent person would exercise under the circumstances set forth above.

201.   Plaintiffs' lifelong suffering of emotional distress from Cosby's conduct was a foreseeable risk that Cosby knew or should have known before engaging in the above-described horrendous acts towards Plaintiffs.

202.   As a direct and proximate result of the aforementioned negligence, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

203.   As a direct and proximate result of the aforementioned negligence, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

204.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

205.   By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

206.   Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

### AS AND FOR A SIXTH CAUSE OF ACTION
### BY ALL PLAINTIFFS FOR FALSE IMPRISONMENT

207.   Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

208.   Cosby, intentionally and without the right to do so, confined Plaintiffs within boundaries fixed by Cosby.

209.   Cosby's acts directly or indirectly resulted in the confinement of Plaintiffs.

210.   Plaintiffs were aware of their confinement.

211.   Plaintiffs were harmed by their confinement.

212.   As a direct and proximate result of the false imprisonments, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, mental anguish, physical injury, embarrassment, and humiliation.

213.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Cosby in such sums as a jury would find fair, just, and adequate.

214.   By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

215.   Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

## JURY DEMAND

216.   Plaintiffs hereby demand that this matter be tried by a jury.

## PRAYER

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.   Compensatory damages to each Plaintiff for pain, suffering, injury, emotional distress, and for medical expenses, past and future;

2.   Prejudgment interest and post judgment interest as allowed under the law;

3.   Punitive damages to each Plaintiff as permitted under the law;

4.   Attorneys' fees and costs as permitted under the law; and

5.   Such other and further relief against Defendant in such sum as a jury would find fair, adequate, and just.

Dated:     Clark County, Nevada
           August 3, 2023

                                        **MERSON LAW, PLLC**

                                         /s/ Jordan Rutsky
                                        Jordan K. Rutsky, Esq.
                                        Jordan K. Merson, Esq.
                                        Nathan E. Werksman, Esq.
                                        Alice A. Bohn, Esq.
                                        Manraj S. Sekhon, Esq.
                                        Attorneys for Plaintiffs
                                        To Be Admitted *Pro Hac Vice*

Dated:     Clark County, Nevada
           August 3, 2023

                                        **PANISH, SHEA, BOYLE, RAVIPUDI,
                                        LLP**
                                        300 South Fourth Street, Suite 710
                                        Las Vegas, Nevada 89101

                                         /s/ Brian J. Panish
                                        Brian J. Panish, Esq.
                                        Rahul Ravipudi, Esq
                                        Robert Glassman Esq.

# Exhibit B

JENNIFER BONJEAN (*pro hac vice*)
ASHLEY COHEN (*pro hac vice*)
BONJEAN LAW GROUP, PLLC
750 LEXINGTON AVE., 9TH FL.
NEW YORK, NY 10021
Office: (718) 875-1850
Fax: (718) 230-0582
Email: jennifer@bonjeanlaw.com
         ashley@bonjeanlaw.com

Attorneys for Defendant
William Cosby, Jr.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LISA LOTTE-LUBLIN, LILI BERNARD, JANICE BAKER-KINNEY, REBECCA COOPER, LINDA KIRKPATRICK, JANICE DICKINSON, ANGELA LESLIE, PAM JOY ABEYTA, AND HEIDI THOMAS,

            Plaintiffs,

    vs.

WILLIAM COSBY, JR.

            Defendant.

Case No. 2:23-cv-932

**MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

# I.    INTRODUCTION

Defendant William Cosby, by and through counsel, Bonjean Law Group, moves to dismiss the complaint against him brought by nine different individuals pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs have brought separate and discrete causes of action against the Defendant in a single lawsuit, notwithstanding that the claims occurred years if not decades apart from one another, will have few (if any) shared witnesses and will invariably involve different defenses. The complaint places the alleged assaults within a 15-year time span, and none of the Plaintiffs can state when alleged assaults actually occurred, instead providing several yearlong windows. What's more, Plaintiff Angela Leslie fails to even allege a sexual assault as it is defined by the statute.

Plaintiffs collectively invoke Nevada Senate Bill 129 ("SB 129"), effective May 31, 2023, which purports to revive stale tort claims that arise from a sexual assault which occurred when the plaintiff was 18 years of age or older. (Nevada Senate Bill No. 129, 82nd Session (2023)). SB 129 expands Nevada Revised Statute ("NRS") 11.215, which states that claims of sexual assault that occurred when a plaintiff was under 18 years of age can be brought at any time. Now, in the State of Nevada, anyone, of any age, who claims sexual assault as it is defined by NRS 200.366, may sue an alleged perpetrator of sexual assault at any point in time.

Defendant moves to dismiss the Plaintiffs' Complaint in its entirety where the claims are barred by the statute of limitations and where SB 129 is unconstitutional under the Due Process and Ex Post Facto clauses of the United States and Nevada Constitutions. SB 129 is also unconstitutional under the Nevada Constitution's Special Legislation prohibition.

Assuming that this Court concluded that SB 129 is constitutionally sound, Plaintiffs' "sexual assault" causes of action must be dismissed where SB 129 revived Plaintiffs' tort claims by retroactively abolishing the statute of limitations; it did not create a new common law tort. Additionally, Plaintiffs Leslie and Abeyta's claims must be dismissed for failure to sufficiently plead facts that allow them to avail themselves of SB 129. Lastly, even if this Court denies Defendant's motion to dismiss, it must sever Plaintiffs' causes of action where the Plaintiffs were not permissibly joined pursuant to Federal Rules of Civil Procedure Rule 20(a).

## II.    FACTS ALLEGED IN THE COMPLAINT

Nine individual Plaintiffs bring this suit against Defendant pursuant to NRS 11.215, as amended by SB 129, alleging state tort claims of sexual assault, battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment. Plaintiffs contend that under this law, their untimely tort claims were revived because their claims are based on conduct that constitutes a sexual assault as defined by NRS 200.366. Plaintiffs make the following claims in their Complaint.

### A.    Lise Lotte-Lublin

Plaintiff Lublin claims that around 1989 she met Defendant at his request, "under the pretense" that he wanted to mentor her and her career. [Compl. ¶ 23]. Lublin claims that during one mentoring session in Defendant's Las Vegas hotel suite, Plaintiff drank two beverages provided to her by Defendant that caused her to feel dizzy and eventually incapacitated. [*Id.* ¶¶ 26-27, 29]. Lublin claims that after the drugs began to take effect, Defendant grabbed her, pulled her between his legs and stroked her hair while he masturbated. [Id. at 30]. Once she was incapacitated, Lublin claims that Defendant dragged her to the bedroom of the hotel suite and proceeded engaged in various sexual acts with her, including penetration with his hand and fingers, without her consent. [*Id.* at ¶¶ 31-34]. Lublin claims upon information and belief that Defendant had placed an intoxicant in her beverage without her consent. [*Id.* at ¶ 28].

### B.    Lili Bernard

Plaintiff Bernard claims that "beginning in or around 1990", Defendant acted as a mentor for her acting career. [*Id.* ¶ 36]. Bernard claims that in the fall of 1990, she travelled to Nevada "under the pretense" that she would be meeting with producers from *A Different World* to cast her in the show. [*Id.* at ¶ 37]. Once Bernard arrived in Nevada, Defendant informed Bernard the producers could not attend the meeting and instead offered to have a mentoring session in his hotel suite. [*Id.* at ¶ 38].

Once in the suite, Bernard claims that Defendant offered her a beverage he claimed was a non-alcoholic sparkling cider to celebrate her future success as an actress. [*Id.* at ¶ 39]. Bernard claims that Defendant encouraged her to drink the beverage quickly and forcibly tilted the drink

as she drank it. [*Id.* at ¶ 41]. Bernard alleges that shortly after drinking the beverage, she felt dizzy, disoriented, giddy and because of the beverage, she fell and then lost consciousness. [*Id.* at ¶¶ 42-44]. When she awoke, Bernard claims she was naked on her back, and had trouble moving. [*Id.* at ¶ 45]. Bernard claims she told the Defendant, who was also naked, that she did not want to have sex and cried for help, but that despite her pleas Defendant raped her by penetrating her vagina with his penis. [*Id.* at ¶ 45-47]. During the rape, Bernard claims that she tried to fight Defendant off, and in response, Defendant placed a pillow over her face to prevent her from breathing. [*Id.* at ¶¶ 48-49]. Bernard claims she lost consciousness again and when she awoke, Defendant was naked and cleaning her with a wet towel. [*Id.* at ¶ 51]. When she next awoke, it was morning and Defendant was gone. [*Id.* at ¶ 52]. Bernard claims upon information and belief that Defendant had placed an intoxicant in her beverage without her consent. [*Id.* at ¶ 40].

C.    Janice Baker-Kinney

Plaintiff Baker-Kinney claims that she met Defendant "in or around 1982" when she was invited by her co-worker to a party Defendant was hosting at a private home in Reno, Nevada. [*Id.* at ¶ 56]. When she arrived at the home, Defendant was there alone. [*Id.* at ¶ 56]. Defendant allegedly offered Baker-Kinney two pills, which she believed to be barbiturates, and she swallowed them "at [Defendant's] insistence." [*Id.* at ¶ 58-60]. Baker-Kinney claims she briefly lost consciousness thereafter. [*Id.* at ¶ 63]. At some point, Defendant's hand was in her shirt and her pants were undone. [*Id.*]. Baker-Kinney awoke in a bedroom where she was naked in bed next to Defendant with "wetness between her legs, while [Defendant] was groping her body and genital area." [*Id.* at ¶¶ 64-65]. At some point, Baker-Kinney claims Defendant "engaged in sexual acts with Ms. Baker-Kinney, including penetration," without her consent. [Id. at ¶ 66].

D.    Rebecca Cooper

Plaintiff Cooper alleges she met Defendant "in the mid 1980s" at a health club where she worked as a masseuse. [*Id.* at ¶ 69]. After developing a "professional, but friendly" relationship, Cooper agreed to attend one of Defendant's shows, have dinner with him, and "provide masseuse services to him because of a tennis injury." [*Id.* at ¶¶ 70-71]. While at dinner, Cooper claims she accepted a beverage that was brought to the table by one of Defendant's employees. [*Id.* at ¶ 72-

73]. Cooper claims that after she took a sip, Defendant encouraged her to drink it all, and she did. [*Id.* at ¶ 75]. Cooper claims that before she had a chance to eat dinner, Defendant informed her "they did not have time" and he escorted her to his dressing room. [*Id.* at ¶ 76]. On the way to the dressing room, Cooper claims she felt disoriented, wobbly, and uncoordinated. [*Id.* at ¶ 77]. Once in the dressing room, Cooper claims that Defendant vaginally raped her and that she was unable to move at the time. [*Id.* at ¶ 78-81]. Cooper claims upon information and belief that Defendant had placed an intoxicant in her beverage without her consent. [*Id.* at ¶ 74].

  E. Linda Kirkpatrick

  Plaintiff Kirkpatrick claims she met Defendant "in or around 1981" while playing tennis in Las Vegas, Nevada. [*Id.* at ¶ 84]. At some point after meeting, Kirkpatrick alleges that Defendant invited her to attend one of his shows and she accepted. Once she arrived, Kirkpatrick claims was invited backstage and drank a beverage Defendant gave her. [*Id.* at ¶ 87-89]. Kirkpatrick claims that she blacked out, and in a moment of consciousness, found herself on the floor of Defendant's dressing room with Defendant on top of her, kissing her, and with his penis pressed against her. [*Id.* at § 89-90]. Kirkpatrick claims she was unable to resist due to "incapacitation and paralysis from the beverage."[*Id.* at ¶ 90]. Kirkpatrick claims that Defendant "engaged in sexual acts with [her], including penetration, without her consent and against her will." [*Id.* at ¶ 91]. Kirkpatrick claims upon information and belief that Defendant had placed an intoxicant in her beverage without her consent. [*Id.* at ¶ 88].

  F. Janice Dickinson

  Plaintiff Dickinson claims that "in or around 1982" Defendant invited her to Lake Tahoe, Nevada "under the pretense" that he wanted to discuss a potential role for her on his TV show. [*Id.* at ¶ 94]. While Dickinson and Defendant were at dinner, Dickinson claims she took a pill Defendant gave her to treat her menstrual cramps. Dickinson claims she felt woozy, dizzy and disoriented shortly after taking the pill but still went to Defendant's suite after. [*Id.* at ¶¶ 97-98]. Once in the suite, Dickinson claims Cosby vaginally and anally raped her. [*Id.* at ¶100]. Dickinson claims she told Defendant to stop and attempted to fight him off but was unable to do so because of the pill he gave her. [*Id.* at ¶¶ 101-102].

G.      Angela Leslie

Plaintiff Leslie alleges she met Defendant in "the late 1980s or early 1990s" when he invited her to Las Vegas, Nevada to mentor her and help her with acting. [*Id.* at ¶ 106]. Leslie claims that she arrived at Defendant's suite and he instructed her to act like she was intoxicated. [*Id.* at ¶ 107]. Defendant allegedly offered Leslie an alcoholic beverage so that she would perform better. [*Id.* at ¶ 108]. Leslie claims that she went to wet her hair at the direction of the Defendant and when she returned from the bathroom, Defendant was sitting on the bed wearing only a white robe. [*Id.* at ¶ 111]. Leslie claims that Defendant grabbed her hand, covering it in lotion, and proceeded to masturbate using her hand. [*Id.* at ¶ 113]. Leslie claims Defendant tried to climb atop her but she fought him off. [*Id.* at ¶ 114]. Defendant went to the bathroom and when he returned, he told Leslie she needed to leave because he had a phone call. [*Id.* at ¶ 115]. Leslie claims she then left the hotel room. [*Id.*].

H.      Pam Joy Abeyta

Plaintiff Abeyta claims she travelled to Las Vegas, Nevada with a friend and colleague to meet Defendant for "professional networking purposes". [*Id.* at ¶ 118]. Abeyta met Defendant in his dressing room after one of his shows and went to his hotel suite after, where he invited her to attend a dinner show the next evening. [*Id.* at ¶¶120-121]. That evening, Abeyta slept in Defendant's suite. [*Id.* at ¶ 122]. While at dinner the next evening, Abeyta "was provided with a drink" and began to feel dizzy thereafter. [*Id.* at ¶¶ 123, 125]. Abeyta claims she required assistance to return to the suite. [*Id.* at ¶ 125]. Abeyta claims that Defendant returned to the suite and placed a pill in her mouth "under the pretense that it would relax her." [*Id.* at ¶ 127]. Abeyta claims she blacked out and when she awoke, Defendant was naked on top of her. [Id. at ¶ 129]. That same evening, apparently as Abeyta was regaining consciousness, Defendant placed a second pill in her mouth and she blacked out again. [*Id.* at ¶ 131]. The next morning, Abeyta claims that her legs were sore and that she had bruises on her inner legs and thighs. [*Id.* at ¶ 132]. Abeyta claims upon information and belief, that Defendant engaged in sexual acts with her, including penetration, without her consent and against her will. [*Id.* at ¶ 133].

I.      Heidi Thomas

1   Plaintiff Thomas alleges that in and around 1984, Defendant invited her to Reno, Nevada
2   to mentor her as an actress. [*Id.* at ¶ 136]. While Thomas was at the home where Defendant was
3   staying, she accepted a drink from him "to aid her acting." [*Id.* at ¶ 139]. Thomas claims that
4   after she drank the beverage, she "blacked out and was in and out of consciousness for several
5   days." [*Id.* at ¶ 143]. During a moment of consciousness, Thomas found herself in bed with
6   Defendant, who was naked and forcing his penis into her mouth, without her consent and against
7   her will. [*Id.* at ¶¶ 144-145]. Thomas claims upon information and belief that Defendant had
8   placed an intoxicant in her beverage without her consent. [*Id.* at ¶ 141].

## III.    LEGAL STANDARD

10  The purpose of a Rule 12(b)(6) is to test the legal sufficiency of the complaint. *Navarro*
11  *v. Block*, 250 F.3d 729 (9th Cir. 2001). "A pleading must give fair notice of a legally cognizable
12  claim and the grounds on which it rests, and although a court must take all factual allegations as
13  true, legal conclusions couched as factual allegations are insufficient." *San Francisco*
14  *Comprehensive Tours, LLC v. Tripadvisor, LLC*, 2021 U.S. Dist. LEXIS 183154, at 8 (D. Nev.
15  Sep. 24, 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual
16  matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Id.* (citing *Ashcroft*
17  *v. Iqbal*, 556 U.S. 662, 678 (2009)).

18  "Generally, a district court may not consider any material beyond the pleadings in a Rule
19  12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555, (9th
20  Cir. 1990). However, material that is properly submitted as part of the complaint or documents
21  whose contents are alleged in the complaint, and the authenticity of which is not questioned by
22  any party, may be considered by the court. *San Francisco Comprehensive Tours, LLC,* 2021 U.S.
23  Dist. LEXIS 183154, at 9. A court may also take notice of matters of public record. *Id. If* a
24  statute of limitations defense is apparent from the face of the complaint, it may be raised in a
25  motion to dismiss. *Seven Arts Filmed Entertainment, Ltd. v. Content Media Corp. PLC*, 733 F.3d
26  1251,1254 (9th Cir. 2013)(*citing Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 119 (9th
27  Cir. 1980).

28

IV.     **ARGUMENT**

A.     **Plaintiffs' Sexual Assault Claims Must Be Dismissed As SB 129 Did Not Create a New Common Law Tort of "Sexual Assault" But Rather Abolished the State of Limitations for Traditional Causes of Actions that *Arise* from a Sexual Assault as Defined by the Nevada's Criminal Code.**

All nine Plaintiffs plead a "Sexual Assault" cause of action. Sexual assault is crime, not a common law or statutory tort under Nevada law. Indeed, SB 129 can be found under Chapter 11 of the Nevada Revised Statutes which deals with "Limitation of Actions." The plain language of the statute reflects the Legislature's intent to abolish the statute of limitations for "an action to recover damages" that arises from a sexual assault as defined by the criminal code. The statute also reflects the Legislature's intent to revive expired causes of action that arise from sexual assault. The statute does not express an intent to create a new tort of "sexual assault." Plaintiff's battery, assault, false imprisonment, and intentional infliction of emotional distress claims are appropriate common law torts that may arise from a sexual assault, but there simply is no common law tort knows as "sexual assault" and the Nevada Legislature did not create one by enacting SB 129. *See also,* Minutes of Senate Committee on Judiciary - 82nd Session (2/21/23)

B.     **Plaintiff Leslie's Claims Are Barred by the Statute of Limitations As They Do Not Allege Sexual Assault As Defined in Nevada Revised Statutes 200.366**

Leslie alleges that at some point in the late 1980s or early 1990s, Defendant forced her to masturbate him. [Compl. ¶113] While the conduct, if true, would constitute a battery, the claim is untimely because it does not involve an act of sexual penetration. NRS 11.190(4)(e); *see also Wilson v. Las Vegas Metro, Police Dept.,* 498 P. 3d 1278, 1280 (Nev. 2021) (actions for battery are subject to a two-years limitations period). Leslie attempts to raise her stale battery claim, by invoking SB 129; however, SB 129 revives claims that were previously barred by the statute of limitations only where the Plaintiff alleges sexual assault as it is defined by NRS 200.366. (Nevada Senate Bill No. 129, 82nd Session (2023)). NRS 200.366 states, in relevant part:

A person is guilty of sexual assault if the person:

(a)  Subjects another person to sexual penetration, or forces another person to make a sexual penetration on themselves or another, or on a beast, against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of the perpetrator's conduct; or

Furthermore, NRS 200.364 defines "sexual penetration" as "cunnilingus, fellatio, or any intrusion, however slight, of any part of a person's body or any object manipulated or inserted by a person into the genital or anal openings of the body of another, including sexual intercourse in its ordinary meaning. This term does not include any such conduct for medical purposes."

Leslie does not plead facts that demonstrate that SB 129 applies to her claims. Accordingly, her claim is time-barred and must be dismissed.

**C.      Plaintiffs' Claims Must Dismissed Where SB 129 Violates the Special Legislation Clause of the Nevada Constitution.**

SB 129 which revives expired tort claims for individuals who are allegedly victims of sexual assault is unconstitutional under the Nevada Constitution as it runs afoul of Article 4, Sections 20 and 21 of the Nevada Constitution. Article 4, Section 20 prohibits, among other things, local and special laws for the punishing of crimes and misdemeanors. Section 21 requires laws to be "general and of the uniform operation through the state" in all cases "where a general law can be made applicable." 255 P. 2d 247, 250 (Nev. 2011). Because SB 129 constitutes impermissible special legislation, it violates the Nevada Constitution and must be struck.

Although the Legislature's law-making authority is considerable, it is not unlimited. *Clean Water Coalition v. M Resort, LLC.,* 255 P. 3d 247, 253 (Nev. 2011). The Nevada Constitution is the "supreme law of the state," which "control[s] over any conflicting statutory provisions." *Id. see also Goldman v. Bryan,* 787 P. 2d 372, 377 (Nev. 1990). Article 4 of the Nevada Constitution both confers law-making authority on the Legislature and limits that authority in order to protect Nevada citizens from unequal treatment under the laws. Nev. Const. Art. 4, §§ 20-21. *see also, Clean Water Coal.,* 255 P. 3d at 253. The Nevada Supreme Court has explained that the prohibition against local and special laws as follows:

If a statute be either special or local law, or both, and comes within any one or more of the cases enumerated in section 20, such statute is unconstitutional; if the state be special or local, or both, but does not come within any of the cases

enumerated in section 20, then its constitutionality depends upon whether a general law can be made applicable. *Id.* at 254 *citing Conservations District v. Beemer,* 45 P.2d 779, 782 (Nev. 1935)

Defendant does not allege that SB 129 is a local law but it qualifies prohibited special legislation, because "it pertain[s] to a part of a class as opposed to all of a class." *Clean Water Coal.,* 255 P. 3d at 255. Long ago, the Nevada Supreme Court described a special law as one that "imposes special burdens, or confers peculiar privileges upon one or more persons in no wise distinguished [way] from others of the same category." *Id. citing State of Nevada v. Cal. Mining. Co.,* 15 Nev. 234, 239 (1880). *see also,* Black's Law Dictionary 963 (9th Ed. 2009) (defining a general law as one that is "neither local nor confined in application to particular persons.")

First, SB 129 involves a special law that serves to punish individuals who have committed or allegedly committed sexual assault as opposed to individuals who have committed any other heinous crime. Special legislation for the punishment of crimes is unconstitutional pursuant to Article 4, Section 20 of the Nevada Constitution. While the Plaintiff is sure to argue that SB 129 does not involve the punishment of crimes at all but relates to the civil remedies, the reviver provision is only available to those who have been victims of a specific *crime* and only revives those claims against a person who has been convicted of the specific crime of *sexual assault* or is accused of the specific crime of *sexual* assault. As such, SB 129 is a special law designed to punish crimes. Critically, it does not revive causes of action against individuals who have been convicted of any other crimes that have the same life-long traumatic effects on victims.

Even if SB 129 is not a law that falls under the prohibitions enumerated in Section 20, it nonetheless constitutes unconstitutional special legislation because a general law could have been made applicable. SB 129 confers a highly peculiar privilege specific to victims of sexual assault, namely it provides a civil remedy and the chance at extraordinary monetary damages that are not available to other crime victims who have suffered equally devastating trauma as a result of  crimes that do not make the elements of sexual assault. Further, it imposes a special burden on individuals who have been convicted or are accused of sexual assault, namely requiring

individuals accused of sexual assault to defend claims without the benefit of witnesses and evidence which is unlikely to exist a half-century or longer after the alleged sexual assault.

Minutes from the Senate Committee on Judiciary reflect that SB 129 arose from an effort by Legislators to provide redress to victims of sexual assault, focusing largely on the trauma suffered by sexual assault victims. Dr. Allison Cotton, M.D. testified that "[v]ictims of intimate interpersonal violence and trauma are more likely to develop post-traumatic stress disorder, depression, anxiety and substance use disorders than people who experience other types of trauma." (Minutes, *supra,* at pg. 5). In response to a question concerning what kinds of damages are commonly awarded when a Plaintiff prevails in a lawsuit of this kind, Senator Krasner offered that the plaintiff receives money "and that money allows the victim to see the psychiatrist or psychologist for help and consultation. It allows the individual to go back to school and get his or her life back together. So those money damages are important to victims of sexual assault." (*Id.* at pg. 8)

However, there are countless forms of "interpersonal violence" that may cause the same type and quality of trauma as does sexual assault. Just by way of example, domestic violence, like sexual assault, is a crime that historically and notoriously is under-reported or never reported and causes lifelong trauma including  "post-traumatic stress disorder, depression, anxiety and substance use disorders."  - the very same trauma[1] identified by Dr. Cotton pointed to in her remarks before the Senate Committee on Judiciary. Arguably, victims of any serious violent crime experience this type of trauma. Incredibly, this legislation is so specific that it applies only to individuals who have suffered a specific form of sexual violence. An adult victim who suffered years of sexual abuse that did not involve penetration as defined by the penal code is prohibited from availing him/herself of SB 129.

There is simply no logical basis for treating sexual assault victims different that victims of any other type of "interpersonal violence" or any type of violence of any kind. Moreover, SB 129 could have been passed as a general law applicable to *any* crime victims. By carving out a

---

1  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4193378/

special exception for individuals who are alleged victims of sexual assault, the Legislature violated Article 4, Sections 20 and 21 of the Nevada Constitution. Because SB 129 was passed in violation of the Nevada Constitution, this Court must consider Plaintiffs' claims under the two-year statute of limitations. Accordingly, the Plaintiffs' Complaints must be dismissed as untimely.

**D.** **SB 129 Violates Due Process Under the United States and Nevada Constitutions Where It Retroactively Deprives Defendant Of His Statute Of Limitations Defense, A Vested Right.**

By operating to retroactively divest Defendant of a statute of limitations defense he had prior to all of Plaintiffs' claims, SB 129 violates his Due Process rights under the United States and Nevada Constitutions. Accordingly, Plaintiffs' untimely tort claims must be dismissed.

Statutes of limitations serve a vitally important function, namely to "[prevent] surprises through revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Petersen v. Bruen,* 792 P. 2d 18, 19 (Nev. 1990) *citing Telegraphers v. Ry Express Agency,* 321 U.S. 342, 348-49 (1944). The Nevada Supreme Court has declared:

> [S]tatutes of limitations embody important public policy considerations in that they stimulate activity, punish negligence, and promote repose by giving security and stability to human affairs. Thus, statutes of limitation rest upon reasons of sound public police in that they tend to promote the peace and welfare of society, safeguard against fraud and oppression, and compel the settlement of claims within a reasonable period after their origin and while the evidence remains fresh in the memory of the witnesses. *Petersen,* 792 P. 2d at 19.

The Nevada Legislature gave no consideration to these principles when it passed SB 129 that not only abolished statutes of limitations for torts arising out of alleged sexual assaults but when it revived such tort claims that had already expired. SB 129 permits an adult plaintiff alleging torts arising from sexual assault to sit on his/her rights for as long as he/she wants, including until long after any evidence that a defendant may rely on no longer exists. It removes any requirement that a plaintiff act with diligence in bringing tort claims. In fact, SB 129 allows a plaintiff to bring a claim that occurred 1 year or a 100 years earlier. It does not even prevent a plaintiff from bringing such claims against the estate of deceased people.

The Nevada Legislature lacked the authority to interfere with Defendant's vested property right by reviving a time-barred claim. Article 4, Section 1 of the Nevada Constitution provides: The Legislative authority of this State shall be vested in a Senate and Assembly which shall be designated "the Legislature of the State of Nevada." This power does not include the power to revive an expired statute of limitation, the effect of which is extinguishing a vested right. "Retroactive operation of a newly enacted law has been defined as a law that "takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty or attaches a new liability in respect to transactions already past." *K-Mart Corp. v. State Indus. Ins. Sys.*, 101 Nev. 12, 21 (Nev. 1985). A statute of limitations defense is a vested right because it provides a legal exemption from a plaintiff's demand. In a discussion about "what are vested rights?" the Nevada Supreme Court cited Justice Campbell's words from *State Bank v. Knoop,* 57 U.S. 369, stating "[w]hen rights have vested under laws that the citizen can claim a protection to them as property. Rights do not vest until all conditions of the law have been fulfilled with exactitude during its continuance, or a direct engagement has been made limiting legislative power over and producing an obligation . *** A plain distinction exists between the statutes which create hopes, expectations, faculties, conditions, and those which form contracts." *Esser v. Spaulding,* 17 Nev. 289, 306 (Nev. 1883). Put differently, "a right cannot be considered a vested right, unless it is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enforcement of a demand, or *a legal exemption from a demand made by another." Id. citing* Thomas M. Cooley, *A Treatise on the Con. Limitations Which Rest Upon the Legis. Power of the States of the Am. Union* 87 (2d ed. 1871).

The guarantee of Due Process as originally understood demands that this Court enforce the statute of limitations applicable to Plaintiffs' claims which expired long ago. The Due Process guarantee has long been understood as a limitation on the legislative power, a prohibition of legislative acts that retrospectively divest a person of vested rights lawfully acquired under preexisting law. *See, e.g. Mitchell v. Roberts,* 469 P. 3d 901, 908 (UT 2021) (holding that the Utah Legislature was constitutionally prohibited from reviving a time-barred claim under the

state's well-rooted precedent *but also* based on Due Process principles as originally understood). While *Mitchell* is in no way binding on this court and clearly turns on Utah's own precedent, the *Mitchell* Court offers a compelling argument concerning the original understanding of the Due Process clause and its limitation on a legislature's (federal or state) to revive expired statutes of limitations. *Id.* at 908-910. At the time the Nevada Constitution was enacted, the framers understood that under principles of Due Process the legislature was prohibited from exercising judicial functions in interpreting and applying the law to the disposition of a case in which a party's rights or property were in dispute. *Id.* at 909. *citing* Nathan S. Chapman & Michael W. McConnell, *Due Process As Separation of Powers,* 121 YALE L.J. 1672, 1781-82 (2012). "This meant the legislature could not retrospectively divest a person of vested rights that had been lawfully acquired under the rules in place at the time." *Id.* at 1782. The legislature "could enact general laws for the future, including the rules for acquisition and use of property, but [it] could not assume the 'judicial' power of deciding individual cases." Retroactive divestment statutes were viewed as judicial because the laws were backward looking and operated to deprive individuals of rights and property "acquired under rules in place at the time" of acquisition. *Id.*

With these principles in mind, the Nevada Legislature lacked authority to pass legislation to revive Plaintiff's time-barred claims under the Nevada Constitution, irrespective of whether the Legislature expressly stated an intent to revive the untimely claims. Likewise, SB 129 runs afoul of the Due Process clause of the United States Constitution as originally understood. Defendant acknowledges that federal constitutional precedent has held that statutes of limitations are "arbitrary enactments" not "vested rights." *See Campbell v. Holt,* 115 U.S 629 (1885). That said, when *Campbell* was published, it stood "opposed to the great weight of authority in this country, and is opposed to the policy of these statutes." H.G. Wood, *Limitation of Actions,* §11 at 41 (2d ed. 1893). Significantly, *Campbell* did not result in states rushing to reinterpret their precedent on vested rights which overwhelmingly provided that a statute of limitations defense is a "vested right." *See Chase Securities Corp. v. Donaldson,* 325 U.S. 312-13 at n. 9 (1945) (citing state court cases that were not in lockstep with federal Due Process analysis). Indeed, Justice Bradley's dissent in *Campbell* reflects the better reasoned view, and the one the United States

Supreme Court might embrace today, on the question of whether the federal Due Process clause protects a defendant from having to defend against ancient claims that were time-barred decades ago but for a legislative act reviving those claims. Citing Chief Justice Marshall, Justice Bradley observed that "[t]he statute of limitations was not enacted to protect persons from claims fictitious in their origin, but from ancient claims, whether well or ill founded, which may have been discharged, but the evidence may be lost." *Campbell,* 115 U.S. at 632. *See also* Nathan S. Chapman & Michael W. McConnell*, Due Process as Separation of Powers*, 121 Yale L.J. 1672., 1781-82 (2012) (arguing that at the time of framing of the U.S. Constitution, statutes retroactively depriving people of rights and property were seen as unconstitutional interference with judicial functions). Because SB 129 purports to revive all claims, no matter how ancient, even after the statute of limitations has run, it deprives Defendant of his vested right under the Due Process clauses of the U.S. and Nevada Constitutions. Accordingly, SB 129 should be struck as unconstitutional, and the Plaintiffs' claims must be dismissed as time barred.

      **E.**     **SB 129 Violates The *Ex Post Facto* Clause Enshrined in both the United States and Nevada Constitutions Where It Retroactively Extends The Statute Of Limitations And Ties Liability To Criminal Conduct.**

The Ex Post Facto clauses prohibit both Congress and the states from passing laws that apply retroactively. U.S. Const. art. 1, § 9, cl. 3; U.S. Const. art 1, § 10, cl. 1. Nevada also prohibits *ex post facto* laws and is construed in lockstep with its federal counterpart. *See* Nevada Const., Art. 1, §§ 9-10. *S.M. v. State v. Eighth Judicial Dist. Court (Logan D.),* 306 P. 3d 369, 382-88 (2013). The United States Constitution makes no distinction between laws on the basis of whether they are civil or criminal in form, and strong arguments exist supporting the view that the Framers intended to prohibit all retroactive laws. While the general rule under current United States jurisprudence is that only laws that impose criminal punishment violate the Ex Post Facto clause. *Calder v. Bull*, 3 U.S. 386, 390-1 (1798), even laws that are not explicitly criminal are violative of *ex post facto* if they intend to punish or if their effects are suitably punitive. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144*,* 168-69 (1963). SB 129 violates the United States and Nevada Ex Post Facto clauses because: (1) a historical interpretation of the Ex Post Facto clause

shows it applies to civil laws like the reviver amendment, and (2) it is punitive in both intent and effect.

### 1.    The Ex Post Facto Rule Was Intended To Apply To Both Civil And Criminal Laws.

The Supreme Court first interpreted the *ex post facto* rule in *Calder v. Bull*, *supra,* holding that it applies only to criminal laws. As discussed below, the time has come for the Supreme Court to revisit *Calder,* which was wrongly decided. Because of the unique nature of SB 129 which ties liability to a finding of criminal conduct by a civil court and reopens long-expired statutes of limitations, the amendment is just the kind of civil law that the historical arguments applying *ex post facto* to the civil context have in mind.

Whether the *ex post facto* rule, as expressed in Article One §§ 9 & 10 applies to civil laws has been debated since before the Constitution was ratified. Evan C. Zoldan, *The Civil Ex Post Facto Clause*, 2015 Wis. L. Rev. 727, 733-750 (2015). Both sides of the argument make originalist arguments. In doing so, both sides rely on the same types of evidence: (1) British primary sources; (2) the Constitutional Convention; (3) state ratifying conventions; (4) public debate; and (5) post-ratification evidence. *Id.* at 736-749. For example, the side in favor of the narrow interpretation in *Calder* will quote John Dickinson, who informed the Convention that, according to Blackstone, "*ex post facto* related to criminal cases only; that they would not consequently restrain the States from retrospective laws in civil cases…." *Id.* at 738 (*quoting* Records of the Federal Convention of 1787, volume 2, page 418-419). Whereas the side supporting the broader interpretation might quote James Madison's response to concerns that the states could retroactively interfere with contracts: "prohibition of ex post facto laws… will oblige the Judges to declare such interferences null & void." *Id.* at 475 (quoting Records of the Federal Convention of 1787, volume 2, page 440). The same back and forth exists for all the categories of historical evidence listed above. *Id.* at 731.

One scholar who recently and comprehensively examined this historical evidence has published findings which should put an end to the debate: at the time the Constitution was framed, the term *ex post facto* was used by legal professionals to refer to all retroactive laws—including civil ones. *Id.* at 732. In his analysis, Zoldan examines several cases where the *ex post*

15

*facto* rule was applied in civil cases in the era surrounding the Constitution's drafting. These cases involved disputes relating to debt, slave liberation, and property. *Id.* at 757-767. In all these cases, the courts applied the *ex post facto* rule to settle these civil disputes. The use of *ex post facto* in these cases undermines the Court's holding in *Calder* and points to the conclusion that the *Calder* is based on a faulty historical premise and should be overturned.

If *Calder* is wrong and the *ex post facto* rule applies to civil laws as well, then it necessarily applies to laws that retroactively change the statute of limitations. *See Stogner v. California*, 539 US 607 (2003). The U.S. Supreme Court has held that statutes retroactively reviving the statute of limitations in sex abuse cases in the criminal context violate *ex post facto* under at least two principles of *Calder*. First, such a statute "aggravates a crime, or makes it greater than it was when committed" because after the statute of limitations had expired, a party was not "liable to any punishment," therefore the retroactive law aggravated the crime. *Stogner*, 539 U.S. at 603. Second, the laws retroactively changing the statute of limitations violate the *Calder* principle that a law violates *ex post facto* if it diminishes "the quantum of evidence required to convict." *Id.* at 613 *citing Calder*, 3 U.S at 390-1. A law that changes the statute of limitations changes the quantum of evidence required because a statute of limitations "reflects a legislative judgment that, after a certain time, no quantum of evidence" will be sufficient to convict. *Stogner, supra citing United States v. Marion*, 404 U.S. 307 at 322 (1971).

Further, the historical justifications for the *ex post facto* rule apply with equal force in the civil and criminal contexts. Two primary justifications exist for the *ex post facto* rule. First, the rule exists to promote stability and ensure citizens have fair notice of the laws. Jane Harris Aiken, *Ex Post Facto in the Civil Context: Unbridled Punishment*, 81 Ky. L.J. 323, 329-30 (1993). Prior to the Constitution's framing, the colonists suffered from *ex post facto* laws enacted by the British and—after the Revolution—the colonists themselves. *Id.* at 327-28. These *ex post facto* laws took civil and criminal forms. Awareness of the instability and unfairness of these laws prompted the framers to include the Ex Post Facto Clauses in the Constitution. Second, the *ex post facto* rule exists to prevent vindictive legislation. *Id.* at 330. Aware that retroactive laws

16

could be used to target specific individuals and groups, the framers included the Ex Post Facto Clauses to prevent these potential abuses of power. *Id.*

These two justifications—notice and preventing legislative vindictiveness—apply to the civil context with the same force they apply to the criminal context, as demonstrated by the allegations at bar. Retroactively changing laws, as the Nevada legislature did with SB 129, necessarily deprives people of fair notice and of the ability to preserve and obtain evidence. This is of particular concern where the reviver amendment applies to adults who claim to have been victimized (as opposed to people who were minors), where a defendant may seek to prove the encounter was consensual through common sources of evidence like witness testimony or personal correspondence. The same problem applies to disproving the allegations through alibi evidence or disputing when or where something could or could not have occurred. Forcing a person to defend against an allegation of something that allegedly happened 30 years earlier (or more), for which the statute of limitations had been long settled, creates a clear and unjust disadvantage that goes right to the heart of the fair notice justification for the Ex Post Facto clause. After a statute of limitations is passed most evidence will be lost or forgotten by a person not suspecting they will have to defend themselves. The more time passes, the more that person is disadvantaged and the more egregious the violation of the *ex post facto* clause becomes. While civil defendants may not face incarceration, they may nonetheless be forced to pay substantial damages and have their names sullied in an action they cannot properly defend against.

The protection against legislative vindictiveness is just as vital since many laws that have been named civil have real and devastating consequences in practice. The protection against vindictiveness applies no less to Defendant, who as a public figure, has been a target of much attention in popular culture because of these allegations. Attention to Defendant and other public figures, and the cultural climate influenced by the #MeToo movement very much have the power to influence legislation, and it is within reason to suggest that in some cases legislators may have had specific people in mind, including Defendant, when drafting and voting for these laws. Indeed, it is clear from the Senate Committee minutes, the Legislature had the Defendant in mind in this case when it passed SB 129. (Minutes at pg. 9 - Senator Stone: "The instigating factor for

17

1   that bill [California's look back window legislation] was a celebrity accused and convicted of

2   sexually assaulting youngsters and adults who was represented by Gloria Allred). The Ex Post

3   Facto clause was intended to prohibit legislators from passing laws that unfairly change the rules

4   retroactively in just these types of cases.

5          Given the strong historical arguments and legal justifications in favor of applying the Ex

6   Post Facto clause to civil cases that operate retroactively, this Court should find SB 129 violates

7   the *ex post facto* rule on the basis of its retroactivity alone and dismiss Plaintiff's complaint. But

8   the punitive nature of SB 129 allows this Court to find it violates *ex post facto* principles even

9   without contradicting *Calder*.

10              **2.    SB 129 Violates The Ex Post Facto Clause Because It Is Punitive.**

11         A law violates the *ex post facto* rule if it either imposes punishment for an act that was

12  lawful when committed or retroactively imposes a greater punishment on unlawful conduct.

13  *Harisiades v. Shaughnessy*, 342 U.S. 580, 594 (1952). In addition, a law can violate the Ex Post

14  Facto clause if it alters the legal rules of evidence, and receives less, or different testimony, than

15  the law required at the time of the commission of the offense, in order to convict the offender.

16  *Calder*, 3 U.S. at 390.

17         If the legislature did not intend the law to punish, it may still violate the *ex post facto* rule

18  if its effects are suitably punitive. *See, Smith v. Doe*, 538 U.S. 84, 97 (2003); *Kennedy v.*

19  *Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963). The *Mendoza-Martinez* Court identified

20  seven factors as useful—not dispositive—guideposts to determine whether a law's effects are

21  punitive enough to subject it to the *ex post facto* rule. *Smith*, 538 U.S. at 97. Those factors are:

22  (1) whether the behavior the law applies to is already a crime; (2) whether the sanction requires a

23  finding of intent; (3) whether its operation will promote retribution and deterrence; (4) whether

24  there is an alternative purpose to the law; (5) whether, if there is an alternative purpose, it is

25  excessive in regard to that purpose; (6) whether the sanction involves an affirmative disability or

26  restraint; and (7)  whether it has historically been regarded as punishment. *Id*.

27         The reviver amendment violates the Ex Post Facto clauses of the United States and

28  Nevada constitutions under two related but alternative theories. First, to the extent it applies to

                                                    18

individuals who were convicted of sexual assault, it serves to inflict greater punishment and change the punishment for crimes from what they were when committed. The fact that the amendment may authorize civil action is not dispositive where the *Mendoza-Martinez* factors, discussed below, weigh in favor of punitive intent and effects. Alternatively, SB 129 violates *ex post facto* to the extent it is applies to individuals who, like the Defendant, has not and cannot be criminally convicted for the offenses alleged in the Complaint. SB 129 violates the *Calder* principle that a law violates *ex post facto* if it "alters the legal rules of evidence, and receives less, or different testimony that the law required at the time of the commission of the offense, in order to convict the offender." *Calder* 3 U.S. at 390-391. Under the plain language of SB 129, a jury will (at some point) have to find that Defendant committed sexual assault against each Plaintiff as defined by the penal code. To authorize a civil court to make such a finding changes the law from what it was at the time the crime was committed, and certainly what it was after the statute of limitations had expired. It operates to the extreme detriment of a defendant and changes the standard and burden of proof, as well as removing other protections of the criminal process. Under *Calder*, either of these interpretations lead to the conclusion that SB 129 is an unconstitutional *ex post facto* law.

Applying the *Mendoza-Martinez* factors to the reviver amendment also leads to the conclusion that SB 129 violates *ex post facto* principles. To start, SB 129 applies only to criminal conduct, all of which requires scienter, and the purpose of the law is to promote retribution and deterrence. That it applies only to criminal conduct is apparent from language, which authorizes a cause of action for injuries resulting from a sexual assault as defined by the criminal code. By tying the liability to criminal conduct, the legislature made clear that it intended to promote the aims of retribution and punishment.

More importantly, Defendant is subject to punitive damages, not merely compensatory damages. The Supreme Court has recognized that "the very labels given 'punitive' or 'exemplary' damages, as well as the rationales that support them, demonstrate that they share key characteristics of criminal sanctions," and that "retroactive imposition of punitive damages would raise a serious constitutional question" under the Ex Post Facto clause. *Landgraf v. Usi*

19

*Film Prods*., 511 U.S. 244 at 281 (1994). Punitive damages are intended to punish and deter. *See Id. quoting Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S. Ct. 2882 (1976) (holding that court would "hesitate to approve the retrospective imposition of liability on any theory of deterrence . . . or blameworthiness"); *DeVeau v. Braisted,* 363 U.S. 144, 160 (1960) ("The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts"). *See also, Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F. 2d 966, 972 (2d Cir. 1985) (retroactive application of punitive treble damages provisions "would present a potential *ex post facto* problem"). Given that SB 129 revives claims that are likely to result in punitive damages if proven, the Court should infer that the legislature's purpose is punitive and that SB 129 is an unconstitutional *ex post facto* law.

Admittedly, the SB 129 does not impose an affirmative disability or restraint on Defendant, insofar as it does not physically restrain him or cause him occupational or housing disadvantages. Nonetheless, every other relevant *Mendoza-Martinez* factor weighs toward finding the amendment to be punitive. Consequently, this Court should find that it is an unconstitutional *ex post facto* rule.

### F. If This Court Denies Defendant's Motion to Dismiss, It Must Sever All Plaintiffs and Their Causes of Action Which Do Not Arise From the Same Occurrence or Series of Occurrences

Plaintiffs and their causes of actions have been improperly joined in a single lawsuit contrary to Federal Rule of Civil Procedure 20(a) where each Plaintiff has a distinct and separate claim against the Defendant that does not arise from the same transaction, occurrence or series of occurrences. Indeed, Plaintiffs share only a general allegation that Defendant engaged in some type of sexual misconduct against them at different times, different locations and which involve different potential witnesses, and possibly very different defenses. The only commonality among these claims is that Plaintiffs are represented by the same lawyer which does not justify joinder of discrete claims made by discrete Plaintiffs. Absent being represented by the same lawyer, these Plaintiffs would not have brought their claims in a single lawsuit. Federal Rule of Civil Procedure 20(a) provides in relevant part:

Persons may join in one action as plaintiffs if (a) they assert any right to relief jointly, severally, or in the alternative with respect to arising out of the same transaction, occurrence, or series of transactions or occurrences; and (b) any question of law or fact common to all plaintiffs will arise in the action.

The "same transaction prong" refers to the similarity in the factual background of the claims at issue. *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997). "Claims are part of the same transaction or occurrence if they "arise out of a systematic pattern of events." *Id.* "If joined plaintiffs fail to meet both of these requirements, the district court may sever the misjoined plaintiffs, as long as no substantial right will be prejudiced by the severance." *Id.* at 1351. Even where the requirements in FRCP (20) are met, a district court "should also consider whether permissive joinder of plaintiffs would comport with principles of judicial economy and further fundamental fairness and whether joinder would result in prejudice to either side." *Bacon v. Civic*, 2020 U.S. Dist. LEXIS 102433 at 3 (D. Nev. June 10, 2020). Significantly, "when the court must give each claim 'individualized attention,' the claims do not involve common questions of law or fact." *S. Nev. Confederation of Clubs v. Las Vegas Metro. Police Dep't*, No. 2:12-cv-01093-APG-VCF, 2013 U.S. Dist. LEXIS 106907 (D. Nev. July 26, 2013).

Plaintiffs in the instant case do not assert they are entitled to relief jointly or severally, nor do they claim they were sexually assaulted by the Defendant during the same occurrence. Thus, the only circumstance under which Plaintiffs are permissibly joined in a single cause of action is if their claims arise from the same series of transactions. While the causes of action brought against the defendant by each plaintiff may be the same, the underlying facts certainly are not. In this case, "nothing unites all of these Plaintiffs but the superficial similarity of their allegations and their common choice of counsel." *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013). The alleged assaults on each of the plaintiffs occurred under different circumstances, at different times, and years or decades apart. Further, none of the witnesses will be the same.

1   DATED: December 8, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

BONJEAN LAW GROUP, PLLC

By: _____

Jennifer Bonjean
Ashley Cohen
Attorneys for Defendant

# Exhibit C

1   Jordan K. Merson, Esq., (Admitted *Pro Hac Vice*)
2   jmerson@mersonlaw.com
3   Jordan K. Rutsky, Esq., (Admitted *Pro Hac Vice*)
4   jrutsky@mersonlaw.com
5   Nathan E. Werksman, Esq., NV bar No. 15117
6   nwerksman@mersonlaw.com
7   Alice A. Bohn, Esq., (Admitted *Pro Hac Vice*)
8   abohn@mersonlaw.com
9   Manraj S. Sekhon, Esq., (Admitted *Pro Hac Vice*)
10  msekhon@mersonlaw.com
11  **Merson Law, PLLC.**
12  950 Third Ave, 18th Floor
13  New York, NY 10022
14
15  Brian J. Panish, Esq., NV Bar No. 16123
16  panish@psbr.law
17  Rahul Ravipudi, Esq., NV Bar No. 14750
18  ravipudi@psbr.law
19  Robert Glassman Esq., (Admitted *Pro Hac Vice*)
20  rglassman@psbr.law
21  Julya Armendariz, Esq, NV Bar No. 15865
22  jarmendariz@psbr.law
23  **Panish, Shea, Boyle, Ravipudi LLP.**
24  300 South Fourth Street, Suite 710
25  Las Vegas, NV 89101
26  Attorneys for Plaintiffs
27
28              **UNITED STATES DISTRICT COURT**
29          **DISTRICT OF NEVADA, SOUTHERN DIVISION**
30

31  LISE-LOTTE LUBLIN, LILI BERNARD,
32  JANICE BAKER-KINNEY, REBECCA            Case No.: 2:23-CV-00932-GMN-DJA
33  COOPER, LINDA KIRKPATRICK, JANICE
34  DICKINSON, ANGELA LESLIE, PAM JOY       **OPPOSITION TO**
35  ABEYTA, HEIDI THOMAS, AND JANE          **DEFENDANT'S MOTION TO**
36  FAZZARI,                                **DISMISS PURSUANT TO**
37                                          **FED. R. CIV. P. 12(b)(6)**
38              Plaintiffs,
39
40      vs.
41
42  WILLIAM COSBY, JR.,
43
44              Defendant.
45

46
47  / / /
48  / / /
49  / / /

1

### **INTRODUCTION**

Plaintiffs, by their counsel Merson Law, PLLC, oppose defendant William Cosby, Jr.'s motion to dismiss the Amended Complaint upon the grounds that each of the arguments presented by Defendant are directly contrary to well-established law. *See* Amended Complaint (ECF No. 26) annexed as **Exhibit 1**. Defendant made, and the Court rejected, similar arguments regarding constitutionality in a litigation brought in the District of New Jersey by plaintiff Lili Bernard. *See*, Opinion, *Bernard v. Cosby,* 1:21-cv-18566, D.N.J. (ECF No. 17), annexed as **Exhibit 2**. The Court, here, should do the same.

Defendant argues that SB 129 denied him due process because it deprives him of his vested right created by the former statute of limitations, but case law states clearly that a statute of limitations *cannot* create a vested right, a point that Defendant concedes: "Defendant acknowledges that federal constitutional precedent has held that statute of limitations are 'arbitrary enactments' not 'vested rights,'" citing *Campbell v. Holt*, 115 U.S. 620, 628 (1885); D's Mot, p. 13. Consequently, Defendant has failed to demonstrate that SB 129 is unconstitutional, and his motion must be denied.

Defendant also contends that SB 129 is violative of the ex post facto clause, but the Court must deny this, as well, because the ex post facto clause only applies to criminal statutes, whereas SB 129 is civil. Defendant concedes this point, too, stating, "the general rule under current United States jurisprudence is that only laws that impose criminal punishment violate the Ex Post Facto clause." D's Mot, p. 14, citing

1   *Calder v. Bull,* 3 U.S. 386, 390-91 (1798). Nonetheless, Defendant argues that this

2   Court should abandon two hundred years of jurisprudence emanating from *Calder* in

3   favor of the opinions expressed in some law journal articles; but even those articles

4   confirm, "courts <u>universally</u> uphold retroactive civil laws against ex post facto

5   challenges." Evan C. Zoldan, *The Civil Ex Post Facto Clause,* 2015 Wis. L. Rev. 727,

6   731, 782, (2015); D's Mot, pp. 15-16. Defendant also argues that the legislative intent

7   was punitive, in defiance of the stated intent of the legislators who explained how the

8   law was intended to help survivors heal and receive compensation to afford

9   treatment, without reference to any intention to punish the perpetrators. To the

10  extent that Defendant claims that even if SB 129 was intended to be civil, it became

11  criminal by changing the rules by which defendants could be "convicted" and allowing

12  punitive damages, such arguments are based on Defendant's conflation of civil and

13  criminal law (Defendant cannot be "convicted" from SB 129) and his misbelief that

14  merely because a law permits common law punitive damages, it should be deemed a

15  criminal law subject to the ex post facto clause. Defendant made those same

16  arguments in the District of New Jersey, which the Court soundly rejected. Ex. 2, pp.

17  23-27. The Court should do the same here.

18      Defendant also argues that SB 129 violates Article 4, Sections 20 and 21 of the

19  Nevada Constitution (Nev. Const. art. 4, §§ 20, 21) because Defendant believes it is a

20  special law that does not apply to all members of the class equally, despite the law

21  applying equally to all survivors and perpetrators of sexual abuse. Defendant

22  attempts to avoid this by inventing a vague class consisting of all "heinous" crimes of

1    "interpersonal violence" to argue that SB 129 is unconstitutional because it applies

2    to sexual assault, but not the other "heinous" crimes in the fictitious, ill-defined class

3    fabricated by Defendant. D's Mot, pp. 9-10. This is an absurd notion that, if credited,

4    would require most laws regarding sexual assault, including criminal statutes, to be

5    deemed unconstitutional. Accordingly, the Court must reject Defendant's argument

6    and his creation of this fictious class, and deny his motion, because SB 129 is a

7    general law which applies equally to all the *relevant* class, i.e., survivors and

8    perpetrators of sexual assault.

9            Defendant also asks that this court sever this one lawsuit into ten separate

10   lawsuits – one for each plaintiff – under his unsupported misbelief that this would

11   aid judicial economy and prevent prejudice. However, case law holds that the

12   commonalities of the assaults and *modus operandi* of Cosby render his serial rape of

13   Plaintiffs part of a series of transactions or occurrences warranting joinder of

14   Plaintiffs' claims under Fed. R. Civ. P. 20. Moreover, the goal of Fed. R. Civ. P. 20

15   and 21 is judicial economy, and Defendant's proposal – turning one case into ten with

16   common issues of law arising from the same series of transactions or occurrences –

17   would run counter to that goal. As a perfect example, instead of this one motion, the

18   Court (and Plaintiffs) would be forced to address ten mostly identical motions in the

19   ten separate lawsuits proposed by Defendant, causing a significant waste of resources

20   and the possibility of disparate decisions. Accordingly, Defendant has failed to

21   demonstrate his entitlement to severance, and his motion must be denied.

Finally, Defendant argues that Angela Leslie's claims are not included within SB 129 and therefore are time-barred based on Defendant's narrow reading of the statute. However, when read in totality, including the broad definition of penetration which includes, "any intrusion, however slight, of any part of a person's body…" [Nev. Rev. Stat. 200.364], Ms. Leslie's claims are covered and were timely filed pursuant to SB 129.

Given Defendant's repeated concessions, a plain reading of the statutes, and well-established case law, Defendant has not met his burden under Fed. R. Civ. P. 12(b)(6) to demonstrate that Plaintiff failed to state a cause of action. Consequently, Defendant's motion must be denied.

## **PERTINENT FACTS**

As per the Amended Complaint, "[f]or decades, defendant Cosby engaged in the serial sexual assault of dozens of women for his sexual gratification by drugging women and using unknown substances to incapacitate them." Ex. 1, ¶16. Further, "Each plaintiff was sexually battered…by defendant Cosby in the same or similar manner, as part of the same conduct, occurrence, plan, or scheme…by Defendant Cosby." Ex. 1, ¶17. "For each of these Plaintiffs, defendant Cosby used his enormous power, fame, and prestige, and claimed interest in helping them and/or their careers as a pretense to isolate and sexually assault them," and "Cosby drugged or attempted to drug each of these women before sexually assaulting them." Ex. 1, ¶¶19-20.

Specific to Jane Fazzari, the Amended Complaint alleges that in the early 1970s, Cosby invited her to a private home where he was staying in Nevada under

the pretense that he was hosting a party, where he drugged and raped her. Ex. 1, ¶¶149-57.

Specific to Pam Joy Abeyta, the Amended Complaint alleges that in or around 1979, Cosby invited her to his hotel and his show under the pretense of professional networking, where he drugged and raped her. Ex. 1, ¶¶119-36.

Specific to Linda Kirkpatrick, the Amended Complaint alleges that in or around 1981, Cosby befriended Ms. Kirkpatrick, and invited her to his show where he drugged and raped her. Ex. 1, ¶¶85-94.

Specific to Janice Baker-Kinney, the Amended Complaint alleges that in or around 1982, Cosby invited her to a private home where he was staying in Nevada under the pretense that he was hosting a party, where he drugged and raped her. Ex. 1, ¶¶57-69.

Specific to Janice Dickinson, the Amended Complaint alleges that in or around 1982, Cosby invited Ms. Dickinson to a private home in Nevada to discuss her career, where he drugged and raped her. Ex. 1, ¶¶95-106.

Specific to Rebecca Cooper, the Amended Complaint alleges that in the mid-1980s, Cosby developed a professional relationship with Ms. Cooper, and invited her to attend a dinner and show, where he drugged and raped her. Ex. 1, ¶¶70-84.

Specific to Heidi Thomas, the Amended Complaint alleges that in or around 1984, Cosby acted as her mentor, and invited her to his hotel under the pretense of mentoring, where he drugged and raped her. Ex. 1, ¶¶137-148.

6

Specific to Angela Leslie, the Amended Complaint alleges that in the late 1980s or early 1990s, Cosby acted as her mentor, and invited her to his hotel under the pretense of mentoring, where he drugged and sexually assaulted her. Ex. 1, ¶¶107-18.

Specific to Lise-Lotte Lublin, the Amended Complaint alleges that in or around 1989, Cosby acted as her mentor, and invited her to his hotel under the pretense of mentoring, where he drugged and raped her. Ex. 1, ¶¶24-36.

Specific to Lili Bernard, the Amended Complaint alleges that in or around 1990, Cosby acted as her mentor, and invited her to his hotel under the pretense of mentoring, where he drugged and raped her. Ex. 1, ¶¶37-56.

Collectively, the timeline demonstrates that Cosby engaged in the serial sexual assault and rape of women in Nevada as part of the same scheme by using his fame and power to manipulate and isolate them under false pretenses, where he then drugged and sexually assaulted these women, using the same *modus operandi*. Ex. 1, ¶¶16-18, 24-157.

## **LEGAL STANDARD**

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all facts alleged in the Amended Complaint, together with all reasonable inferences that can be drawn in the light most favorable to the plaintiff. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); D's Mot, p. 6. Dismissal is warranted only if it appears beyond question that Plaintiffs can prove no set of facts to support their claims. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

7

As regards Defendant's claim that SB 129 is unconstitutional, "The burden, of course, is upon appellants as challengers of the validity of the [law] to establish its unconstitutionality." *Buck v. People of State of Cal.,* 343 U.S. 99, 108 (1952); *Moon v. Freeman*, 379 F.2d 382, 391 (9th Cir. 1967)("the whole burden of proof lies on him who denies it constitutionality."). Moreover, the Nevada Supreme Court has emphasized "the heavy burden appellants must bear to overcome the presumption of constitutional validity which every legislative enactment enjoys." *Allen v. State,* 100 Nev. 130, 133 (1984). "In case of doubt, **every possible presumption will be made in favor of the constitutionality of a statute**, and courts will interfere only when the Constitution is clearly violated. Further, the presumption of constitutional validity places upon those attacking a statute **the burden of making a clear showing that the statute is unconstitutional**. " *List v. Whisler*, 99 Nev. 133, 137-38 (1983)(emphasis added)(internal citations omitted); *Cegavske v. Hollywood,* 512 P.3d 284, 289 (Sup. Ct. Nevada 2022)("If a statute lends itself to both a constitutional and an unconstitutional interpretation, we apply the interpretation that does not violate the constitution."); *Toombs v. Citizens Bank of Waynesboro,* 281 U.S. 643, 647 (1930); *Metropolitan Casualty Ins. Co. v. Brownell,* 294 U.S. 580, 584 (1935).

Moreover, a party challenging a state's amendment of its statute of limitations must do much more than complain about its retrospective operation, particularly if the moving party cannot show that its "conduct would have been different if the present rule had been known and the change foreseen":

8

**The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation**. . . [I]t cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is per se an offense against the Fourteenth Amendment. **Nor has the appellant pointed out special hardships or oppressive effects which result from lifting the bar in this class of cases with retrospective force. This is not a case where appellant's conduct would have been different if the present rule had been known and the change foreseen. It does not say, and could hardly say, that it [acted] depending on a statute of limitation for shelter from liability**. The nature of the defenses shows that no course of action was undertaken by appellant on the assumption that the old rule would be continued. When the action was commenced, it no doubt expected to be able to defend by invoking Minnesota public policy that lapse of time had closed the courts to the case, and its legitimate hopes have been disappointed. **But the existence of the policy at the time the action was commenced did not, under the circumstances, give the appellant a constitutional right against change of policy before final adjudication. Whatever grievance appellant may have at the change of policy to its disadvantage, it had acquired no immunity from this suit that has become a federal constitutional right.** (emphasis added).

*Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 315-16 (1945).

Finally, in Nevada, the "court will not interfere with the Legislature's broad power to enact statutes absent 'a specific constitutional limitation to the contrary.'"

*Id.*, citing *Nevadans for Nev. v. Beers*, 122 Nev. 930, 939 (2006).

9

# LEGAL ARGUMENT

I.     **SB 129 Does Not Violate Defendant's Due Process or Deprive Defendant of Any Vested Right, Because a Statute of Limitations Cannot Create a Vested Right**

Defendant argues that that SB 129 is unconstitutional because it violates due process by depriving him of his vested right created by the previous statute of limitations; however, this argument fails, because, as Defendant concedes[1], the overwhelming case law holds that <u>a statute of limitations cannot create a vested right</u>. *Huntley v. Gile*, 32 F.2d 857, 859 (9th Cir. 1929). Accordingly, Defendant has failed to meet the "the heavy burden appellants must bear to overcome the presumption of constitutional validity which every legislative enactment enjoys," and his motion to dismiss must be denied. *Allen v. State,* 100 Nev. 130, 133 (1984); *Toombs v. Citizens Bank of Waynesboro,* 281 U.S. 643, 647 (1930)("In assailing the constitutionality of a state statute the burden rests upon appellant to establish that it infringes the constitutional guarantee which he invokes."); *Metropolitan Casualty Ins. Co. v. Brownell,* 294 U.S. 580, 584 (1935).

Defendant made – and the Court rejected – the same arguments in a similar lawsuit between plaintiff Lili Bernard and defendant Cosby in the District Court of New Jersey. *See* Ex. 2. There, the Court aptly held, "The Court…rejects Defendant's contention that the revival statute deprived him of a vested right in the statute of limitations," explaining how, "the revival statute's public purpose of correcting injustices suffered by victims of sexual offenses outweighs any expectation in an

---

[1] "Defendant acknowledges that federal constitutional precedent has held that statute of limitations are 'arbitrary enactments' and not vested rights." Defendant's Brief, p. 13.

1    earlier statute of limitations for conduct that was illegal at the time of commission

2    and that <u>a defendant's expectation in the continuance of a law cannot alone constitute</u>

3    <u>a vested right or manifest injustice</u>."[2] Ex. 2, p. 22 (emphasis added)(internal citations

4    omitted). The same holds true here.

5        As the U.S. Supreme Court explained in *Campbell v. Holt*, 115 U.S. 620, 628

6    (1885):

7        "We certainly **do <u>not</u> understand that a right to defeat a just debt**
8        **by the statute of limitations is a vested right, so as to be beyond**
9        **legislative power in a proper case**. The statutes of limitation, as
10       often asserted, and especially by this court, are founded in public needs
11       and public policy,-are *[sic]* arbitrary enactments by the law-making
12       power." (emphasis added).
13

14   Therefore, the U.S. Supreme Court concluded, "**We are unable to see how a man**

15   **can be said to have *property* in the bar of the statute**." *Id.* at 629 (bolded

16   emphasis added; italicized emphasis in original).

17       Moreover, Defendant concedes that this is the state of the law: "**Defendant**

18   **acknowledges that federal constitutional precedent has held that statute of**

19   **limitations are 'arbitrary enactments' not 'vested rights,'**" citing *Campbell,* 115

20   U.S. at 629. D's Mot, p. 13 (emphasis added). Yet, Defendant asks the Court to ignore

21   the majority decision in *Campbell* and its 100+ years of followed precedent in favor of

22   the dissent, which holds no legal precedent. *Id.*

---

[2] This quote was in reference to Defendant's argument in the NJ case that the law was violative of the NJ constitution, but the Court continued, "The Court finds that turning to the United States Constitution does not produce a different result. Ex. 2, p. 22.

1      As the Ninth Circuit explained, "**no vested right accrues to the**

2  **[defendant] out of the running of the period of limitation**..." *Huntley v. Gile*,

3  32 F.2d 857, 859 (9th Cir. 1929)(emphasis added).

4      Against the overwhelming case law demonstrating that Cosby did not have a

5  vested right in the statute of limitations, Defendant offers several distinguishable

6  and irrelevant cases.

7      Defendant cites *K-Mart Corp. v. State Indus. Ins. System*, 101 Nev. 12 (1985)

8  and *Esser v. Spaulding,* 17 Nev. 289 (1883) for the general concept that the legislature

9  cannot pass a retroactive law that takes away or impairs a vested right, but those

10  cases do not address whether a statute of limitations could create a vested right at

11  all. D's Mot, p. 12. Consequently, they are irrelevant to whether Defendant, here, had

12  a vested right created by the former statute of limitations.

13      Defendant also cited a Utah case, *Mitchell v. Roberts*, 469 P.3d 901 (UT 2021),

14  which rested its decision on the Utah Constitution and Utah case law, to support his

15  argument. *Id.* at 904-914. While out-of-state case law is non-binding, if the Court

16  were to consider out-of-state case law, it should consider that the majority of states

17  that have dealt with this issue have expressly upheld the constitutionality of

18  retroactive revival of civil claims that were previously time-barred, including at least

19  23 states plus the District of Columbia.[3]

---

[3] **ARIZ**: *Chevron Chemical Co. v. Superior Court*, 641 P.2d 1275, 1284 (Ariz. 1982); *City of Tucson v. Clear Channel Outdoor, Inc.*, 105 P.3d 1163, 1167, 1170 (Ariz. 2005) (barred by statute, ARIZ. REV. STAT. ANN. § 12-505 (Ariz. 2010)); **CAL**: *Mudd v. McColgan*, 183 P.2d 10, 13 (Cal. 1947); *20th Century Ins. Co. v. Superior Court*, 109 Cal. Rptr. 2d 611, 632 (Cal. Ct. App. 2001), cert. denied, 535 U.S. 1033, 122 S. Ct. 1788 (2002); **CONN**: *Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 439-40 (Conn. 2015); **DEL**: *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258-60 (Del. 2011); **DC**: *Riggs Nat'l Bank v. Dist. of Columbia*, 581 A.2d 1229, 1241 (D.C. 1990);

1    Finally, Defendant offers that "The Nevada Legislature lacked the authority

2    to interfere with Defendant's vested property right by reviving a time-barred claim,"

3    citing to Article 4, Section 1 of the Nevada Constitution. D's Mot, p. 12; Nev. Const.,

4    art. 4, §1. Yet, the section of the Nevada Constitution cited by Defendant merely

5    states that the Senate and Assembly are vested with legislative authority, and the

6    "court will not interfere with the Legislature's broad power to enact statutes absent

7    'a specific constitutional limitation to the contrary.'" *Chase Sec. Corp. v. Donaldson*,

8    325 U.S. 304, 315-16 (1945), citing *Nevadans for Nev. v. Beers*, 122 Nev. 930, 939

9    (2006); Nev. Const., art. 4, §1. Since Defendant cannot point to any specific

10   constitutional limitation (as none exists) and merely directs this Court to a section of

**GA**: *Canton Textile Mills, Inc. v. Lathem*, 317 S.E.2d 189, 193 (Ga. 1984); *Vaughn v. Vulcan Materials Co.*, 465 S.E.2d 661, 662 (Ga. 1996); **HAW**: *Roe v. Doe*, 581 P.2d 310, 316 (Haw. 1978); *Gov't Emps. Ins. Co. v. Hyman*, 975 P.2d 211 (Haw. 1999); **IDAHO**: *Hecla Mining Co. v. Idaho St Tax Comm'n*, 697 P.2d 1161, 1164 (Idaho 1985); *Peterson v. Peterson*, 320 P.3d 1244, 1250 (Idaho 2014); **IOWA**: *Schulte v. Wageman*, 465 N.W.2d 285, 287 (Iowa 1991); **KAN**: *Harding v. K.C. Wall Prod., Inc.*, 831 P.2d 958, 967-968 (Kan. 1992); *Ripley v. Tolbert*, 921 P.2d 1210, 1219 (Kan. 1996); **MASS**: *Sliney v. Previte*, 41 N.E.3d 732, 739-40 (Mass. 2015); *City of Boston v. Keene Corp.*, 406 Mass. 301, 312-13 (Mass. 1989); *Kienzler v. Dalkon Shield Claimants Tr.*, 426 Mass. 87, 93 (Mass. 1997); **MICH**: *Rookledge v. Garwood*, 65 N.W.2d 785, 790-92 (Mich. 1954); *Pryber v. Marriott Corp.*, 296 N.W.2d 597, 600- 01 (Mich. Ct. App. 1980), aff'd, 307 N.W.2d 333 (Mich. 1981) (per curiam); **MINN**: *Gomon v. Northland Family Physicians, Ltd.*, 645 N.W.2d 413, 416 (Minn. 2002); *In re Individual 35W Bridge Litig.*, 806 N.W.2d 820, 830-31 (Minn. 2011); **MONT**: *Cosgriffe v. Cosgriffe*, 864 P.2d 776, 778 (Mont. 1993); **NJ**: *Panzino v. Continental Can Co.*, 364 A.2d 1043, 1046 (N.J. 1976); **NEW MEX**: *Bunton v. Abernathy*, 73 P.2d 810, 811-12 (N.M. 1937); *Orman v. Van Arsdell*, 78 P. 48, 48 (N.M. 1904); **NY**: *In re World Trade Ctr. Lower Manhattan Disaster Site Lit.*, 89 N.E.3d 1227, 1243 (N.Y. 2017); *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1079-80 (N.Y. 1989); *McCann v. Walsh Const. Co.*, 123 N.Y.S.2d 509, 514 (N.Y. 1953) aff'd without op. 306 N.Y. 904, 119 N.E.2d 596 (1954); *Gallewski v. Hentz & Co.*, 93 N.E.2d 620, 624-25 (N.Y. 1950); **N DAK**: *In Interest of W.M.V.*, 268 N.W.2d 781, 786 (N.D. 1978); **OR**: *McFadden v. Dryvit Systems, Inc.*, 112 P.3d 1191, 1195 (Or. 2005); *Owens v. Maass*, 918 P.2d 808, 813 (Or. 1996); **S DAK**: *Stratmeyer v. Stratmeyer*, 567 N.W.2d 220, 223 (S.D. 1997); **VA**: *Kopalchick v. Cath. Diocese of Richmond*, 274 Va. 332, 337, 645 S.E.2d 439 (Va. 2007); **WASH**: *Lane v. Dep't of Labor & Indus.*, 151 P.2d 440, 443 (Wash. 1944); *Ballard Square Condo. Owners Ass'n v. Dynasty Constr. Co.*, 146 P.3d 914, 922 (Wash. 2006), superseded in part by statute WASH. REV. CODE 25.15.303, as recognized in *Chadwick Farms Owners Ass'n v. FHC, LLC*, 160 P.3d 1061, 1064 (Wash. 2007), overruled in part by 207 P.3d 1251 (Wash. 2009); **W VA:** *Pankovich v. SWCC*, 163 W. Va. 583, 259 S.E.2d 127, 131-32 (W. Va. 1979); *Shelby J.S. v. George L.H.*, 381 S.E.2d 269, 273 (W. Va. 1989); **WYO**: *Vigil v. Tafoya*, 600 P.2d 721, 725 (Wyo. 1979); *R.M. v. State*, 891 P.2d 791, 792 (Wyo. 1995).

the Nevada Constitution stating, ironically, that the Legislature *has* authority to make laws, Defendant has failed to meet his "heavy burden" to overcome the presumption of constitutional validity which every legislative enactment enjoys. *Allen v. State,* 100 Nev. 130, 133 (1984); *Toombs v. Citizens Bank of Waynesboro,* 281 U.S. 643, 647 (1930).

## II. The Ex Post Facto Clause Does Not Apply to SB 129, Because SB 129 is Not a Criminal Law nor So Punitive as to Negate Its Civil Purpose

Defendant's argument that the law unconstitutionally violates the ex post facto clause should be immediately rejected by the Court because two hundred years of jurisprudence holds that the ex post facto clause applies only to statutes that impose criminal punishment, whereas the subject statute is civil. *Calder v. Bull,* 3 U.S. 386, 390-91 (1798); *see* D's Mot, p. 14 (conceding this point). Consequently, the ex post facto clause does not apply and cannot be the basis of dismissal.

Defendant concedes that the law does not support the application of the ex post facto clause on civil statutes like SB 129: "**the general rule under current United States jurisprudence is that only laws that impose criminal punishment violate the Ex Post Facto clause**." D's Mot, p. 14, citing *Calder v. Bull,* 3 U.S. 386, 390-91 (1798) (emphasis added). Yet, Defendant contends that the Court should abandon over two hundred years of legal jurisprudence in favor of his (incorrect) interpretation of journal articles. D's Mot, pp. 14-18.

14

Defendant made the same argument in the District of New Jersey, where the Court correctly held, "The Court will decline Defendant's invitation to challenge *Calder* and its more than two centuries of precedent." Ex. 2, p. 12.

The Court should similarly not be persuaded by Defendant's efforts to circumvent two-hundred-plus years of consistent legal precedent[4] by citing to a couple of Law Review articles to suggest that the United States Supreme Court and every other Court that has followed its precedent have been wrong since 1798. Law Review articles do not hold more weight than two hundred years of jurisprudence. Moreover, at most, these articles discuss a debate about the applicability of the ex post facto clause before concluding that the ex post facto clause does not apply to civil statutes. As per Evan C. Zoldan, *The Civil Ex Post Facto Clause,* 2015 Wis. L. Rev. 727, 731, 782, (2015), cited in Defendant's Motion on pages 15-16, **"courts universally uphold retroactive civil laws against ex post facto challenges"** and "the Court has not yet questioned *Calder's* fundamental historical conclusion that the original meaning of the ex post facto Clauses included criminal laws only." (emphasis added). Ironically, the same article concludes that the debate, "cautions against relying too heavily on historical conclusions as a basis for formulating legal interpretations," the very thing Defendant requests of this Court. *Id.* at 784. Similarly, Jane Harris Aiken, *Ex Post Facto in the Civil Context: Unbridled Punishment,* 81 Ky. L.J. 323, 324 (1993), cited on pages 16-17 of Defendant's Motion, states that, "courts consistently find that

---

[4] *See, e.g., Collins v. Youngblood,* 497 U.S. 37, 41-2 (1990)(relying on *Calder* when describing the *ex post facto* clause in 1990); *Schroeder v. Tilton,* 493 F.3d 1083, 1087 (9th Cir. 2007) (citing *Calder* in support of its explanation of the *ex post facto* clause in 2007); *Miller v. Ignacio,* 113 Nev. 930, 933 (1996)(applying *Calder's* ex post facto clause analysis in 1996).

1   since the statute in question is civil in nature, the ex post facto Clause is not

2   applicable."

3       Ironically, Defendant also cites Nevada case law – *State v. Eighth Jud. Dist.*

4   *Ct.*, 129 Nev. 492 (2013) – which supports denial of Defendant's motion. D's Mot, p.

5   14. In *State,* the Court considered whether a law that provided retroactive application

6   of mandatory sex offender registration on juvenile offenders violated the ex post facto

7   clauses of the U.S. and Nevada Constitutions. *Id.* at 510. The Court agreed that the

8   law was retroactive, and applied a two-part test on whether the law was punitive: (1)

9   whether the intent was to impose a punishment, and, if not, (2) whether the law was

10  so punitive that it negates the State's intention to deem it civil. *Id.* at 511. The Court

11  ultimately held that the defendant failed to provide support for his contention that

12  the law was intended to be punitive, or that it was so punitive that it negates the

13  State's intention to create a civil regulatory scheme. *Id.* at 511-12.

14      Similarly, here, Defendant has failed to provide any support for his contention

15  that the law was intended to be punitive or that it was so punitive as to negate any

16  intention to create a civil law. Rather, Defendant offers conjecture that "the

17  legislature made clear that it intended to promote the aims of retribution and

18  punishment" because the law applies, "only to criminal conduct". D's Mot, p. 19. But

19  when the law is read in its entirety, it shows an intent to compensate survivors of

20  sexual abuse – a civil remedy – rather than punish abusers. SB 129(1)(permitting

21  civil suits from which plaintiffs can "recover damages for an injury to a person arising

22  from the sexual assault."). That it references sexual assault is a byproduct of the

intent to compensate survivors of sexual assault, and not an indicator that it is meant to be punitive.

Moreover, the architects of the law have expressed their intention to create the law to help survivors of sexual assault in their recovery. Senator Lisa Krasner, who introduced and sponsored the law, explained:

> Currently the law in this area, that statute of limitations is two years. Two years isn't enough time for a victim of rape, sexual assault - to heal, to understand what happened to them to gain the strength and courage to come forward. Studies show that many people don't come forward until they're in their sixties, seventies, or even eighties.

Josh Meny, *Sen. Krasner introduces bill to remove statute of limitation on civil sexual assault cases,*" KTVN-TV, Feb. 21, 2023, https://www.2news.com/townnews/parliament/sen-krasner-introduces-bill-to-remove-statute-of-limitation-on-civil-sexual-assault-cases/article_8091aa80-b262-11ed-a015-1392181bde20.html, a copy of which is annexed as **Exhibit 3**.

As she explained at a Senate Committee on Judiciary meeting on February 21, 2023, the Minutes of which are annexed as **Exhibit 4**:

> Sexual assault survivors will tell you that it can take many years, if not most of one's life, for a victim to gain the strength and the courage to come forward and report the abuse if he or she ever feels safe coming forward at all. Dr. Allison Cotton is an expert witness who can speak to the trauma involved in sexual assault and sexual abuse and to the years of work it takes to heal those wounds and start to become whole.

Ex. 4, p. 3.

Dr. Allison Cotton explained further:

> Rape and sexual assault are uniquely intimate crimes. Perpetrators of rape forcefully engage their victims in sex acts to the point that the victims are too terrorized to resist. Rape and sexual assault victims with

17

whom I have worked have said to me; "I wish he had just killed me." Rape victims uniquely experience shame, guilt, self-hatred and self-blame. Furthermore, a 2022 study confirmed research showing that up to 75 percent of rape victims experience stigmatization when they disclose their rape. This includes minimization of the actions of the perpetrator, doubting the veracity of the victim's disclosure, blaming the victim and even urging the victim to stay quiet so as not to disrupt family or social ties. Often the perpetrator is close to the victim, so he or she lives in constant fear of the rapist after the assault. For these reasons and so many more, disclosing a rape is a terrifying prospect.

\*     \*     \*

**The good news is there is hope for healing. Trauma is incredibly treatable if the victim has the resources and the ability to participate in treatment. Part of treatment for sexual assault victims is to give them back the power surrounding the assault, giving a victim the ability to choose whether to pursue legal action, even 50 years later, is incredibly important in the healing process.**

\*     \*     \*

The importance of this bill to me as a psychiatrist does not necessarily lie with the opportunity to get money. It lies with the opportunity to choose. Many of the people who I have worked with have not felt able to testify in court or pursue redress legally. This gives them the opportunity to say it is my choice; I am empowered to choose this or not choose. **This is imperative to help them heal and move forward.**

Ex. 4, pp. 5-6, 9 (emphasis added).

Other Senators shared their intention with the law, all of which was

focused on the healing effect on the survivors. Ex. 4. As per Senator Jeff Stone:

**This is healing. And this is cathartic to let these women speak for the first time in 36 years about a traumatic event that touched their lives. I am grateful the committee agreed to hear all this testimony. A lot of this is suppressed for many years, and a two-year statute of limitations does not suffice. Bringing this forward gives victims justice and the resources they need to get the appropriate health care.**

Ex. 4, p. 9 (emphasis added).

18

1    Indeed, during the entire meeting, the word "punish" or any derivation

2    therefrom was not used once. Ex. 4. Accordingly, there is ample evidence that the

3    intention of SB 129 was not punitive, but rather restorative and compensatory for

4    the survivors of sexual assault.

5    Nonetheless, Defendant contends that even if the law was not intended to be

6    punitive, it is still punitive in nature because, for convicted individuals, it will "inflict

7    greater punishment and change the punishment for crimes from what they were

8    when committed," and it alters the legal rules "in order to convict the offender." D's

9    Mot, p. 19. For a party to establish that a law is "so punitive in form and effect as to

10   render them criminal despite [the legislature's] contrary intent" a party must

11   demonstrate this by the "clearest proof." *Hudson v. U.S.,* 522 U.S. 93, 94 (1997). Here,

12   however, Defendant has presented no proof at all, but rather confuses civil and

13   criminal penalties, as is apparent by his belief that SB 129 alters the legal rules "to

14   convict the offender." D's Mot, p. 19. As should be obvious, Defendant cannot be

15   "convicted" in a civil case both generally and under SB 129.

16   As explained by the District Court of New Jersey, after Defendant made

17   similar arguments:

18   [T]he Court finds that Defendant conflates civil and criminal
19   proceedings, and that the revival statute does not increase penalties for
20   those convicted of a sexual offense or change evidentiary burdens as
21   applied to those who have not been convicted.
22
23   Ex. 2, pp. 24-25. The same is true here.

24   Defendant also argues that the law is inherently punitive because it may

25   subject him to punitive damages. When Defendant made that argument in the

19

District of New Jersey, the Court correctly held that the mere fact that Plaintiff can avail itself of the common law remedy of punitive damages does not render the law subject to the ex post facto clause:

> With respect to Defendant's reference to punitive damages, the Court notes that the revival statute itself does not reference punitive or treble damages and that Plaintiff here seeks punitive damages under the common law and Punitive Damages Act. (ECF 1 at ¶¶ 63-67). Such damages, in the Court's view, do not implicate the Ex Post Facto Clauses. *See Roman Cath. Bishop of Oakland v. Superior Ct.,* 28 Cal. Rptr. 3d 355, 362 (Cal. Ct. App. 2005) ("[A] statute reviving the limitations period for a common law tort cause of action, thereby allowing the plaintiff to seek punitive damages, does not implicate the ex post facto doctrine….").

Ex. 2, p. 25. The same is true here.

Even the case law cited by Defendant supports denial of his motion. Specifically, Defendant relies upon *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), *Smith v. Doe,* 538 U.S. 84 (2003) and *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1996), all of which advocate *against* the application of the ex post facto clause to the present matter. D's Mot, pp. 18-20.

In *Harisiades*, 342 U.S. at 594, the Court held that the ex post facto clause does not apply to a law that would result in deportation because:

> [E]ven if the Act were found to be retroactive, **to strike it down would require us to overrule the construction of the ex post facto provision which has been followed by this Court from earliest times. It always has been considered that that which it forbids is penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment**. Deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure." (emphasis added).

20

1    The Court explained that even though they were urged to apply some doctrine of

2    atonement and redemption to find the law to be punitive and in violation of the ex

3    post facto clause, it was not for the judiciary to usurp the function of the legislature.

4    *Id.* at 595.

5        Similarly, in *Smith v. Doe*, 538 U.S. at 92, the Court applied the seven non-

6    exhaustive factors referenced in *Mendoza-Martinez*, 372 U.S. at 168, to analyze

7    whether a law requiring sex offenders to register on a public database was subject to

8    the ex post facto clause, finding that it was not. The mandatory registration of sex

9    offenders such that their status would be available to the public is necessarily more

10   severe than monetary damages available under SB 129. Nonetheless, the Court found

11   the sex offender registry law to be civil and therefore not subject to the ex post facto

12   clause, explaining, "**only the <u>clearest proof</u> will suffice to override legislative**

13   **intent and transform what has been denominated as a civil remedy to a**

14   **criminal remedy**." *Smith,* 538 U.S. at 92 (emphasis added).

15       The *Smith* Court further held that of the seven non-exhaustive factors

16   considered in *Mendoza-Martinez*, "[t]he factors most relevant to our analysis… [are

17   whether the law] has been regarded in our history and traditions as a punishment;[5]

18   imposes an affirmative disability or restraint;[6] promotes the traditional aims of

---

[5] The *Smith* Court held that where a law is recent in origin this "suggests that the statute was not meant as a punitive measure." *Smith*, 538 U.S. at 97. The same is true here. Moreover, monetary damages occur regularly in the civil court system and are not regarded as a criminal penalty.

[6] Defendant concedes that SB 129, "does not impose an affirmative disability or restraint on Defendant, insofar as it does not physically restrain him or cause him occupational or housing disadvantages." Defendant's Brief, p. 20. The *Smith* Court explained, where the law, "imposes no physical restraint [and] does not restrain activities sex offenders may pursue but leaves them free to change jobs and residences," the law is not punitive in nature. *Smith*, 538 U.S. at 100.

punishment;[7] has a rational connection to a nonpunitive purpose;[8] or is excessive with respect to this purpose."[9] *Id.* at 97. The Court continued by explaining that the two remaining *Mendoza-Martinez* factors, namely "whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime—are of little weight in this case." *Id.* at 105.

Here, the legislative intent was to afford victims of sexual assault the ability to seek redress in civil court for the trauma caused by sexual assault. Ex. 4; SB 129. More importantly, Defendant has not presented any evidence suggesting a punitive purpose or that its punitive effect negates its non-punitive purpose. *See* D's Mot.

As such, Defendant has failed to show "the clearest proof" (or any proof) that SB 129 was intended as a criminal statute or is so punitive as to negate its non-punitive purpose, and therefore, the ex post facto clause does not apply and Defendant's motion must be denied. *Smith,* 538 U.S. at 92.

---

[7] The *Smith* Court found that even if the sex registry deterred future crimes, it still did not promote the traditional aims at punishment. *Id.* at 87, 102. The same is true here.

[8] The *Smith* Court held that the sex offender registry had a rational connection to non-punitive purpose, namely public safety. *Id.* at 102-103. Here, the non-punitive purpose is compensation for individuals injured by sexual assault. SB 129; Ex. 4.

[9] The *Smith* Court found that the sex offender registry was not excessive with respect to its purpose, holding, "A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* at 103. The same is true here, as SB 129, only permits a monetary award, in accordance with its non-punitive purpose of compensating individuals injured by sexual assault.

1   **III.    SB129 Does Not Violate the Special Law Clause of the Nevada**
2          **Constitution Because it Applies Equally to All Sexual Assault**
3          **Survivors and Perpetrators**
4
5          According to Defendant, SB 129 runs afoul of Article 4, Sections 20 because it
6   constitutes a "special law" that pertains to a part of a class as opposed to all of a class,
7   and runs afoul of Article 4, Section 21, which requires that when possible, "all laws
8   shall be general and of uniform operation throughout the state." D's Mot, pp. 8-11;
9   Nev. Const., art. 4, §§ 20, 21. Frankly, Plaintiffs are dumbfounded by Defendant's
10  argument, as SB 129 applies equally to the entire class of sexual assault survivors
11  throughout the State. Nonetheless, Defendant argues otherwise by claiming that the
12  relevant class is not sexual assault survivors or even sexual assault perpetrators, but
13  rather all "heinous" crimes. This is an absurd notion that the Court should summarily
14  reject, as Defendant cannot make a law unconstitutional by creating a fictitious class.

15         A law is considered a "special law" if it "pertain[s] to a part of a class as opposed
16  to all of a class." *Clean Water Coalition v. The M Resort, LLC*, 255 P.3d 247 (Nev.
17  2011)(internal quotations omitted) *citing State of Nevada v. Irwin,* 5 Nev. 111, 121
18  (1869). Stated otherwise, a "special law" is one that, "imposes special burdens, or
19  confers peculiar privileges upon one or more persons in no [way] distinguished from
20  others of the same category." *State of Nevada v. Cal. M. Co.,* 15 Nev. 234, 249 (1880).
21  Yet, SB 129 applies equally to all survivors and perpetrators of adult sexual abuse.
22  As such, the law does not impose any special burdens or confer any peculiar privileges
23  to "a part of a class as opposed to all of a class" or "upon one or more persons in no

23

1 [way] distinguished from others of the same category." *Irwin,* 5 Nev. At 121; *Cal. M.*

2 *Co.,* 15 Nev. at 249.

3       Nonetheless, Defendant attempts to reverse engineer a defense using Article

4 4, Sections 20 and 21 of the Nevada Constitution by creating a fictitious and ill-

5 defined class, which Defendant variously refers to as "heinous" crimes (D's Mot, p. 9),

6 "any serious violent crime" (D's Mot, p. 10), and "interpersonal violence" (D's Mot, p.

7 10), and then claiming that the law does not apply equally to all class members in

8 this fictitious group.  Defendant offers scant examples of the crimes included in his

9 fictious "class," other than that it should include domestic violence claims. D's Mot,

10 p. 10. Presumably, Defendant would also include murder as a heinous crime, as well

11 as perhaps kidnapping. But if the Court were to credit this grouping as a class for

12 which all laws must be equally applied, then the criminal statute for sexual assault,

13 in and of itself, is unconstitutional, as are the laws against murder and domestic

14 violence, since they each apply to sub-groups within the class. This would be an

15 absurd result, which merely underscores how the Defendant's argument is baseless.[10]

---

[10] Even accepting Defendant's absurd class of "heinous" crimes, the legislature may still pass a law to a sub-group if it is not arbitrary. *State of Nevada v. Cal. M.* Co., 15 Nev. 234, 249 (1880)(defining a "special law" as  "one which affects only individuals and not a class--one which imposes special burdens, or confers peculiar privileges upon one or more persons <u>in no wise distinguished from others of the same category</u>")(emphasis added). Here, there are elements that distinguish a sexual assault victim from a victim of other heinous crimes like murder or kidnapping:

> Rape and sexual assault are <u>uniquely</u> intimate crimes. Perpetrators of rape forcefully engage their victims in sex acts to the point that the victims are too terrorized to resist. Rape and sexual assault victims with whom I have worked have said to me; "I wish he had just killed me." Rape victims uniquely experience shame, guilt, self-hatred and self-blame. Furthermore, a 2022 study confirmed research showing that up to 75 percent of rape victims experience stigmatization when they disclose their rape. This includes minimization of the actions of the perpetrator, doubting the veracity of the victim's disclosure, blaming the victim, and even urging the victim to stay quiet so as not to disrupt family or social ties. Often the perpetrator is close to the victim, so he or

Accordingly, Article 4, Sections 20 and 21 of the Nevada Constitution are not implicated or violated by SB 129 because SB 129 is a general law applying equally to all members of the relevant class, namely sexual abuse survivors and perpetrators, and Defendant's motion must be denied.

## IV. Cosby's Serial Rape of Plaintiffs Were of the Same Series of Occurrences and Share Common Questions of Law, Thereby Warranting Joinder for Judicial Economy

Defendant further contends that the Court sever this one lawsuit into ten separate lawsuits under Defendant's belief that the serial rape of Plaintiffs are not part of the same series of transactions or occurrences because the assaults happened at different times and locations and may possibly have different witnesses and defenses. D's Mot, p. 20. However, case law holds that the commonalities of the assaults and Cosby's *modus operandi* render his serial rape of Plaintiffs part of a series of transactions or occurrences warranting joinder of the claims.

Pursuant to Fed. R. Civ. P. 20, Plaintiffs may join in one action if they assert any right of relief, "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and share "any question of law or fact common to all plaintiffs." Moreover,

**The rule 'is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits.'** *League to Save Lake Tahoe*

---

she lives in constant fear of the rapist after the assault. For these reasons and so many more, disclosing a rape is a terrifying prospect.

Ex. 4, pp. 5-6 (emphasis added). As such, the Court could rightfully create a law applicable to sexual assault but not murder, for example. Of course, if the Court rejects Defendant's fictitious class – as the Court should – this analysis becomes purely academic.

*v. Tahoe Reg'l Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977). **'[T]he impulse is toward entertaining the broadest possible scope of action** consistent with fairness to the parties; **joinder of claims, parties and remedies is strongly encouraged.'** *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 724 (1966).

*Brown v. Chicago Title Ins. Co.,* 2022 WL 16553003 (D. Nev. October 31, 2022)(emphasis added), a copy of which is annexed as part of **Exhibit 5**.

Stated more succinctly, "**Rule 20 is designed to promote judicial economy, and reduce inconvenience, delay, and added expense.**" *Coughlin v. Rogers,* 130 F.3d 1348, 1351 (9th Cir. 1997)(emphasis added).

The decision in *Ardolf v. Weber,* 332 F.R.D. 467 (S.D.N.Y. 2019) is particularly instructive. There, the Court permitted four male models to bring a single action against a photographer who sexually assaulted them at different times and places. The Court explained:

> **Plaintiffs' claims are logically related, in large part, because they are all against the same Defendant.** Defendant argues, however, that the facts alleged by Plaintiffs are not shared or overlapping in any way. However, **Plaintiffs allege that Defendant subjected them to the same *modus operandi* to molest them.** Indeed, **Defendant's *modus operandi* is the common thread that logically ties all Plaintiffs' claims...**Accordingly, Plaintiffs' claims are logically related and therefore arise out of a series of transactions or occurrences under Rule 20.

*Id.* at 480 (emphasis added).

The *Ardolf* Court added that judicial economy would also be served by joining the plaintiffs' sexual assault claims into one action, because:

> [M]uch of the discovery and depositions will be identical for [the] plaintiffs. For example, Plaintiffs' have identified thirteen (13) models (not parties to this case) in their initial disclosures who will allegedly testify that Defendant attempted to molest them during private

26

photoshoots in the same way that he allegedly molested Plaintiffs…These witnesses' testimony is obviously relevant to support or disprove the claims of *each individual Plaintiff*. Therefore, it would surely be a waste of judicial resources to sever Plaintiffs' claims, and have to depose all thirty-eight (38) witnesses (including Plaintiffs and Defendant) five times each. It would also be inefficient to expect all of these non-party witnesses to unnecessarily appear at five separate trials.

Defendant argues that litigating all Plaintiffs' claims in one lawsuit would result in "a lengthier trial, fraught with confusing instructions to the jury, ... endless curative instructions from the Court, and time spent wasted on complex legal issues related to each individual Plaintiff," Yet, the prospect of conducting five separate trials—with overlapping evidence and testimony—could be equally wasteful, if not worse.

*Id.* at 481 (emphasis in original). The same is true here.

Defendant argues that there are no similarities in the factual background of the claims, but that is simply incorrect. Cosby isolated and drugged each of these ten women (and allegedly many others as part of the same scheme) before sexually assaulting them, sharing a common *modus operandi*. Ex. 1, ¶¶ 16, 20, 29, 34-36, 41, 45-52, 59-69, 75, 79, 81-84,  89-94, 97-98, 101-06, 110, 113-15, 117-18, 125-36, 142-148, 152-57. The behavior also shows that Cosby was honing his craft as the assaults progressed, initially tricking women by inviting them to non-existent house parties where he drugged and raped them [Ex. 1, ¶¶ 57-69, 107-18, 149-57], and later using that experience to refine his approach so that he fostered false mentoring relationships with his intended prey to lure them to an isolated place (usually his hotel room) before drugging and raping them [Ex. 1, ¶¶ 24-56, 137-48]. That the women's experience may also include specific details that may vary at the individual level is not dispositive. *Id.* at 480; *Green v. Padilla,* 484 F.Supp.3d 1098, 1150 (D.N.M. 2020)(permitting

1    multiple plaintiffs who alleged they were sexually abused while incarcerated to bring

2    one lawsuit even though "the Complaint lodges factual allegations specific to each

3    Female Inmate.").

4         This motion is a perfect example. Presumably, if the present case was filed as

5    ten cases, rather than one, Defendant would have made the same motion seeking to

6    find SB 129 unconstitutional ten times, which, in turn, would have required Plaintiffs

7    to oppose the same motion ten times, all in the same manner. The Court would then

8    have to address ten different motions regarding the same questions of law via ten

9    different orders, and potentially ten different oral arguments with potentially

10   multiple judges. Moreover, if the cases are assigned to different judges, the results of

11   the motions may be disparate, despite the arguments and legal issues being identical.

12   As such, splitting this one case into ten would have already created significant waste

13   of judicial and party resources. Prospectively, Cosby would also be subject to ten

14   different sets of discovery and interrogatory demands, ten different sets of

15   overlapping depositions, and ten different trials. As such, Defendant's request is the

16   antithesis of the intent of Rule 20, which is to "promote judicial economy, and reduce

17   inconvenience, delay, and added expense," and Defendant's motion must be denied.

18   *Coughlin v. Rogers,* 130 F.3d 1348, 1351 (9th Cir. 1997).

19        Since the Plaintiffs' claims share common questions of law and arise out of the

20   same series of transactions or occurrence, severance would be improper and merely

21   serve to waste judicial and party resources. Therefore, Defendant's motion must be

22   denied.

## V.   Angela Leslie's Claims Arising from Sexual Assault Are Included within SB 129's Provisions Reviving Claims Arising from Sexual Assault

Under SB 129(1), plaintiffs may bring civil claims arising from sexual assault. Pursuant to SB 129(2), "'sexual assault' has the meaning ascribed to it in Nev. Rev. Stat. 200.366. Nev. Rev. Stat. 200.366, in turn, states that a person is guilty of "sexual assault" if he or she, among other things, "forces another person to make a sexual penetration on themselves or another…against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting…." Finally, Nev. Rev. Stat. 200.364 further defines "sexual penetration" as, among other things, "**any intrusion**, *__however slight__*, of *__any part__ of a person's body*…"[11] (emphasis added).

In the Amended Complaint, Angela Leslie alleges that Cosby drugged her, "without Ms. Leslie's consent, grabbed her hand…forced Ms. Leslie's hand onto his penis and forced her to masturbate him, by holding and moving her hand on his penis." Ex. 1, ¶¶109-114. Cosby then attempted to climb atop Ms. Leslie, but she was able to fight him off. Ex. 1, ¶115.

Given the statutes and definitions set forth above, Cosby "sexually penetrated" Ms. Leslie pursuant to Nev. Rev. Stat. 200.364 by forcing his penis ("intrusion") into Ms. Leslie's hand ("however slight, of *any part* of a person's body"), satisfying the definition of "sexual assault" under SB 129, as defined by Nev. Rev. Stat. 200.366.

---

[11] Intrusion is defined by Black's Law Dictionary (11th ed. 2019) as "a person's entering without permission," or "a highly offensive invasion of another person's seclusion or private life."

Moreover, to accept Cosby's narrow definition of SB 129 would be to deprive Ms. Leslie of her chance at the very justice and healing which is the intention of SB 129 merely because Cosby did not complete the heinous acts he began to Cosby's satisfaction. *See* Ex. 4. As alleged, like the other Plaintiffs, Cosby drugged Ms. Leslie, forced her to engage in a sexual act, and then tried to climb atop her. Ex. 1, ¶¶ 109-14. Based on Cosby's pattern of assaults set forth in the Amended Complaint, Cosby's intention when he got atop Ms. Leslie after drugging her was to continue his rape. *See* Ex. 1, ¶¶ 16, 18, 20, 24-157. To deny Ms. Leslie a chance at justice merely because she was able to stop Cosby after he assaulted her but before he forced his penis into her vagina would be an incongruous result and injustice unintended by the legislature.

Accordingly, Ms. Leslie's claims that Cosby sexually assaulted her by intruding his penis into her hand and forcing her to masturbate him, without consent, constitutes "sexual assault" under SB 129, and Defendant's motion must be denied.

## **CONCLUSION**

Plaintiff respectfully requests that this Court enter an order denying Defendant's Motion to Dismiss Plaintiff's Complaint, in its entirety.

Respectfully Submitted,

/s/ Jordan Rutsky
/s/ Jordan Merson
Merson Law, PLLC
950 Third Avenue
New York, New York 10022
Email: jrutsky@mersonlaw.com
        jmerson@mersonlaw.com

30

1                                   **<u>CERTIFICATE OF SERVICE</u>**

2         I HEREBY CERTIFY that on January 15, 2024, I caused to be served via the

3 Court's e-filing/e-service system, a true and correct copy of the Opposition to

4 Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) to all parties

5 registered for electronic service.

6

7

8                           /s/ Jordan Rutsky

9                          Jordan Rutsky, Esq.

# EXHIBIT 1

Jordan K. Merson, Esq., (To Be Admitted *Pro Hac Vice*)
jmerson@mersonlaw.com
Jordan K. Rutsky, Esq., (To Be Admitted *Pro Hac Vice*)
jrutsky@mersonlaw.com
Nathan E. Werksman, Esq., NV bar No. 15117
nwerksman@mersonlaw.com
Alice A. Bohn, Esq., (To Be Admitted *Pro Hac Vice*)
abohn@mersonlaw.com
Manraj S. Sekhon, Esq., (To Be Admitted *Pro Hac Vice*)
msekhon@mersonlaw.com
**Merson Law, PLLC.**
950 Third Ave, 18th Floor
New York, NY 10022

Brian J. Panish, Esq., NV bar No. 16123
panish@psbr.law
Rahul Ravipudi, Esq., NV bar No. 14750
ravipudi@psbr.law
Robert Glassman Esq., (To Be Admitted *Pro Hac Vice*)
rglassman@psbr.law
**Panish, Shea, Boyle, Ravipudi LLP.**
300 South Fourth Street, Suite 710
Las Vegas, NV 89101
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA, SOUTHERN DIVISION

| | |
|---|---|
| LISE-LOTTE LUBLIN, LILI BERNARD, JANICE BAKER-KINNEY, REBECCA COOPER, LINDA KIRKPATRICK, JANICE DICKINSON, ANGELA LESLIE, PAM JOY ABEYTA, HEIDI THOMAS, AND JANE FAZZARI, | Case No.: 2:23-cv-00932-DJA **AMENDED COMPLAINT** **[DEMAND FOR JURY TRIAL]** |
| Plaintiffs, | |
| vs. | |
| WILLIAM COSBY, JR., | |
| Defendant. | |

1

## INTRODUCTION

Plaintiffs Lise-Lotte Lublin, Lili Bernard, Janice Baker-Kinney, Rebecca Cooper, Linda Kirkpatrick, Janice Dickinson, Angela Leslie, Pam Joy Abeyta, Heidi Thomas, and Jane Fazzari (hereinafter jointly referred to as "Plaintiffs"), by and through their attorneys, Merson Law, PLLC, and Panish, Shea, Boyle, Ravipudi, LLP, respectfully allege as follows:

## JURISDICTION, VENUE, AND INTERDISTRICT ASSIGNMENT

1.     Plaintiff Lise-Lotte Lublin resides in Las Vegas, Nevada.

2.     Plaintiff Lili Bernard resides in Los Angeles, California.

3.     Plaintiff Janice Baker-Kinney resides in Rohnert Park, California.

4.     Plaintiff Rebecca Cooper resides in Las Vegas, Nevada.

5.     Plaintiff Janice Dickinson resides in Tarzana, California.

6.     Plaintiff Linda Kirkpatrick resides in Mesa, Arizona.

7.     Plaintiff Angela Leslie resides in Theodore, Alabama.

8.     Plaintiff Pam Joy Abeyta resides in Atwater, California.

9.     Plaintiff Heidi Thomas resides in Castle Rock, Colorado.

10.    Plaintiff Jane Fazzari resides in Cathedral City, California.

11.    Defendant William Cosby, Jr. (hereinafter, "Cosby") resides in Elkins Park, Pennsylvania and/or Shelburne Falls, Massachusetts.

12.    This Court has jurisdiction under 28 U.S.C. § 1332.

2

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Clark County, Nevada.

14.     Venue in the Southern Division of the United States District Court, District of Nevada is proper under Rule 1-6 of the Local Rules of Practice for the District of Nevada because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Clark County, Nevada.

15.     Plaintiffs bring this action under Nevada Revised Statutes, Chapter 11; Added by 2023 Nev. SB 129, § 1, which eliminated the statute of limitations for a victim of a sexual assault to commence an action against the alleged perpetrator for damages arising from sexual abuse.

## GENERAL FACTUAL ALLEGATIONS

16.     For decades, defendant Cosby engaged in the serial sexual assault of dozens of women for his sexual gratification by drugging women and using unknown substances to incapacitate them.

17.     Each Plaintiff was sexually battered, assaulted, and abused by defendant Cosby in the same or similar manner, as a part of the same conduct, occurrence, plan, or scheme that was perpetrated, conducted, organized, and/or performed in Nevada by defendant Cosby.

18.     All these sexual assaults and batteries took place in a similar manner from approximately the early 1970s through the early 1990s in Nevada. Several of the incidents took place in Cosby's suite in the same Las Vegas hotel.

19.     For each of these Plaintiffs, defendant Cosby used his enormous power, fame, and prestige, and claimed interest in helping them and/or their careers as a pretense to isolate and sexually assault them.

20.     Defendant Cosby drugged or attempted to drug each of these women before sexually assaulting them.

21.     In a deposition filed in the Eastern District of Pennsylvania, defendant Cosby admitted to obtaining drugs to use on women with whom he wanted to engage in sex.

22.     Now, these Plaintiffs have come forward to stand up for themselves, after they were sexually abused and assaulted by defendant Cosby.

23.     In performing the sexual assaults and batteries set forth above, defendant Cosby committed multiple torts, including, but not limited to, sexual assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment pursuant to Nevada law, including Nevada Revised Statutes, Chapter 11; Added by 2023 Nev. SB 129, § 1.

### PLAINTIFF LISE-LOTTE LUBLIN

24.     In or around 1989, Ms. Lublin met Cosby at Cosby's request, under the pretense that he wanted to mentor her and her career.

25.     Following their initial meeting, Ms. Lublin met with Cosby multiple times for mentoring during which Cosby acted interested in Ms. Lublin's career development as a model and actress.

26.     On one such occasion, in or around 1989, Cosby invited Ms. Lublin to his hotel suite in Las Vegas, Nevada, under the pretense that he wanted to assess her acting skills.

27.     During the mentoring session in Cosby's suite, Cosby provided Ms. Lublin with two beverages and instructed her to drink the beverages to help her relax and improvise more effectively.

28.     Ms. Lublin drank the beverages at Cosby's direction.

29.     Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverages, without Ms. Lublin's knowledge or consent, prior to giving the beverages to Ms. Lublin.

30.     After drinking the beverages, Ms. Lublin felt dizzy and became incapable of moving of her own volition.

31.     As Ms. Lublin began to feel the effects of the beverages, Cosby grabbed her wrists, pulled her between his legs, and held her in place with his legs. He then began stroking Ms. Lublin's hair while masturbating.

32.     Once incapacitated, Cosby dragged Ms. Lublin to the bedroom of the suite.

33.     While incapacitated, Ms. Lublin felt forcible vaginal pressure and penetration from Cosby's hand and fingers.

34.     Once Cosby had isolated and incapacitated Ms. Lublin, Cosby engaged in sexual acts with Ms. Lublin, including penetration, without her consent and against her will.

5

35.    Ms. Lublin did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

36.    Cosby knew or should have known that Ms. Lublin was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF LILI BERNARD

37.    Beginning in or around 1990, Cosby acted as Ms. Bernard's mentor for her acting career.

38.    In or around the Fall of 1990, Cosby arranged for and induced Ms. Bernard to travel interstate from New York to Nevada under the pretense that he was arranging a meeting between Ms. Bernard and producers from *A Different World* to cast her in the show.

39.    Once in Las Vegas, Nevada, Cosby told Ms. Bernard that the producers could not attend the meeting but offered to engage in a mentoring session in his hotel suite.

40.    While in Cosby's suite, Cosby offered and provided Ms. Bernard with a beverage that he claimed was non-alcoholic sparkling cider to celebrate her future success as an actress.

41.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Bernard's knowledge or consent, prior to giving the beverage to Ms. Bernard.

6

42.     When Ms. Bernard drank the beverage, Cosby, in a joking manner, encouraged her to drink faster and forcibly tilted the glass as she brought it to her mouth to ensure that she drank quickly and fully from the beverage.

43.     Shortly after drinking the beverage, Ms. Bernard felt dizzy, disoriented, and giddy.

44.     Because of the effects of the beverage, Ms. Bernard fell while in the suite.

45.     After falling, Ms. Bernard was unable to move and lost consciousness because of the effects of the beverage.

46.     When Ms. Bernard awoke, she was naked, lying on her back, and had difficulty moving; Cosby was naked by her feet.

47.     Ms. Bernard told Cosby that she did not want to have sex and cried out for help.

48.     Despite her pleas, Cosby raped her by penetrating her vagina with his penis.

49.     Ms. Bernard attempted to fight off Cosby during the rape but was unable to stop him because of the effects of the beverage he had provided to her earlier that evening.

50.     To silence Ms. Bernard's protests, Cosby placed a pillow over her face, preventing Ms. Bernard from breathing.

51.     After removing his penis from Ms. Bernard's vagina and ejaculating on Ms. Bernard, Cosby removed the pillow from Ms. Bernard's face. Ms. Bernard remained incapacitated by the beverage and lost consciousness again.

52.     When Ms. Bernard next awoke, she was still incapacitated, and Cosby, who was naked, was cleaning Ms. Bernard with a wet towel. She lost consciousness again.

53.     When Ms. Bernard awoke again, it was morning and Cosby was gone.

54.     Cosby engaged in sexual acts with Ms. Bernard, including penetration, without her consent and against her will.

55.     Ms. Bernard did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

56.     Cosby knew or should have known that Ms. Bernard was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF JANICE BAKER-KINNEY

57.     In or around 1982, Ms. Baker-Kinney was invited by her co-worker to a party that Cosby was hosting in a private home in Reno, Nevada.

58.     Upon arrival at the home with her co-worker, Ms. Baker-Kinney discovered that there was no party, and Cosby was alone.

59.     With only Ms. Baker-Kinney, her co-worker, and Cosby present, Cosby offered Ms. Baker-Kinney two pills, which she believed to be barbiturates.

8

60.    Cosby insisted Ms. Baker-Kinney swallow the two pills and assured her that she would be fine.

61.    Ms. Baker-Kinney swallowed the pills at Cosby's insistence.

62.    When Ms. Baker-Kinney swallowed the pills, she was not anticipating nor was she consenting to any sexual acts between her and Cosby.

63.    Shortly after swallowing the pills, Ms. Baker-Kinney lost consciousness.

64.    When Ms. Baker-Kinney regained consciousness, she was unable to focus or walk a straight line due to the continued effects of the pills. Cosby was sitting next to her, with his hand in her open blouse. Her pants were also undone.

65.    Cosby took Ms. Baker-Kinney, who was still incapacitated, into a bedroom, where she lost consciousness again.

66.    When Ms. Baker-Kinney regained consciousness, she was naked in bed next to Cosby, with wetness between her legs, while he was groping her body and genital area.

67.    Cosby engaged in sexual acts with Ms. Baker-Kinney, including penetration, without her consent and against her will.

68.    Ms. Baker-Kinney did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

69.    Cosby knew or should have known that Ms. Baker-Kinney was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF REBECCA COOPER

70.    In the mid-1980s, Rebecca Cooper met Cosby at a health club where she worked as a masseuse in Las Vegas, Nevada.

71.    After Ms. Cooper and Cosby developed a professional, but friendly, relationship, Cosby invited Ms. Cooper to his shows several times.

72.    On one such occasion, Cosby invited Ms. Cooper to attend his show, have dinner, and provide masseuse services to him because of a tennis injury.

73.    While at dinner, Cosby offered Ms. Cooper a beverage, which she accepted.

74.    The beverage was brought to the table by an employee of Cosby.

75.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Cooper's knowledge or consent, prior to giving the beverage to Ms. Cooper.

76.    After Ms. Cooper sipped the beverage, Cosby insisted that she drink it all, to which she complied.

77.    Before Ms. Cooper had a chance to eat dinner, Cosby informed her that they did not have time, and escorted her to his dressing room.

78.    As she was being escorted to the dressing room, Ms. Cooper felt disoriented, wobbly, and uncoordinated.

79.    Once isolated in his dressing room, Cosby vaginally raped Ms. Cooper with his penis.

80.    Ms. Cooper resisted and told Cosby to stop, but he did not.

81.     When Cosby raped Ms. Cooper, she was still feeling the effects of the beverage, including an inability to move.

82.     Cosby engaged in sexual acts with Ms. Cooper, including penetration, without her consent and against her will.

83.     Ms. Cooper did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

84.     Cosby knew or should have known that Ms. Cooper was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### Plaintiff Linda Kirkpatrick

85.     In or around 1981, Ms. Kirkpatrick met Cosby when playing tennis in Las Vegas, Nevada.

86.     After they met, Cosby invited Ms. Kirkpatrick to attend one of his shows in Las Vegas, and she accepted his invitation.

87.     When she arrived at the show, Ms. Kirkpatrick was invited backstage.

88.     Once backstage, Cosby gave Ms. Kirkpatrick a beverage, which she partially drank.

89.     Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Kirkpatrick's knowledge or consent, prior to giving the beverage to Ms. Kirkpatrick.

90. After Ms. Kirkpatrick drank the beverage provided by Cosby, she blacked out, and was in and out of consciousness.

91. During a moment of consciousness, Ms. Kirkpatrick found herself lying on the floor of Cosby's dressing room, incapacitated, with Cosby atop her, forcefully kissing her and reaching into her pants, with his penis pressed against her. She was unable to resist due to incapacitation and paralysis from the beverage.

92. Cosby engaged in sexual acts with Ms. Kirkpatrick, including penetration, without her consent and against her will.

93. Ms. Kirkpatrick did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby in his suite.

94. Cosby knew or should have known that Ms. Kirkpatrick was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

**PLAINTIFF JANICE DICKINSON**

95. In or around 1982, Ms. Dickinson was invited by Cosby to Lake Tahoe, Nevada, under the pretense that he wanted to discuss a potential role on his television show and other employment opportunities.

96. When Ms. Dickinson arrived, Cosby took Ms. Dickinson to dinner.

12

97.     While at dinner, Ms. Dickinson complained of menstrual cramps, to which Cosby offered a pill under the pretense that it would be helpful for her cramps.

98.     Shortly after ingesting the pill provided by Cosby, Ms. Dickinson felt woozy, dizzy, and disoriented.

99.     After dinner, Cosby invited Ms. Dickinson to his suite to finish their conversation.

100.    Ms. Dickinson continued to feel the effects of the pill, including weakness and disorientation, in Cosby's suite.

101.    Once isolated in Cosby's suite, Cosby vaginally and anally raped Ms. Dickinson with his penis.

102.    During the rape, Ms. Dickinson told Cosby to stop, but Cosby ignored her.

103.    During the rape, Ms. Dickinson attempted to fight Cosby off, but was unable to do so because of the pill that she had received from Cosby.

104.    Cosby engaged in sexual acts with Ms. Dickinson, including penetration, without her consent and against her will.

105.    Ms. Dickinson did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

106.    Cosby knew or should have known that Ms. Dickinson was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF ANGELA LESLIE

107.    In or around the late 1980s or early 1990s, Cosby invited Ms. Leslie to travel to Las Vegas, Nevada under the pretense that he wanted to mentor Ms. Leslie, including by helping her with her acting skills.

108.    When Ms. Leslie arrived in Las Vegas, she met Cosby at his suite, where Cosby directed Ms. Leslie to act like she was intoxicated under the pretense that this was an acting exercise.

109.    After Ms. Leslie did the exercise, Cosby offered Ms. Leslie an alcoholic beverage under the pretense that she would perform better if she had a sip of the drink.

110.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Leslie's knowledge or consent, prior to giving the beverage to Ms. Leslie.

111.    Ms. Leslie sipped some of the drink at Cosby's direction.

112.    Cosby then directed Ms. Leslie to wet her hair, which she did in the bathroom, assuming it would be for another acting scene. When she returned from the bathroom, Cosby was sitting on his bed, wearing only a white robe.

113.    Cosby then, without Ms. Leslie's consent, grabbed Ms. Leslie's hand, covering it in lotion.

114.    Cosby then, without Ms. Leslie's consent, forced Ms. Leslie's hand onto his penis and forced her to masturbate him, by holding and moving her hand on his penis.

115.    Cosby then tried to climb atop Ms. Leslie, but she fought him off.

116.    Cosby briefly went to the bathroom, and when he returned, told Ms. Leslie that she needed to leave because he had a phone call; Ms. Leslie fled the suite.

117.    Cosby engaged in sexual acts with Ms. Leslie without her consent and against her will.

118.    Ms. Leslie did not consent to any sexual acts that were perpetrated against her by Cosby in his suite.

### PLAINTIFF PAM JOY ABEYTA

119.    In or around 1979, Ms. Abeyta traveled with a friend and colleague of Cosby from California to Las Vegas, Nevada to meet Cosby for professional networking purposes.

120.    Ms. Abeyta was first introduced to Cosby in Cosby's dressing room, while other people were present, after Cosby performed a show in Las Vegas, Nevada.

121.    During their initial meeting, Cosby had his friend/colleague bring Ms. Abeyta to his suite under the pretense that they could continue their initial meeting that began in the dressing room.

122.    While in his suite that evening, Cosby invited Ms. Abeyta to attend a dinner show with him and others the next evening.

123.    That evening, Ms. Abeyta slept alone in one of the several bedrooms within Cosby's suite.

124.    The next evening, at the dinner show, Ms. Abeyta was provided with a beverage.

125.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Abeyta's knowledge or consent, prior to giving the beverage to Ms. Abeyta.

126.    After Ms. Abeyta drank the beverage, she felt dizzy and required assistance to return to the suite.

127.    After the dinner show ended, Cosby returned to the suite, where Ms. Abeyta was alone, sitting in the living room area.

128.    When Cosby returned, he put a pill in Ms. Abeyta's mouth without her consent, under the pretense that it would relax her.

129.    Shortly after swallowing the pill, Ms. Abeyta blacked out.

130.    When Ms. Abeyta awoke, she was in Cosby's bedroom, within the suite, with Cosby naked and atop her.

131.    Ms. Abeyta also recalls touching Cosby's penis in her compromised state, and the bed being wet, potentially from Cosby's ejaculate.

132.    That same evening, as Ms. Abeyta was regaining her consciousness and clarity of mind, Cosby placed a second pill in her mouth, without her consent, causing her to black out again.

133.    The next morning, Ms. Abeyta's legs were sore, and she had bruises on her legs, including on her inner thighs.

134. Upon information and belief, Cosby engaged in sexual acts with Ms. Abeyta, including penetration, without her consent and against her will.

135. Ms. Abeyta did not consent to and did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby in his suite.

136. Cosby knew or should have known that Ms. Abeyta was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF HEIDI THOMAS

137. In or around 1984, Cosby invited Ms. Thomas to travel from Denver, Colorado to Reno, Nevada, under the pretense that he wanted to coach and mentor her as an actress.

138. When Ms. Thomas arrived in Reno, Nevada, she was taken by car to a private property where Cosby was staying.

139. As part of the supposed mentoring session, Cosby asked Ms. Thomas to read a monologue of a character who was intoxicated.

140. When Ms. Thomas told Cosby that she did not drink alcohol, Cosby insisted that she try an alcoholic beverage to aid her acting.

141. Cosby provided Ms. Thomas with a beverage under that pretense.

142. Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Thomas' knowledge or consent, prior to giving the beverage to Ms. Thomas.

143.    Ms. Thomas sipped the beverage provided to her by Cosby.

144.    After Ms. Thomas drank the beverage provided to her by Cosby, Ms. Thomas blacked out, and was in and out of consciousness for several days.

145.    During one moment of consciousness, Ms. Thomas found herself in bed with Cosby, who was naked and forcing his penis into her mouth.

146.    Cosby engaged in sexual acts with Ms. Thomas, including penetration, without her consent and against her will.

147.    Ms. Thomas did not consent to and did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

148.    Cosby knew or should have known that Ms. Thomas was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### PLAINTIFF JANE FAZZARI

149.    In the early 1970s, in Lake Tahoe, Nevada, Cosby invited Ms. Fazzari and her friend to a party under the false pretense that there would be celebrities at the party.

150.    After Cosby transported Ms. Fazzari and her friend by car to a house in Zephyr Cove, Nevada, Ms. Fazzari and her friend learned that there were no party or other guests at the house.

151.    While at the house, Cosby prepared a beverage and provided it to Ms. Fazzari.

152.    Upon information and belief, Cosby had placed or caused to have placed an intoxicant in the beverage, without Ms. Fazzari's knowledge or consent, prior to giving the beverage to Ms. Fazzari.

153.    After Ms. Fazzari consumed the beverage provided by Cosby, she lost consciousness.

154.    As Ms. Fazzari went in and out of consciousness, she found herself naked, with Cosby vaginally raping her.

155.    Cosby engaged in sexual acts with Ms. Fazzari, including penetration, without her consent and against her will.

156.    Ms. Fazzari did not consent to and did not have the mental or physical capacity to consent to or resist any sexual acts that were perpetrated against her by Cosby.

157.    Cosby knew or should have known that Ms. Fazzari was mentally or physically incapable of consenting or resisting when he engaged in sexual acts with her.

### AS AND FOR A FIRST CAUSE OF ACTION
### BY ALL PLAINTIFFS FOR SEXUAL ASSAULT

158.    Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

159.    Cosby's conduct constituted sexual assault under Nevada Revised Statutes, Chapter 11; Added by 2023 Nev. SB 129, § 1.

160.   Cosby forcefully sexually penetrated or otherwise sexually assaulted Plaintiffs against their will, all while Cosby knew they were mentally and physically incapable of resisting or consenting.

161.   As a direct, proximate, and legal result of Cosby's sexual assault of Plaintiffs, Plaintiffs suffered horrific injuries, including, but not limited to, severe physical injury, emotional distress, and lifelong psychological trauma.

162.   At all times mentioned herein, Cosby intended to cause Plaintiffs injury and/or his acts constituted despicable conduct with a willful and conscious disregard of the rights or safety of Plaintiffs and others.

163.   As a direct and proximate result of the sexual assaults, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, mental anguish, embarrassment, and humiliation.

164.   As a direct and proximate result of the aforementioned sexual assaults, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

165.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

166.    By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate, to deter said Defendant and others from future similar misconduct.

167.    Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

<div align="center">

**AS AND FOR A SECOND CAUSE OF ACTION**
**BY ALL PLAINTIFFS FOR BATTERY**

</div>

168.    Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

169.    Cosby's unlawful, abusive, manipulative, and predatory acts against Plaintiffs amounted to harmful and offensive contacts to Plaintiffs' persons, each of which was done intentionally by Cosby without Plaintiffs' consent.

170.    Cosby willfully and lawfully used force or violence upon Plaintiffs.

171.    Cosby touched Plaintiffs with the intent to harm or offend Plaintiffs.

172.    Plaintiffs did not consent to the touching.

173.    Cosby's conduct in touching Plaintiffs was harmful and offensive.

174.     As a direct and proximate result of the batteries, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

175.   As a direct and proximate result of the aforementioned batteries, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

176.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

177.   By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate, to deter said Defendant and others from future similar misconduct.

178.   Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

### AS AND FOR A THIRD CAUSE OF ACTION
### BY ALL PLAINTIFFS FOR ASSAULT

179.   Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

180.   Cosby's predatory, abusive, manipulative, and unlawful acts against Plaintiffs created a reasonable apprehension in Plaintiffs of immediate harmful or offensive contact as to Plaintiffs' persons, all of which was done intentionally by Cosby to Plaintiffs without Plaintiffs' consent.

181.   Cosby unlawfully attempted to use physical force against Plaintiffs.

182.   Cosby intentionally placed Plaintiffs in reasonable apprehension of immediate bodily harm.

183.   Plaintiffs were in reasonable apprehension of immediate bodily harm because of the conduct of Cosby.

184.   As a direct and proximate result of the aforementioned assaults, Plaintiffs sustained in the past and will continue to sustain in the future serious and severe psychological injuries and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

185.   As a direct and proximate result of the aforementioned assaults, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

186.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

187.   By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

188.   Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

## AS AND FOR A FOURTH CAUSE OF ACTION
## BY ALL PLAINTIFFS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

189.   Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

190.   Cosby engaged in outrageous and extreme conduct toward Plaintiffs with the intention to cause, or with reckless disregard for the probability of causing, Plaintiffs to suffer severe emotional distress.

191.   Cosby knew Plaintiffs were incapacitated and could not consent, and he intended to sexually batter Plaintiffs with a complete disregard of the physical and emotional trauma caused to Plaintiffs.

192.   As a proximate result of the outrageous and extreme conduct of Cosby in assaulting and battering Plaintiffs, Plaintiffs suffered and continue to suffer extreme mental distress, humiliation, anguish, and emotional and physical injuries, as well as economic losses, in amounts to be proven at trial.

193.   Cosby committed the acts alleged herein maliciously, fraudulently, and oppressively with the wrongful intention of injuring Plaintiffs from an improper or evil motive amounting to malice and/or in conscious disregard of Plaintiffs' rights, entitling Plaintiffs to recover punitive damages from Cosby in such sums as a jury would find fair, just, and appropriate, to deter Cosby and others from future similar misconduct.

194.   As a direct and proximate result of the intentional infliction of emotional distress, Plaintiffs sustained in the past and will continue to sustain in

the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

195.   As a direct and proximate result of the aforementioned intentional infliction of emotional distress, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation. By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

196.   By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

197.   Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

## AS AND FOR A FIFTH CAUSE OF ACTION
## BY ALL PLAINTIFFS FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

198.   Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

199.   Cosby's conduct created a risk of physical harm to Plaintiffs.

200.    Cosby failed to exercise the degree of care that an ordinarily careful and prudent person would exercise under the circumstances set forth above.

201.    Plaintiffs' lifelong suffering of emotional distress from Cosby's conduct was a foreseeable risk that Cosby knew or should have known before engaging in the above-described horrendous acts towards Plaintiffs.

202.    As a direct and proximate result of the aforementioned negligence, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, physical injury, mental anguish, embarrassment, and humiliation.

203.    As a direct and proximate result of the aforementioned negligence, Plaintiffs have incurred or will incur medical expenses and other economic damages to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment, and humiliation.

204.    By reason of the foregoing, Plaintiffs are entitled to compensatory damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

205.    By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

206.    Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

## AS AND FOR A SIXTH CAUSE OF ACTION
## BY ALL PLAINTIFFS FOR FALSE IMPRISONMENT

207.    Plaintiffs repeat, reiterate and reallege every allegation contained in all preceding paragraphs with the same force and effect as if hereafter set forth at length.

208.    Cosby, intentionally and without the right to do so, confined Plaintiffs within boundaries fixed by Cosby.

209.    Cosby's acts directly or indirectly resulted in the confinement of Plaintiffs.

210.    Plaintiffs were aware of their confinement.

211.    Plaintiffs were harmed by their confinement.

212.    As a direct and proximate result of the false imprisonments, Plaintiffs sustained in the past and will continue to sustain in the future psychological injury, pain and suffering, serious and severe psychological and emotional distress, mental anguish, physical injury, embarrassment, and humiliation.

213.    By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Cosby in such sums as a jury would find fair, just, and adequate.

214.    By reason of the foregoing, Plaintiffs are further entitled to punitive damages from defendant Cosby in such sums as a jury would find fair, just, and adequate.

215.    Upon information and belief, as a proximate result of the conduct alleged hereinabove, Plaintiffs have suffered damages, including special and general damages, according to proof.

## JURY DEMAND

216.    Plaintiffs hereby demand that this matter be tried by a jury.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Compensatory damages to each Plaintiff for pain, suffering, injury, emotional distress, and for medical expenses, past and future;

2.    Prejudgment interest and post judgment interest as allowed under the law;

3.    Punitive damages to each Plaintiff as permitted under the law;

4.    Attorneys' fees and costs as permitted under the law; and

5.    Such other and further relief against Defendant in such sum as a jury would find fair, adequate, and just.

Dated:     Clark County, Nevada
          August 3, 2023

**MERSON LAW, PLLC**

  /s/ Jordan Rutsky
Jordan K. Rutsky, Esq.
Jordan K. Merson, Esq.
Nathan E. Werksman, Esq.
Alice A. Bohn, Esq.
Manraj S. Sekhon, Esq.
Attorneys for Plaintiffs
To Be Admitted *Pro Hac Vice*

Dated:     Clark County, Nevada
          August 3, 2023

**PANISH, SHEA, BOYLE, RAVIPUDI, LLP**
300 South Fourth Street, Suite 710
Las Vegas, Nevada 89101

  /s/ Brian J. Panish
Brian J. Panish, Esq.
Rahul Ravipudi, Esq
Robert Glassman Esq.

29

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

LILI BERNARD                    1:21-cv-18566-NLH-MJS

        Plaintiff,          OPINION

    v.

WILLIAM COSBY
        Defendant.

---

Appearances:

JORDAN KOEL MERSON
JORDAN K. RUTSKY
MERSON LAW, PLLC
950 THIRD AVENUE
18TH FLOOR
NEW YORK, N.Y. 10022

    *On behalf of Plaintiff*

JENNIFER ANN BONJEAN
ASHLEY BLAIR COHEN
BONJEAN LAW GROUP, PLLC
750 LEXINGTON AVENUE
9TH FLOOR
NEW YORK, N.Y. 10022

    *On behalf of Defendant*

HILLARY MARA NAPPI
HACH ROSE SCHIRRIPA & CHEVERIE LLP
112 MADISON AVENUE
10TH FLOOR
NEW YORK, N.Y. 10016

    *On behalf of Amicus Curiae*

**HILLMAN**, District Judge

Pending before the Court is Defendant William Cosby's ("Defendant") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF 10). For the reasons expressed below, Defendant's motion will be denied.

## I. Background

For the purposes of the instant motion, the Court will treat as true all facts alleged in the Complaint and draw all reasonable inferences in favor of Plaintiff Lili Bernard ("Plaintiff"). See Jones v. Pi Kappa Alpha Int'l Fraternity, 431 F. Supp. 3d 518, 522 (D.N.J. Dec. 18, 2019).

Plaintiff, a citizen of California, (ECF 1 at ¶¶ 1, 6), met Defendant, a citizen of Pennsylvania, (id. at ¶¶ 2, 7), on the set of Defendant's television program, The Cosby Show, (id. at ¶ 9). In July of 1990, Defendant offered to mentor Plaintiff in acting and for several weeks thereafter led her through theatrical exercises, asked her detailed personal questions, and promised that if she worked hard and followed his direction, he'd feature her in a principal speaking role on The Cosby Show. (Id. at ¶¶ 10-11). During one such mentoring session involving vocal projection, Defendant grabbed Plaintiff by the ribs without permission and then fondled her breasts. (Id. at ¶ 13).

In August of 1990, Defendant convinced Plaintiff to travel from New York to Trump Taj Mahal in Atlantic City, New Jersey

2

for a meeting with Defendant and an entertainment producer and arranged for her transportation.  (Id. ¶¶ 15-16).  The meeting continued from a Taj Mahal dining room to a suite and Defendant prepared what was represented as a non-alcoholic beverage for Plaintiff.  (Id. at ¶¶ 19-20).  After drinking the beverage, Plaintiff immediately felt dizzy, weak, and nauseous and later vomited and lost consciousness.  (Id. at ¶¶ 21-22).

Plaintiff woke to Defendant undressing her despite her protest before falling back out of consciousness.  (Id. at ¶¶ 23-24).  When Plaintiff next regained temporary consciousness, Defendant was naked and on top of her, penetrating her vaginally with his penis.  (Id. at ¶ 25).  Plaintiff woke again in an empty bathtub or jacuzzi still unable to move and, next, the following morning naked and in bed.  (Id. at ¶¶ 26-27).  After Plaintiff woke, Defendant sat her up, dressed her, handed her money, and walked her to a waiting car that drove her back to New York.  (Id. at ¶¶ 28-29).

Following the sexual assault in Atlantic City, Defendant threatened that he would file a police report against her, sue her for defamation, prevent her from working in the entertainment industry, and "erase" her if she reported the incident.  (Id. at ¶¶ 31-33).  Defendant drugged and assaulted Plaintiff on additional unspecified occasions.  (Id. at ¶ 30).

Plaintiff filed the instant Complaint on October 24, 2021

3

pursuant to New Jersey's statutory extension of the statute of
limitations for injuries resulting from sexual offenses, (<u>id.</u> at
¶ 8), which provided a two-year window following its enactment
to bring otherwise time-barred actions in tort resulting from
the commission of a sexual assault, "any other crime of a sexual
nature," or statutorily defined sexual acts or sexual abuse.
N.J.S.A. 2A:14-2b(a).  The Complaint contains five counts, four
intentional torts – assault, (ECF 1 at ¶¶ 38-42), battery, (<u>id.</u>
at ¶¶ 44-47), intentional infliction of emotional distress
("IIED"), (<u>id.</u> at ¶¶ 49-55), and false imprisonment, (<u>id.</u> at ¶¶
57-61) – as well as a separate count for punitive damages, (<u>id.</u>
at ¶¶ 63-67).[1]

Defendant moved for dismissal pursuant to Federal Rule of
Civil Procedure 12(b)(6).  (ECF 10).  Plaintiff filed an
opposition, (ECF 12), and Defendant replied, (ECF 13).  CHILD
USA, a "non-profit national think tank working to end child
abuse and neglect in the United States," (ECF 11-1 at ¶ 2),
moved for leave to file an amicus brief, (ECF 11).  In an August
11, 2022 Opinion and Order, the Court granted CHILD USA's

---

[1] The Complaint contains five counts, four intentional torts and
one demand for punitive damages.  While, as discussed below,
Plaintiff may pursue punitive damages, damages themselves are a
remedy rather than a cause of action and "an independent count
for punitive damages is not cognizable."  <u>See</u> <u>Bond v. Solvay</u>
<u>Specialty Polymers, USA, LLC</u>, 583 F. Supp. 3d 643, 654 (D.N.J.
Feb. 2, 2022).

4

motion.  (ECF 14; ECF 15).  CHILD USA filed a brief opposing
Defendant's motion to dismiss that same day.  (ECF 16).

## II. Discussion

### A. Jurisdiction

The Court has jurisdiction over this matter as the parties
are diverse in citizenship and the amount in controversy exceeds
$75,000.  See 28 U.S.C. § 1332(a).

### B. Motion to Dismiss

Pursuant to the Federal Rules of Civil Procedure, a party
may assert by motion a failure to state a claim upon which
relief can be granted.  See Fed R. Civ. P. 12(b)(6).  "To
survive a motion to dismiss, a complaint must provide 'a short
and plain statement of the claim showing that the pleader is
entitled to relief,'" Doe v. Princeton Univ., 30 F.4th 335, 341-
42 (3d Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)), and –
accepting the plaintiff's factual assertions, but not legal
conclusions, as true – "'plausibly suggest[]' facts sufficient
to 'draw the reasonable inference that the defendant is liable
for the misconduct alleged,'" id. at 342 (quoting Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 557 (2007) and Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009)).

The sufficiency of a complaint is determined by "(1)
identifying the elements of the claim, (2) reviewing the
complaint to strike conclusory allegations, and then (3) looking

at the well-pleaded components of the complaint and evaluating

whether all of the elements identified in part one of the

inquiry are sufficiently alleged." Malleus v. George, 641 F.3d

560, 563 (3d Cir. 2011).

### C. Interpretation and Constitutionality

Central to Defendant's motion to dismiss is the

application, and overall constitutionality, of New Jersey's

statute providing a two-year revival window for otherwise time-

barred claims arising out of sexual offenses.  The statute, in

relevant part, provides:

> Notwithstanding the statute of limitations provisions
> of N.J.S.2A:14-2, section 2 of P.L.2019, c. 120
> (C.2A:14-2a), section 1 of P.L.1964, c. 214 (C.2A:14-
> 2.1), or any other statute, an action at law for an
> injury resulting from the commission of sexual
> assault, any other crime of a sexual nature, a
> prohibited sexual act as defined in section 2 of
> P.L.1992, c. 7 (C.2A:30B-2), or sexual abuse as
> defined in section 1 of P.L.1992, c. 109 (C.2A:61B-1),
> that occurred prior to the effective date of P.L.2019,
> c. 120 (C.2A:14-2a et al.), and which action would
> otherwise be barred through application of the statute
> of limitations, may be commenced within two years
> immediately following the effective date.

N.J.S.A. 2A:14-2b(a).

Federal courts sitting in diversity "are required to apply

the substantive law of the state whose law governs the action."

Spence v. ESAB Grp., Inc., 623 F.3d 212, 216 (3d Cir. 2010)

(citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)); see

also Schmigel v. Uchal, 800 F.3d 113, 119 (3d Cir. 2015)

("Pursuant to the Erie doctrine, '[a] federal court sitting in diversity must apply state substantive law and federal procedural law.'" (alteration in original) (quoting Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000))).[2]

Where, as here, a court is tasked with interpreting a

-----

[2] Federal courts exercising diversity jurisdiction apply the choice-of-law analysis of the forum state to determine which state's substantive laws should apply. See Mills v. Ethicon, Inc., 406 F. Supp. 3d 363, 373 (D.N.J. Aug. 27, 2019) (citing Warriner v. Stanton, 475 F.3d 497, 499-500 (3d Cir. 2007)). New Jersey employs a two-step analysis in which courts first determine whether an actual conflict between the various state laws exist. Id. (citing P.V. ex rel. T.V. v. Camp Jaycee, 962 A.2d 453 (N.J. 2008)). If there is no conflict, the law of the forum state applies, however, if a conflict does exist courts proceed to the second step to "determine 'which state has the "most significant relationship" to the claim at issue by weighing the factors' in the applicable section of the Restatement (Second) of Conflict of Laws." Id. (quoting Agostino v. Quest Diagnostics Inc., 256 F.R.D. 437, 461 (D.N.J. Feb. 11, 2009)). Because the parties here do not address which state's tort laws should apply in this action, instead focusing on New Jersey's revival statute, the Court will not weigh the similarities and differences between New Jersey, Pennsylvania, and California tort law here. See Stewart v. Beam Glob. Spirits & Wine, Inc., 877 F. Supp. 2d 192, 196 (D.N.J. June 29, 2012) (declining to conduct a choice-of-law analysis without full briefing and applying New Jersey law limited to the claims of named plaintiffs and absent class members whose claims would be governed by New Jersey law). The Court is satisfied that, even assuming that a conflict exists due to the revived statute of limitations available under New Jersey law, see Rigollet v. Kassoff, 570 F. Supp. 3d 246, 249 (D.N.J. Nov. 4, 2021) (recognizing an actual conflict between New Jersey and Florida laws due to their different statutes of limitations for legal malpractice claims), that Section 145 of the Restatement (Second) of Conflict of Laws pertaining to torts would favor New Jersey law as it is the state in which both the injury and conduct that caused the injury occurred, see Restatement (Second) of Conflict of Laws §§ 145(2)(a),(b) (1971); see also P.V., 962 A.2d at 461-63 (applying Section 145).

7

statutory provision not previously interpreted by a state's high court, the objective "is to predict how the [New Jersey] Supreme Court would rule on this question of New Jersey law." See Roma v. United States, 344 F.3d 352, 361 (3d Cir. 2003) (citing U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996)).  In so doing, the plain language of the statute may provide "persuasive indication" as to how a state high court would rule, see id. at 362, along with state intermediate appellate decisions, federal courts interpreting the state's law, analogous decisions, and other persuasive material, see Spence, 623 F.3d at 216-17; Fink v. Ritner, 318 F. Supp. 2d 225, 228 (D.N.J. May 24, 2004) ("A court will consider the New Jersey legislature's purpose for enacting such a statute, as well as how the New Jersey courts have interpreted and applied the statute.").

## III. Analysis

### A. Defendant's Interpretive Challenges to N.J.S.A. 2A:14-2b

The Court will first consider Defendant's arguments pertaining to interpretation of N.J.S.A. 2A:14-2b.  Defendant's submissions seek to whittle down Plaintiff's potential causes of action until there is nothing left for her to open the two-year revival window of N.J.S.A. 2A:14-2b.  First, Defendant asserts that, because Plaintiff was twenty-six years old at the time of the alleged assault in Atlantic City, she cannot be granted

8

relief for a "prohibited sexual act" or "sexual abuse," as referenced in the revival statute, (ECF 10-2 at 8-10; ECF 13 at 2); see also N.J.S.A. 2A:14-2b(a), because both require the alleged victim to be under the age of eighteen, see N.J.S.A. 2A:30B-2 (listing prohibited sexual acts and defining "Child" as "any person under 18 years of age"); N.J.S.A. 2A:61B-1(a)(1) (defining "sexual abuse" as "an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult").

Relatedly, Defendant, relying on the New Jersey Supreme Court's decision in Hardwicke v. American Boychoir School, 902 A.2d 900 (N.J. 2006), asserts that Plaintiff's common-law tort claims cannot be revived without a statutory cause of action not presented here, (ECF 10-2 at 13-15). With the specifically cited triggers for revival unavailable, Defendant claims that Plaintiff cannot state a cause of action for an injury resulting from the commission of a sexual assault or "other crime of a sexual nature" because she has not pled that Defendant was convicted of a crime. (ECF 10-2 at 9-12).

The Court is unpersuaded. The Court first holds that Plaintiff need not plead that Defendant has been convicted of sexual assault or other sexual offense. Defendant's position is based, in part, on the fact that "sexual assault" is defined in the New Jersey Code of Criminal Justice and that the Code

9

equates guilt with commission.  (Id. at 11 (citing N.J.S.A.
2C:14-2(a)); see also N.J.S.A. 2C:14-2(a) ("An actor is guilty
of aggravated sexual assault if the actor commits an act of
sexual penetration with another person . . . .").  Defendant
also notes that Plaintiff pursued criminal charges against
Defendant and the Atlantic City Prosecutor declined to
prosecute.  (ECF 10-2 at 10 n.6).

The revival statute unambiguously provides the two-year
revival window for "an action at law for an injury resulting
from the commission of" a sexual assault or other crime of a
sexual nature.  N.J.S.A. 2A:14-2b(a) (emphasis added).
Therefore, the Court finds that the plain, unambiguous language
of the statute supports the interpretation that the revival
window is triggered by the commission of, rather than conviction
for, a sexual assault or other sexual offense.  See Rosano v.
Twp. of Teaneck, 754 F.3d 177, 186 (3d Cir. 2014) ("As with any
question of statutory interpretation, our analysis begins with
the plain language of the statute." (quoting Jimenez v.
Quarterman, 555 U.S. 113, 118 (2009))).

Had the New Jersey Legislature intended to require
conviction, rather than commission, to trigger the revival
window, the Court finds that it surely would have done so in
plain and simple language.  Instead, it chose the broader term –
"commission" – over the narrower one – "conviction."  In the

10

absence of some ambiguity – and there is none – we assume the Legislature intended the meaning of the words it used.  The fact that the Legislature utilized the word "commit" in the state criminal code to define a criminal act does not usurp the use of that common and ordinary word in the other legal contexts, such as here common law tort, nor does it require the Court to ascribe more meaning to it than that context would otherwise require.

Moreover, Defendant's conflation of commission and conviction further ignores the differences between criminal and civil matters – including different objectives, evidentiary burdens, and penalties.  See Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 147 (3d Cir. 2002) (noting that evidence of non-arrest is generally inadmissible at related civil trials because of "the fact that criminal and civil trials require different burdens of proof for proving guilt and liability, respectively").  State and federal courts in New Jersey have consistently drawn a distinction between civil and criminal liability.  See, e.g., Sec. and Exch. Comm'n v. Hatch, 128 F.R.D. 58, 63 (D.N.J. Sept. 25, 1989) (declining to vacate a consent injunction on the basis that related criminal charges were dismissed, concluding that "criminal action dismissals are of no relevance to a determination of civil liability"); Velazquez v. City of Camden, 146 A.3d 681, 687-89 (N.J. Super.

Ct. App. Div. 2016) (holding that testimony that defendant police officer was not to be prosecuted was violative of the New Jersey Rules of Evidence); see also cf. State v. Damiano, 730 A.2d 376, 384 (N.J. Super. Ct. App. Div. 1999) ("Obviously, criminal liability cannot attach simply because civil liability attaches.").

Further, as recognized by the Third Circuit in Johnson, a decision not to pursue criminal charges may be influenced not only by more stringent evidentiary burdens, but other factors such as allocation of resources.  See 283 F.3d at 147; see also Velazquez, 146 A.3d at 688-89 (discussing Johnson).  The New Jersey Legislature is presumed to be aware of such decisions. See Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 74 A.3d 860, 872 (N.J. 2013).

Although, given the lack of ambiguity in the statutory language, the Court need not undertake the oft-times perilous task of reviewing legislative history, this interpretation is further supported by statements by members of the New Jersey Legislature emphasizing the time sometimes necessary for victims of sexual offenses to come forward.  See Governor Murphy Signs Legislation Extending the Civil Statute of Limitations for Sexual Abuse Claims in New Jersey, Governor Phil Murphy (May 13, 2019), https://www.nj.gov/governor/news/news/562019/approved/20190513c.shtml ("Because those who have been sexually abused

12

often suppress their memories for years or don't connect their injuries to their abuse, they need much more time to file a civil action.  This new law gives them that time." (quoting Assemblymember Annette Quijano)).  If intended beneficiaries of the revival statute are unable to come forward until after many years later to pursue civil actions, logic dictates that these individuals also did not pursue criminal charges following the offenses.

As the plain language of the revival statute, existing distinctions between criminal and civil law, and legislative intent all point toward a finding that civil liability within the revival window is not premised on conviction, the Court holds that Defendant's argument must fail.  While, as will be discussed infra, Plaintiff must sufficiently demonstrate that a sexual assault or other sexual offense occurred, such a showing need not take place at this juncture, satisfy criminal evidentiary burdens, or be supported by a prior conviction.

Because the Court concludes that plaintiffs may access the revival window by alleging commission of sexual assault or other sexual offense, Defendant's argument contending that Plaintiff must tether her intentional tort claims to a statutory cause of action must fail.  Defendant's argument is based on a reading of Hardwicke, which noted that the plaintiff's common-law claims were based on sexual abuse as defined by the Child Sexual Abuse

13

Act ("CSAA") and the New Jersey Supreme Court's caution against
reading the opinion as permitting application of the CSAA's
tolling provisions for conduct not within the statutory
definition of sexual abuse.  (ECF 10-2 at 14-15); <u>see also</u>
<u>Hardwicke</u>, 902 A.2d at 919, 919 n.12.  Though Defendant concedes
that the CSAA has since been amended, he emphasizes that the New
Jersey Legislature cited <u>Hardwicke</u> in so doing and that "based
on sexual abuse" language remains.  (ECF 10-2 at 15).

However, Defendant fails to acknowledge that the same bill
referenced in his brief that amended the CSAA amended or
otherwise changed multiple statutes and created the revival
window expressly applicable to "Child and Adult Victims."  <u>See</u>
N.J. S. Judiciary Comm. Statement to S. Comm. For S. No. 477, §
9 (Mar. 7, 2019).  The Court holds that this statement provides
evidence of legislative intent for the revival statute to apply
to adults and, logically, not be limited by the language of the
CSAA.  As Defendant appears to understand, "[a]s written, the
reviver statute requires a claim to be tethered to a statutory
cause of action either 'based on sexual abuse' or 'resulting
from' the commission of a crime."  (ECF 10-2 at 15).

The Court is not alone in finding that causes of action
defined within the CSAA are not required to trigger the revival
window.  In <u>S.Y. v. Roman Catholic Diocese of Paterson</u>, the
plaintiff alleged in his complaint that the assault and abuse he

14

suffered "constitute[d] crimes of a sexual nature."  No. 20-2605, 2021 WL 4473153, at *1 (D.N.J. Sept. 30, 2021).  The court, in denying the defendant's motion to dismiss, concluded that the plaintiff could sustain his negligence claims based on specific accusations in the complaint, including prior abuse and an alleged policy aimed to prevent a scandal within the clergy. Id. at *9.  Though S.Y. is distinguishable from the instant matter in that the plaintiff was a minor at the time of the alleged assaults and the action was brought against the diocese as opposed to the alleged abuser, the Court finds that the plaintiff's use of the revival statute's "crimes of a sexual nature" language and lack of a cited conviction supporting the analysis adds further support to the Court's conclusion.  The Court therefore rejects Defendant's interpretative challenges to the revival statute.

**B. Defendant's Vagueness Argument**

Defendant next contends that if the revival statute does not require a plaintiff to be a minor or demonstrate that the defendant was convicted of a sexual offense, the statute must be void for vagueness.  The Court disagrees.

"The 'void for vagueness' doctrine arises under the due process clause of the Fourteenth Amendment, and is designed to give 'fair warning' of prohibited conduct."  Scavone v. Pa. State Police, 501 Fed. Appx. 179, 181 (3d Cir. 2012) (quoting

15

San Filippo v. Bongiovanni, 961 F.2d 1125, 1135 (3d Cir. 1992)).
The vagueness doctrine aims to ensure the nondiscriminatory
application of laws.  See Waterman v. Farmer, 183 F.3d 208, 212
n.4 (3d Cir. 1999) (citing Kreimer v. Bureau of Police for the
Town of Morristown, 958 F.2d 1242, 1266 (3d Cir. 1992)).
Therefore, a "statute is unconstitutionally vague under the Due
Process Clause if it '(1) "fails to provide people of ordinary
intelligence a reasonable opportunity to understand what conduct
it prohibits"; or (2) "authorizes or even encourages arbitrary
and discriminatory enforcement."'"   United States v. Fontaine,
697 F.3d 221, 226 (3d Cir. 2012) (quoting United States v.
Stevens, 533 F.3d 218, 249 (3d Cir. 2008)); see also F. for
Acad. and Institutional Rts., Inc. v. Rumsfeld, 291 F. Supp. 2d
269, 317 (D.N.J. Nov. 5, 2003) (providing the same two
standards).

The vagueness doctrine applies to both criminal and civil
matters.  Mateo v. Att'y Gen., 870 F.3d 228, 232 (3d Cir. 2017).
Lesser degrees of specificity are required in civil matters as
compared to criminal due to the less severe potential penalties
implicated, id. (citing San Filippo, 961 F.2d at 1135), and
"[w]ether a law 'threatens to inhibit the exercise of
constitutionally protected rights' is critical in determining
the level of clarity demanded by the Constitution," Rumsfeld,
291 F. Supp. 2d at 317 (quoting Vill. of Hoffman Ests. v.

16

_Flipside, Hoffman Ests., Inc._, 455 U.S. 489, 499 (1982)).

Though a vagueness challenge may attack a law on its face or as applied, the conduct of the party challenging the law is of critical importance. See _Amaya v. New Jersey_, 766 F. Supp. 2d 533, 539 (D.N.J. Feb. 10, 2011); see also _Borden v. Sch. Dist. of Twp. of E. Brunswick_, 523 F.3d 153, 167 (3d Cir. 2008) ("The [vagueness doctrine] inquiry is completed on a case-by-case basis, and the party opposing the statute or standard must show that it is vague as applied to him." (citing _San Filippo_, 961 F.2d at 1136)). A party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." _Amaya_, 766 F. Supp. 2d at 539 (quoting _Vill. of Hoffman Ests._, 455 U.S. at 495).

Here, Defendant concedes that – had he been convicted of sexual assault – the revival statute would apply to Plaintiff's tort claims. However, "the amendment as applied to any other set of facts is vague, and the remainder of its language is vague on its face." (ECF 10-2 at 16-17). This is because, while "sexual assault" is defined in the New Jersey Code of Criminal Justice, it is not defined in the statute, and courts may similarly be forced to interpret what other crimes of a sexual nature might be. (_Id._ at 17-18). However, as noted by Plaintiff, (ECF 12-19 at 14), Chapter 14 of the New Jersey Code of Criminal Justice lists a finite number of recognized sexual

17

offenses and related definitions.  These include sexual assault, the definition of which includes "an act of sexual penetration with another person" when "[t]he actor commits the act using coercion or without the victim's affirmative and freely-given permission."  N.J.S.A. 2C:14-2(c)(1).

Therefore, the Court concludes that the New Jersey Code of Criminal Justice provides sufficient clarity as to what constitutes "sexual assault" and "any other crime of a sexual nature" in the revival statute.  For the reasons described above, the Court finds that, while civil plaintiffs must demonstrate that a sexual offense was committed, that showing need not include a criminal conviction or criminal evidentiary standards.  Because N.J.S.A. 2C:14-2 clearly defines proscribed "sexual assault" conduct, the Court holds that the revival statute is not vague as to Defendant and therefore analysis as to the statute's application in other contexts need not be considered.  See Amaya, 766 F. Supp. 2d at 539.

**C. Defendant's Vested Right in the Statute of Limitations**

Defendant next contends that the revival statute violates Due Process under both the United States and New Jersey Constitutions because it retroactively deprives Defendant of a vested right – an absolute defense under the statute of limitations – and should thus be struck down.  (ECF 10-2 at 19-22).  The Court joins other decisions within the District and

18

rejects Defendant's contention that the revival statute deprived him of a vested right in the statute of limitations.

The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive any person of life, liberty, or property, without due process of law.  U.S. Const. amend. XIV, § 1.  The New Jersey Constitution, relatedly, states that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  N.J. Const. art. I, ¶ 1.

The language of Article I, Paragraph 1 of the New Jersey Constitution has been found to "embrace the fundamental guarantee of due process," see Jamgochian v. N.J. State Parole Bd., 952 A.2d 1060, 1070 (N.J. 2008), and the New Jersey Constitution "affords greater protection for individual rights than its federal counterpart," State v. Melvin, 258 A.3d 1075, 1091 (N.J. 2021).  "Retroactive legislation that impairs or destroys a 'vested right' may violate the due process clauses" of the United States or New Jersey Constitutions.  See Twiss v. State Dep't of Treasury, 591 A.2d 913, 917 (N.J. 1991) (citing Panzino v. Cont'l Can Co., 364 A.2d 1043 (N.J. 1976)).

Though Defendant claims that the revival statute is violative of both the United States and New Jersey

Constitutions, the section of his brief largely focuses on the laws of New Jersey and other states. (ECF 10-2 at 19-22). New Jersey courts employ a two-part test when determining whether a statute may be applied retroactively: (1) whether the Legislature intended for it to be retroactively applied and (2) "whether retroactive application of that statute will result in either an unconstitutional interference with vested rights or a manifest injustice." See James v. N.J. Mfrs. Ins. Co., 83 A.3d 70, 77 (N.J. 2014) (quoting In re D.C., 679 A.2d 634, 644 (N.J. 1996)).

A finding of manifest injustice generally looks to reliance on existing law and the unfairness of changing that law retroactively. See D.C., 679 A.2d at 648 (citing Gibbons v. Gibbons, 432 A.2d 80 (N.J. 1981)); see also Nobrega v. Edison Glen Assocs., 772 A.2d 368, 384 (N.J. 2001) ("The manifest injustice analysis requires 'a weighing of the public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance.'" (quoting Nelson v. Bd. of Educ. of Twp. of Old Bridge, 689 A.2d 1342, 1349 (N.J. 1997))); Phillips v. Curiale, 608 A.2d 895, 904 (N.J. 1992) ("[W]e must consider in the weighing process the extent to which plaintiff changed his position in reliance on the existing law . . . or had his reasonable expectations defeated.").

20

Applied to the present matter, the New Jersey Legislature clearly intended for the revival statute to have retroactive effect by expressly referencing otherwise time-barred actions. See N.J.S.A. 2A:14-2b(a).  Moving toward the second prong of the analysis, the Court notes that a "defendant's expectation or hope that the statute of limitations would bar a tort suit against him arising from his criminal conduct is not a constitutionally protected interest," see Short v. Short, 858 A.2d 571, 575 (N.J. Super. Ct. App. Div. 2004) (citing Panzino v. Cont'l Can Co., 364 A.2d 1043 (N.J. 1976)), and though Defendant contends that it would be "manifestly unfair" for him to defend allegations from three decades ago, (ECF 10-2 at 20), he does not show that he changed his position in reliance of then-existing law or that that reliance outweighs the public interest in retroactive application.  In other words, Defendant's alleged actions were as illegal at the time of their commission as they are now.  The only difference is the length of time Plaintiff has been provided to seek recourse.

Courts within the District of New Jersey have arrived at same conclusion with respect to the constitutionality of the revival statute, albeit with focuses limited to the New Jersey Constitution.  See S.Y., 2021 WL 4473153, at *5-8; W.F. v. Roman Cath. Diocese of Paterson, No. 20-7020, 2021 WL 2500616, at *3-4 (D.N.J. June 7, 2021).  These decisions provide persuasive

21

support that the revival statute's public purpose of correcting injustices suffered by victims of sexual offenses outweighs any expectation in an earlier statute of limitations for conduct that was illegal at the time of commission, see W.F., 2021 WL 2500616, at *4, and that a defendant's expectation in the continuance of a law cannot alone constitute a vested right or manifest injustice, see S.Y., 2021 WL 4473153, at *8 (citing Phillips, 608 A.2d at 903-04 and D.J.L. v. Armour Pharm. Co., 704 A.2d 104, 115 (N.J. Super. Ct. Law. Div. 1997)).

The Court finds that turning to the United States Constitution does not produce a different result.  See Pittsburgh Can Co. v. United States, 113 F.2d 821, 824 (3d Cir. 1940) (discussing Campbell v. Holt, 115 U.S. 620 (1885) and recognizing that statutes of limitations "confer no vested rights"); see also Evan H., ex rel. Kosta H. v. Unionville-Chadds Ford Sch. Dist., No. 07-4990, 2008 WL 4791634, at *4 (E.D. Pa. Nov. 4, 2008) ("[A] party possesses no vested right in a statute of limitations." (citing Pittsburgh Can Co., 113 F.2d at 824 and Terry v. Anderson, 95 U.S. 628, 633 (1877))).

Defendant acknowledges decisions contrary to his position, but "urges this Court to strongly consider Justice Bradley's dissent in Campbell" and distinguish cases such as W.F. as being unique to minor victims.  (ECF 10-2 at 20-22).  For reasons articulated throughout this Opinion, the Court finds that the

22

New Jersey Legislature clearly intended for the revival statute to apply to adults and will not turn to a Nineteenth Century dissent when the more modern and well-reasoned authorities in front of it are clear.  The Court holds that Defendant has failed to demonstrate that the revival statute deprives him of a vested right or constitutes a manifest injustice.

### D. Defendant's **Ex Post Facto Challenge**

Finally, Defendant asserts that the revival statute violates the Ex Post Facto Clauses of the United States and New Jersey Constitutions.  (ECF 10-2 at 23-31).  The Court disagrees.

The Ex Post Facto Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law . . . ."  U.S. Const. art. I, § 10, cl. 1; Spanier v. Dir. Dauphin Cnty. Prob. Servs., 981 F.3d 213, 221 (3d Cir. 2020).  Similarly, under the New Jersey Constitution, "[t]he Legislature shall not pass any . . . ex post facto law . . . ."  N.J. Const. art. IV, § 7, ¶ 3.  "The New Jersey Ex Post Facto Clause is interpreted in the same manner as its federal counterpart."  Riley v. N.J. State Parole Bd., 98 A.3d 544, 552 (N.J. 2014) (citing Doe v. Poritz, 662 A.2d 367 (N.J. 1995)).

The prohibition against ex post facto statutes has been understood to be limited to laws that are penal in nature.  See, e.g., Collins v. Youngblood, 497 U.S. 37, 41 (1990) ("[I]t has

long been recognized by this Court that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them." (citing Calder v. Bull, 3 Dall. 386, 390–392 (1798) (opinion of Chase, J.); id. at 396 (opinion of Paterson, J.); id. at 400 (opinion of Iredell, J.))); Matter of Garay, 444 A.2d 1107, 1110 (N.J. 1982) ("There is no dispute that the constitutional ban against the passage of ex post facto laws applies only to criminal laws.").

Defendant does not dispute the general application of the Ex Post Facto Clauses.  Rather, Defendant – citing scholarly articles – asserts that Calder was wrongly decided in so far as it does not extend the ex post facto prohibition to civil laws. (ECF 10-2 at 23-28).  The revival statute, according to Defendant, either increases the punishment of those who have been convicted of a sexual offense or decreases the burden of proof necessary to find that defendant committed a sexual offense.  (Id. at 29-30).  Finally, Defendant argues that, because the CSAA, which is referenced in the revival statute, permits punitive damages, the revival statute may be deemed punitive.  (Id. at 30-31).

The Court will decline Defendant's invitation to challenge Calder and its more than two centuries of precedent.  For the reasons discussed above, the Court also finds that Defendant

24

conflates civil and criminal proceedings, and that the revival statute does not increase penalties for those convicted of a sexual offense or change evidentiary burdens as applied to those who have not been convicted.

With respect to Defendant's reference to punitive damages, the Court notes that the revival statute itself does not reference punitive or treble damages and that Plaintiff here seeks punitive damages under the common law and Punitive Damages Act.  (ECF 1 at ¶¶ 63-67).  Such damages, in the Court's view, do not implicate the Ex Post Facto Clauses.  See Roman Cath. Bishop of Oakland v. Superior Ct., 28 Cal. Rptr. 3d 355, 362 (Cal. Ct. App. 2005) ("[A] statute reviving the limitations period for a common law tort cause of action, thereby allowing the plaintiff to seek punitive damages, does not implicate the ex post facto doctrine . . . .").[3]

An analysis on the merits does not lead to a different result.  To be sure, "it is possible for a civil statute to be criminally punitive in effect."  United States ex rel. Int'l Brotherhood of Elec. Workers Loc. Union No. 98 v. Farfield Co., 5 F.4th 315, 336 (3d Cir. 2021).  However, so finding requires "clearest proof" based on factors including whether the civil

---

[3] Like the New Jersey Constitution, the ex post facto prohibition within the California Constitution "is analyzed in the same manner as its federal counterpart."  See People v. Castellanos, 982 P.2d 211, 213 (Cal. 1999).

sanction: (1) involves affirmative disability or restraint, (2) has historically be considered punishment, (3) requires a finding of scienter, (4) promotes retribution or deterrence, (5) applies to conduct that already constitutes a crime, (6) may serve an alternative purpose, and (7) appears excessive in relation to the alternative purpose. Id. (citing Hudson v. United States, 522 U.S. 93, 99-100 (1997)). Fairfield Co. involved an amendment to the False Claims Act ("FCA") and related treble damages, id. at 324-25, and the Third Circuit ultimately found that – on balance – its retroactive application did not violate the federal Ex Post Facto Clause, id. at 336-38.

Of particular relevance, the Third Circuit concluded that the FCA's treble damages and civil fines did not restrict individuals' physical liberty as imprisonment would and that monetary penalties have "not historically been viewed as punishment." Id. at 336. Further, the Circuit Court found that though the FCA promoted deterrence, "all civil penalties have some deterrent effect," id. at 337 (quoting Hudson, 522 U.S. at 102), and that "the separate existence of a criminal statute suggest[ed] that the civil statute serve[d] a different purpose," id.

Applied here, the Court agrees that potential punitive damages do not restrict Defendant's liberty, that monetary damages are not generally viewed as punishment, and that the

26

revival statute serves separate means as compared to the New Jersey Code of Criminal Justice.  Further, while a "monetary penalty likely promotes the traditional ends of punishment, retribution and deterrence, to some degree, that alone is not enough to characterize the penalty as penal in nature, rather than civil." See Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin., 302 Fed. Appx. 115, 120-21 (3d Cir. 2008) (considering an Eighth Amendment challenge to Section 1140 of the Social Security Act). The revival statute is only of minimal deterrent value, if any, as it applies only to a narrow range of previously extinguished claims arising from past conduct.  Further, while its revival of civil recourse, including punitive damages, may promote retribution, the Court finds that it does not itself increase penalties beyond those that have already existed.

Therefore, the Court holds that the punitive damages made available under the revival statute do not implicate the Ex Post Facto Clauses and, for the sake of completeness, that Defendant has failed to provide "clearest proof" to override legislative intent as to the civil nature of the revival statute.

## IV. Merits of Plaintiff's Claims

Having rejected Defendant's challenges to the revival statute, the Court moves to the merits of Plaintiff's claims.

In his reply to Plaintiff's opposition, Defendant raises several concerns regarding the use of an alleged sexual assault

to trigger the revival window, including how such a determination may be made, and Plaintiff's purported failure to plead sexual assault as defined in the New Jersey Code of Criminal Justice. (ECF 13 at 3-5). These points are well taken and the Court agrees that in circumstances such as the case at bar, a two-part analysis is required. First, the plaintiff must demonstrate a prohibited triggering act pursuant to the revival statute and, only after such showing, may a court move on to the second prong of the analysis – the plaintiff's otherwise time-barred claims.

Therefore, while the Court agrees with Defendant that "Plaintiff must, at some point, demonstrate a <u>commission</u> of a sexual assault," (<u>id.</u> at 4) (emphasis in original), that point is not the dismissal stage. Federal courts sitting in diversity apply state substantive law, but federal procedural law. <u>See</u> <u>Schmigel</u>, 800 F.3d at 119. A plaintiff's burden at the dismissal stage is to sufficiently plead, not prove their case. <u>See</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 213 (3d Cir. 2009) ("[A] plaintiff is not required to establish the elements of a <u>prima facie</u> case but instead, need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" (quoting <u>Graff v. Subbiah Cardiology Assocs., Ltd.</u>, No. 08-207, 2008 WL 2312671, at *4 (W.D. Pa. June 4, 2008))); <u>Tarrant v. Hamilton Twp. Sch. Dist.</u>,

No. 16-7058, 2017 WL 3023211, at *5 (D.N.J. July 14, 2017)
(citing <u>Fowler</u> and finding that "[a]t the pleading stage . . .
Plaintiff is not required to <u>prove</u> the elements of her <u>prima
facie</u> case").

Applied here, sexual assault as defined in the New Jersey
Code of Criminal Justice may be found upon the commission of an
act of sexual penetration using coercion or "without the
victim's affirmative and freely-given permission." N.J.S.A.
2C:14-2(c)(1). Plaintiff alleges that Defendant served her a
beverage that caused her to lose consciousness, undressed her
despite her protestation, and then penetrated her vaginally with
his penis. (ECF 1 ¶¶ 19-25). While Plaintiff will be required
to demonstrate by a preponderance of the evidence that a sexual
assault occurred should this case proceed to trial, <u>see</u> <u>N.L. v.
P.C.L.</u>, No. A-1918-18T2, 2020 WL 2790422, at *1 (N.J. Super. Ct.
App. Div. May 29, 2020) (per curiam) (affirming the issuance of
a restraining order in a domestic matter upon the establishment
of two acts of sexual assault by a preponderance of the
evidence); <u>see also</u> <u>Gardner v. Pawliw</u>, 696 A.2d 599, 609 (N.J.
1997) (noting that a preponderance-of-the-evidence standard is
generally applicable to tort claims), the Court holds that
Plaintiff's allegations as pled are sufficient to make out a
plausible claim of sexual assault and survive dismissal.

Because Plaintiff has satisfied the threshold part of the

29

analysis, the Court will move to her claims.  Plaintiff's
Complaint alleges four substantive counts – assault, battery,
false imprisonment, and IIED – and demands punitive damages.
The Court holds that Plaintiff has sufficiently pled the
elements of her four substantive claims as well as sufficient
facts which if true could justify an award of punitive damages.
See <u>Malleus</u>, 641 F.3d at 563.

Under New Jersey law, common-law assault requires: (1) an
action intending to cause a harmful or offensive contact or
place a person in imminent apprehension of such contact; and (2)
the person is placed in imminent apprehension, <u>see</u> <u>Leang v.
Jersey City Bd. of Educ.</u>, 969 A.2d 1097, 1117 (N.J. 2009)
(citing <u>Wigginton v. Servidio</u>, 734 A.2d 798 (N.J. Super. Ct.
App. Div. 1999)), while battery is premised "upon a
nonconsensual touching," <u>id.</u> (citing <u>Perna v. Pirozzi</u>, 457 A.2d
431 (N.J. 1983)).  Plaintiff alleges that Defendant physically
undressed her despite her protestation and then vaginally
penetrated her while she was falling in and out of
consciousness.  (ECF 1 at ¶¶ 23-25).  Such factual assertions –
which are to be accepted as true at this stage – are sufficient
to support Plaintiff's battery and assault claims.

Similarly, false imprisonment requires (1) arrest or
detention against a person's will and (2) lack of legal
authority or justification.  <u>Leang</u>, 969 A.2d at 1117 (citing

30

Mesgleski v. Oraboni, 748 A.2d 1130 (N.J. Super. Ct. App. Div. 2000)).  Constraint is the essential element of false imprisonment, not the use of physical force, therefore even words can cause sufficient constraint.  See Eivich v. E. Greenwich Twp., No. 1:20-cv-06851, 2021 WL 856883, at *4 (D.N.J. Mar. 8, 2021) (citing Earl v. Winne, 101 A.2d 535, 539 (N.J. 1954)).  Plaintiff alleges that Defendant served her what was represented as a non-alcoholic beverage and she thereafter felt nauseous, slipped in and out of consciousness, and was otherwise unable to move while she was undressed and assaulted.  (ECF 1 at ¶¶ 20-26).  The Court holds that Plaintiff adequately pleads that she was constrained by Defendant without legal authority or justification.

Next, to establish an IIED claim a plaintiff must prove (1) that the defendant acted intentionally or recklessly, (2) the conduct was "so 'extreme and outrageous . . . as to go beyond all possible bounds of decency,'" (3) proximate cause, and (4) severe emotional distress beyond which a reasonable person may be expected to endure.  Juzwiak v. Doe, 2 A.3d 428, 433 (N.J. Super. Ct. App. Div. 2010) (omission in original) (citing Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857 (N.J. 1988)).  An IIED claim may be premised on sexual conduct.  See Wilson v. Parisi, 633 A.2d 113, 115 (NJ. Super. Ct. App. Div. 1993) (reversing summary judgment in a New Jersey Law Against

31

Discrimination action in which a superior allegedly harassed, kissed, and fondled a subordinate).

Here, Plaintiff alleges that Defendant intentionally served her a beverage that caused her to lose consciousness and thereafter assaulted her, (ECF 1 at ¶¶ 20-26), and claims that as a result of Defendant's actions she has suffered permanent injuries including post-traumatic stress disorder, anxiety, depression, inability to sleep, and other injuries, (id. at ¶¶ 34-36).  These allegations, taken as true, are sufficient to support Plaintiff's IIED claim at the dismissal stage.

Finally, pursuant to the Punitive Damages Act, a plaintiff may be awarded punitive damages only when it is proven "by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S.A. 2A:15-5.12(a).  The trier of fact determines whether punitive damages are warranted by considering factors including the likelihood of serious harm at the time of the conduct, the defendant's awareness of the likelihood of serious harm, and concealment of the conduct by the defendant.  See 2A:15-5.12(b)(1), (2), (4).  The Punitive Damages Act has been found to have codified common-law punitive-damages principles.  See Rivera v. Valley Hosp., Inc., 280 A.3d

32

299, 310 (N.J. 2022).

Here, in addition to alleging that Defendant served her a beverage that caused her to lose consciousness, undressed her, and raped her, Plaintiff also claims that Defendant attempted to conceal these acts by threatening to file a police report against her, sue her for defamation, and harm her career. (ECF 1 at ¶¶ 31-33). The Court holds that those allegations, if proven, are sufficient to support Plaintiff's claim for punitive damages. To summarize, the Court holds that Plaintiff's Complaint alleges facts sufficient to revive her otherwise time-barred claims, survive dismissal of those claims, and allow a claim for punitive damages to proceed.

In so doing, the Court limits its holding to the alleged incidents that took place in Atlantic City in August 1990. Defendant correctly contends in his supporting brief that Plaintiff fails to provide similar details with respect to allegations that Defendant fondled her during a theatrical exercise and that she was assaulted, battered, and drugged by Defendant on additional occasions. (ECF 10-2 at 4 n.2). This lack of clarity and specificity raises a fair doubt as to which acts Plaintiff relies upon in asserting this Court is the proper venue for the allegations in the four counts of the Complaint and if those other alleged acts are intended to form the basis of a separate cause of action. See E. Controls, Inc. v.

33

<u>Borysowski</u>, No. 22-96, 2022 WL 740761, slip op. at 5 (D.N.J. Mar. 11, 2022) (recognizing that transfer, or even dismissal, for improper venue is within the discretion of district courts).[4] However, Plaintiff lumps together without reference to time or place all of the background facts when setting forth her four causes of action.

If Plaintiff intended the allegations related to Atlantic City to form the core allegations of each of the four counts – which would be sufficient for venue and is admittedly a fair reading of the Complaint – and merely offers the other allegations as evidence that such an assault occurred then she should say so in an amended pleading.[5]  If on the other hand, Plaintiff alleges these other acts to form the basis for a separate cause of action, her amended pleading should set forth when and where such acts occurred or be said to disavow them as standalone counts.  Accordingly, the Court will provide Plaintiff thirty days to file an amended complaint specifying

---

[4] The Court acknowledges that the uncertain location of these additional alleged incidents also implicates personal jurisdiction, but "because personal jurisdiction may be conferred by consent of the parties . . . a court may not <u>sua sponte</u> dismiss for want of personal jurisdiction."  <u>Jasper v. Bexar Cnty. Adult Det. Ctr.</u>, 332 Fed. Appx. 718, 719 (3d Cir. 2009) (omission in original) (quoting <u>Zelson v. Thomforde</u>, 412 F.2d 56, 59 (3d Cir. 1969)).

[5] The Court expresses no opinion at this time as to whether such evidence would be admissible at trial.  <u>See</u> Fed. R. Evid. 403, 404(b).

which acts she relies upon for establishing venue of each of the four counts in the Complaint and, to the extent that she intends to pursue them as standalone counts, the times and places of the non-Atlantic City allegations and setting them forth in separate counts.

## V. Conclusion

For the reasons stated above, Defendant's Motion to Dismiss, (ECF 10), will be denied.  Plaintiff will be provided thirty days to file an amended complaint to provide the clarity required above.

An Order consistent with this Opinion will be entered.


Date: January 3, 2023            s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.

# EXHIBIT 3

https://www.2news.com/townnews/parliament/sen-krasner-introduces-bill-to-remove-statute-of-limitation-on-civil-sexual-assault-cases/article_8091aa80-b262-11ed-a015-1392181bde20.html

FEATURED    TOP STORY

# Sen. Krasner introduces bill to remove statute of limitation on civil sexual assault cases

Josh Meny
Feb 21, 2023

Tuesday in the legislature, the Senate Judiciary Committee heard testimony on a bill that would abolish the statute of limitations on civil actions on sexual assault cases.

Senator Lisa Krasner introduced Senate Bill 129 which would give sexual assault survivors the remainder of their lives to seek money damage.

"Currently the law in this area, that statute of limitations is two years. Two years isn't enough time for a victim of rape, sexual assault - to heal, to understand what happened to them to gain the strength and courage to come forward. Studies show that many people don't come forward until they're in their sixties, seventies, or even eighties," said Republican District 16 Senator Lisa Krazner.

Krasner co-introduced the bill with Democrat Senator Patricia Spearman. Child adolescent and adult psychiatrist Dr. Allison Cotton also presented the bill to the committee.

Cotton has spent years working in psychotherapy with victims of sexual assault.

"I think the importance of this bill stems from the guilt and shame associated with this type of violence, and this type of trauma. It is incredibly important that these victims not be limited as far as when they are able to and are comfortable coming forward," said Cotton.

Victims, advocates, and law enforcement representatives testified in support of the bill.

**Josh Meny**
Anchor/Reporter

# EXHIBIT 4

**MINUTES OF THE
SENATE COMMITTEE ON JUDICIARY**

**Eighty-second Session
February 21, 2023**

The Senate Committee on Judiciary was called to order by Chair Melanie Scheible at 1:03 p.m. on Tuesday, February 21, 2023, in Room 2135 of the Legislative Building, Carson City, Nevada. The meeting was video conferenced to Room 4412E of the Grant Sawyer State Office Building, 555 East Washington Avenue, Las Vegas, Nevada. Exhibit A is the Agenda. Exhibit B is the Attendance Roster. All exhibits are available and on file in the Research Library of the Legislative Counsel Bureau.

**COMMITTEE MEMBERS PRESENT:**

Senator Melanie Scheible, Chair
Senator Dallas Harris, Vice Chair
Senator James Ohrenschall
Senator Marilyn Dondero Loop
Senator Rochelle T. Nguyen
Senator Ira Hansen
Senator Lisa Krasner
Senator Jeff Stone

**GUEST LEGISLATORS PRESENT:**

Senator Pat Spearman, Senatorial District No. 1

**STAFF MEMBERS PRESENT:**

Patrick Guinan, Policy Analyst
Karly O'Krent, Counsel
Sally Ramm, Committee Secretary

**OTHERS PRESENT:**

Allison Cotton, M.D., Psychiatrist
Marlene Lockard, Domestic Violence Resource Center
Tess Opferman, Nevada Women's Lobby
Serena Evans, Nevada Coalition to End Domestic and Sexual Violence
Janice Baker-Kinney
Sabrina Lublin

Senate Committee on Judiciary
February 21, 2023
Page 2

Amanda Vaskov, Associated Students of the University of Nevada, Reno
Simon Lublin
Susan Reed
Janine Hansen, State President, Nevada Families for Freedom
Heidi Thomas, Health Through Music
Lise-Lotte Lublin
Benjamin Lublin
Scott Johnston
Sherry Powell, Ladies of Liberty
Rick McCann, Nevada Association of Public Safety Officers
Beth Schmidt, Las Vegas Metropolitan Police Department
John Jones, Jr., Nevada District Attorneys Association
Jason Walker, Washoe County Sheriff's Office; Nevada Sheriffs' and Chiefs'
      Association
Leonardo Benavides, City of North Las Vegas
Barry Cole
Amber Martin
Kim Small, CEO, Signs of Hope
Betsy Aguilar, Nevada Justice Association
Linda Kirkpatrick


CHAIR SCHEIBLE:
We will open the hearing with Senate Bill (S.B.) 129.


**SENATE BILL 129**: Revises provisions relating to certain civil actions involving
      sexual assault. (BDR 2-573)


SENATOR LISA KRASNER (Senatorial District No. 16):
Senate Bill 129 makes an important and long overdue change to the way we
manage justice for victims of sexual assault in Nevada, specifically regarding a
civil action brought by a victim of sexual assault against a perpetrator.

In 2017, I sponsored A.B. No. 145 of the 79th Session, which extended the
statute of limitations on civil actions relating to sexual assault or pornography of
a minor to 20 years after the victim is 18 years old. In 2019, A.B. No. 142 of
the 80th Session abolished the statute of limitations for prosecuting sexual
assault if there was DNA evidence. In 2021, Senator Dondero Loop sponsored
S.B. No. 203 of the 81st Session, which eliminated the statute of limitations for

Senate Committee on Judiciary
February 21, 2023
Page 3

a civil action to recover damages for sexual abuse if the person abused was 18 years old or younger.

While the Nevada Legislature has abolished the statute of limitations on civil actions brought for sexual assault if the victim was a child at the time of the offense, we have only a two-year general statute of limitations for civil actions for an adult who has been sexually assaulted. Not only do we provide a short time period for such a lawsuit to be filed, we also do not include the term sexual assault in our civil statutes governing these types of actions.

Sexual assault survivors will tell you that it can take many years, if not most of one's life, for a victim to gain the strength and the courage to come forward and report the abuse if he or she ever feels safe coming forward at all. Dr. Allison Cotton is an expert witness who can speak to the trauma involved in sexual assault and sexual abuse and to the years of work it takes to heal those wounds and start to become whole.

I will quickly go through the provisions of S.B. 129. Section 1 sets forth the guidelines for a victim of sexual assault who was an adult—18 years or older at the time of the assault—to bring a civil lawsuit against an alleged perpetrator or person who was convicted of the sexual assault. Such an action can be brought at any time after the assault occurred. In other words, there is no statute of limitation on these types of civil lawsuits. Additionally, if the plaintiff's alleged injury is the result of two or more acts that constitute sexual assault, the plaintiff is not required to identify specifically which of those acts caused the alleged injury. Section 1 also imports into Nevada Revised Statutes (NRS) 11 the definition of sexual assault found in NRS 200.366. That chapter defines what sexual assault is for the purposes of establishing criminal guilt. This is necessary because we do not have this definition in the relevant civil statutes. Using other terminology unspecific to sexual assault is not sufficient to describe the seriousness of the crime.

Section 2 of the bill inserts language necessary to make clear that a suit alleging sexual assault is not subject to the statute of limitations that otherwise applies to actions brought under NRS 11.

Section 3 sets forth that the provisions of this bill apply retroactively to any act constituting sexual assault regardless of any statute in effect at the time the

Senate Committee on Judiciary
February 21, 2023
Page 4

sexual assault occurred. And finally, section 4 makes the bill effective upon passage and approval.

SENATOR PAT SPEARMAN (Senatorial District No. 1):
I am going to speak from a couple of different vantage points. The first one is from a pastoral perspective. I have been a pastor for more than 30 years. I currently am not pastoring a church, but I am an ordained minister, and people still come to me for counseling. I have counseled many victims who have not been able to get their lives back together. In my last church, a 62-year-old who was sexually assaulted at work when 20 years old was never able to get her life back together. One of the things that happens when someone is sexually assaulted is loss, not just of self-esteem but even the ability to figure out what to do next. I signed on to this bill because two years is not enough time to do justice for victims of sexual assault.

The next vantage point is of military sexual trauma that has occurred. It was rampant in the last two wars and even in Vietnam. Some people say women were not in Vietnam. Yes, they were, and sexual abuse was rampant then. Some of my colleagues in the military had this happen to them. In the civilian world, they would have recourse. In the military, you must go through the whole military justice system. I am hoping this is the first step to make change happen.

Trauma that is not transformed is transferred. Victims of sexual assault or any type of trauma act out in ways in that people will usually say, "I do not understand why you do that," but because of what has happened to them, they have been debilitated emotionally and mentally. Many times, the things they say and do are incongruent with either their emotional or developmental age.

When the victim is still trying to find a way forward and the perpetrator is successful in life, the victim must watch that success repeatedly and is traumatized again. Then, when there is no way to make sure that perpetrator pays for his or her action, the trauma continues.

This is a bill we must pass. The laws on the books today were written by people who lived perfect lives, like in the 1960s and 1970s. They were written by people who did not have this kind of experience and were not exposed to these types of things. Today, we are still a women-majority Legislature, and this is one of the things that we do. We fix stuff, and we make stuff right.

Senate Committee on Judiciary
February 21, 2023
Page 5

SENATOR KRASNER:
Dr. Allison Cotton is a double board-certified child, adolescent and adult psychiatrist. She holds an appointment as Associate Professor and Associate Director, Psychiatry Residency Program at the University of Nevada, Reno, and previously served the University as the Director for Clinical Education and Psychiatry for third- and fourth-year medical students. During her training, Dr. Cotton worked for a year at the University of Arkansas for Medical Sciences and the Centers for youth and families, a treatment center where victims and perpetrators of sexual violence received treatment. She has been an invited speaker on the topic of trauma, suicide and sexual assault at several conferences and the grand rounds event.

ALLISON COTTON, M.D. (Psychiatrist):
As part of my training, I worked at the Center for Healthy Children where we worked with perpetrators and victims of sexual crimes, most of whom were children, but some of the perpetrators were adults. I carry that experience into these comments I am about to make for you today.

Rape and sexual assault are uniquely intimate crimes. Perpetrators of rape forcefully engage their victims in sex acts to the point that the victims are too terrorized to resist. Rape and sexual assault victims with whom I have worked have said to me; "I wish he had just killed me." Rape victims uniquely experience shame, guilt, self-hatred and self-blame. Furthermore, a 2022 study confirmed research showing that up to 75 percent of rape victims experience stigmatization when they disclose their rape. This includes minimization of the actions of the perpetrator, doubting the veracity of the victim's disclosure, blaming the victim and even urging the victim to stay quiet so as not to disrupt family or social ties. Often the perpetrator is close to the victim, so he or she lives in constant fear of the rapist after the assault. For these reasons and so many more, disclosing a rape is a terrifying prospect.

Rape and sexual assault are among the most demoralizing crimes one person can inflict on another. Victims of intimate interpersonal violence and trauma are more likely to develop post-traumatic stress disorder, depression, anxiety and substance use disorders than people who experience other types of traumas. Additionally, they are at increased risk for experiencing another sexual trauma in the future. Social, emotional, physical and psychological effects are devastating, both in the initial aftermath and for the rest of the victim's life. The initial devastation of rape is easy to appreciate because we can see bruises and

Senate Committee on Judiciary
February 21, 2023
Page 6

broken bones. We can test for sexually transmitted infections. We can see the product of a rape pregnancy.

The far-reaching consequences can be more difficult to appreciate for they are insidious and often occur while the victim remains silent. These consequences can include development of a deep mistrust for others, inability to develop confidence and self-esteem, disruption of the victim's education, loss of the ability to form intimate relationships, loss of family relationships, self-medication with drugs and alcohol, development of maladaptive coping strategies which lead the victim to develop chronic diseases, and so much more. Furthermore, the human brain is good at suppressing and repressing traumatic events so that we can survive the day today. A victim may not even consciously remember that a rape occurred for several decades. When a repressed memory emerges, it is as if the victim has just experienced the assault. The victim could be a 7-year-old who immediately reports the assault, a 50-year-old whose memories come flooding back after an emotional trigger or a 70-year-old who was finally able to let him or herself remember that it happened.

The good news is there is hope for healing. Trauma is incredibly treatable If the victim has the resources and the ability to participate in treatment. Part of treatment for sexual assault victims is to give them back the power surrounding the assault, giving a victim the ability to choose whether to pursue legal action, even 50 years later, is incredibly important in the healing process.

I want to share a few examples with you to illustrate how the psychological effects of rape can impact people. I have changed names and some details to protect patient privacy. But these are these are real stories. Sarah is a woman who is 62 years old. I saw her for psychotherapy several years ago. She was raped by a college boyfriend at the age of 21. When she told her roommate what had happened, Sarah was told that she could never tell her parents because of the shame it would bring them. The roommate also responded with questions about whether Sarah had teased the perpetrator sexually. What was she wearing at the time? Had she been drinking? Was she asking for it? These are all questions we now know are completely inappropriate. Sarah kept the rape secret over the next 40 years, and sex became such a painful act for her that she avoided romantic relationships. She had recurring nightmares about the attack and found herself unable to form meaningful relationships. She never fully recognized that her ongoing problems were related to the attack. Nor did she realize that she could get treatment. She never married, and our focus in

Senate Committee on Judiciary
February 21, 2023
Page 7

psychotherapy was her deep regret at never having children. She did eventually seek trauma-focused treatment and was able finally to have a positive sexual relationship with a romantic partner when she was almost 70 years old. I was the second person she told about the rape.

John is a man in his 60s who I met several weeks ago. A family member sexually abused him when he was a child and young adult, and he was told not to say anything by his mother when he did disclose the abuse. Decades later, I was called to speak with him about his anxiety surrounding a new diagnosis of congestive heart failure. What I uncovered was a lifetime of maladaptive coping habits driven by self-loathing and anxiety related to the sexual abuse. His mother's response communicated to him that what happened to him was shameful and not worth pursuing and this internalized shame undoubtedly contributed to obesity, heart disease, diabetes and other health problems which will shorten his life. This is a man who asked for help and was denied it by his own mother. I ask myself what his life might have looked like if he had not suffered that ultimate invalidation as a child and young adult.

These are just two examples of people who have suffered in silence for decades due to fear of coming forward after being sexually assaulted. Last, I want to talk to you about Phoenix, whose name is not changed. He has given me permission to use his real name because he wants people to know that he has indeed risen from the ashes. I first met nine-year-old Phoenix in the emergency room after he had taken half a bottle of Tylenol in a suicide attempt. That night, he disclosed that he had been anally penetrated by his grandfather. Phoenix did not suffer the same fate as John and Sarah because his mother believed him and so did I. He was able to get the treatment he so desperately needed. The treatment itself, even with the support of his family and a team of medical professionals, led to two more suicide attempts and severe depression. He struggled with the extremely complex emotional burden of sexual abuse by a family member as his grandfather was convicted and sent to prison. He felt at fault as his family fractured into pieces as aunts and uncles were forced to pick a side. His grades plummeted, and he was held back a year. He punched holes in the walls, not knowing what else to do with the anger inside him. Through all, Phoenix and his family had a team of doctors and therapists supporting them, and it was still pure hell for this little boy who did not ask for any of it.

Fast forward six years and Phoenix is a straight A student. He is happy, and he does not punch holes in the walls. Instead, he volunteers with kids who are

Senate Committee on Judiciary
February 21, 2023
Page 8

victims of sexual abuse. During the process, he tearfully told me he wished he had never told what happened. As you can see, rape victims must choose between suffering in silence and potentially suffering even more if they speak out.

I am here today to wholeheartedly and passionately urge you to embrace this opportunity to support victims of sexual violence. The far-reaching psychological and emotional effects of rape can be completely debilitating, and each victim's experience is unique. We know that the average time it takes for a person to disclose childhood sexual abuse is 20 to 25 years. Applying a limit to the time a person must process the immensely complex emotional burden of rape is detrimental to any opportunity a person may have to heal. A step in the right direction for supporting victims of rape and sexual violence is to remove the statute of limitations so that I and other professionals no longer must tell the person, our patients, that it is too late.

CHAIR SCHEIBLE:
In these types of civil suits, what kinds of damages are commonly awarded when a plaintiff is successful?

SENATOR KRASNER:
There are two types of law for people who are not lawyers: criminal law and civil law. In a criminal lawsuit, someone could receive jail time. In a civil lawsuit, someone sues for money damages. Once the lawyer accepts the case, it must be proven in front of a judge and jury. If the plaintiff wins, the person receives money for the damage done, and that money allows the victim to see the psychiatrist or psychologist for help and consultation. It allows the individual to go back to school and get his or her life back together. So those money damages are important to victims of sexual assault.

SENATOR DONDERO LOOP:
I will just add something in reference to the Chair's question. According to the National Center for Victims of Crime, every state has a basic suspension of the statute of limitations for civil actions while a person is a minor. Many states have also adopted additional extensions specifically for cases involving sexual abuse of children. Those extensions for civil actions for children are different than for adults.

Senate Committee on Judiciary
February 21, 2023
Page 9

SENATOR SPEARMAN:
I do not know of penalties or damages awarded, but no amount of money would help anyone with whom I have done pastoral counseling get their soul back. The 62-year-old person I mentioned earlier said, "I wish I had a chance to say to that son of a biscuit 'you know how this feels,' and I wish I could get some of what they have now because my life is trash."

DR. COTTON:
The importance of this bill to me as a psychiatrist does not necessarily lie with the opportunity to get money. It lies with the opportunity to choose. Many of the people who I have worked with have not felt able to testify in court or pursue redress legally. This gives them the opportunity to say it is my choice; I am empowered to choose this or not choose. This is imperative to help them heal and move forward.

SENATOR STONE:
I served in the legislature in California, and one of my colleagues brought forward a bipartisan bill to abolish the statute of limitations in California. The instigating factor for that bill was a celebrity accused and convicted of sexually assaulting youngsters and adults who was represented by Gloria Allred. As you know, witnesses get five minutes each to talk and then we bring up other witnesses to get a minute or two. Dozens of women came forward for the first time in their lives and told these horrific stories of abuse while being limited to a minute to speak. The chair was respectfully saying when time was up, and I requested the chair give them more time. This is healing. And this is cathartic to let these women speak for the first time in 36 years about a traumatic event that touched their lives. I am grateful the committee agreed to hear all this testimony. A lot of this is suppressed for many years, and a two-year statute of limitations does not suffice. Bringing this forward gives victims justice and the resources they need to get the appropriate health care.

MARLENE LOCKARD (Domestic Violence Resource Center):
I am representing myself and the Domestic Violence Resource Center, formally known as the Committee to Aid Abused Women. We are in strong support of this measure for the obvious reasons stated in the presentation. I would point out that the example of sexual assault regarding Phoenix, it was also a domestic violence situation on top of the initial crime. We strongly feel this measure should be passed.

Senate Committee on Judiciary
February 21, 2023
Page 10

Tess Opferman (Nevada Women's Lobby):
We heard compelling testimony. There are many reasons victim survivors may not come forward or only do so years after a crime has taken place. This measure is incredibly important. We urge your support.

Serena Evans (Nevada Coalition to End Domestic and Sexual Violence):
Recovering from sexual violence is a lifelong process, and each victim survivor's response is unique and personal. That is why we are here today in support of S.B. 129. We echo the sentiments shared in the powerful and emotional bill introduction. What justice and healing may look like to one victim survivor may not be the same for another. The criminal justice system often does not always yield the results that victim survivors wish, and engaging in the criminal justice system can be draining and retraumatizing. Abolishing the statute of limitations for civil proceedings creates another avenue for victim survivors to pursue justice and accountability against their perpetrator. It is common for victim survivors to shut down emotionally and not be ready to talk about their experience for years or decades. This should not mean they are denied options for justice. Abolishing the statute of limitations for civil proceedings is a victim centered approach. Nevada Coalition to End Domestic and Sexual Violence believes in creating options for victim survivors and supporting them in their pursuit of justice, whatever that looks like to them. We support and urge the passage of this measure.

Janice Baker-Kinney:
I was raped when I lived in Reno. The three most difficult words I had to ever say was I was raped. It was in the early 1980s. I did not say those three words until about 2015 when I first came forward. I never admitted to being raped all those years because I blamed myself and the person who raped me was someone I knew, admired, and trusted. The term acquaintance rape was not in the common vernacular then. One of the reasons I blamed myself at the time was because I accepted pills from this person that were much stronger than I had been led to believe and caused me to pass out, which in turn allowed him to rape me while I was in and out of consciousness.

So why did I wait 30 years to come forward? You heard most of the reasons today, especially from the psychiatrist. I was humiliated. I was embarrassed, and I thought I slept with him. I justified what he did to me by placing the blame on myself. I passed out in front of this man, and I slept with him. So that was me blaming me. I revictimized myself like so many survivors experience from

Senate Committee on Judiciary
February 21, 2023
Page 11

others when they are told what happened. What were you wearing? Did you drink too much? Why were you there? By revictimizing myself, I never had to come to terms with what happened to me that night.

Coming forward was difficult because of the 30-plus years I kept silent about it. I kept second-guessing myself and playing the blame game for decades as so many survivors do after they have been sexually assaulted. But through the encouragement of my close friends and family, I gained strength to make a public statement about what happened to me. That first step was not easy. It is never easy. But the gate opened, a toxic chain of silence was broken and there was no turning back. Admitting that one has been a victim of rape is scary and difficult enough to begin with. But then comes the public shame, associated stigmas, and fear that comes with speaking one's truth becomes overwhelming.

I was fortunate enough to have a great support system, especially from a lot of my fellow survivors. I formed a sisterhood with them, and I found that some of the pain loses its power when you speak out and share it. I had an immediate connection to these women, and I stopped feeling so alone with my guilt. But this need to share has consequences. It caused me to shut down from my husband and sharing with him. I wanted to share my pain with people who had the same story as me. I had no idea at the time that burying the experience so deeply for so long would affect me once I finally came forward. It was a new territory. It felt like once I told my story aloud, it seemed to have happened 3 weeks ago, not 30-plus years ago. There were so many raw emotions to deal with, along with the underlying guilt and shame, no matter how many times I was told it was not my fault. I found a great therapist, and luckily, I have great insurance that pays for a therapist. Through many years of therapy and marriage counseling, I reconnected with my husband, who was a strong support system, but I had shut him out of my life because he did not know what I was going through.

Thousands of survivors out there are not as fortunate as I was to have a support system and people to lean on to go to therapy. I cannot say this has been easy, but it has been empowering and liberating to say it. I feel so much stronger now that I have come forward. I can say "screw you" to this person, shout from the rooftops and not be ashamed of myself. But there are still those days when I have trouble forgiving myself and second-guess myself. What could I have done differently? I buried the guilt for so long it still hides in the depths of my soul.

Senate Committee on Judiciary
February 21, 2023
Page 12

Speaking my truth has brought some strength and peace, but it has not brought consequences for my rapist. The one thing that has not been served is justice because my time has passed. Most everyone on this planet has enough information on why it takes years for us to come forward, and you heard a lot of that today. It is well-documented. It is reported on by medical and mental health experts and by victim advocate organizations. The #MeToo movement opened new avenues of awareness and resources for information regarding why we wait so long. I commend the leaders in Nevada for extending the statute of limitations for reporting sexual assault. But for far too many of us, that time has long passed. The only way for justice to be served is for this Committee to allow S.B. 129 to move forward to a vote.

So many states are listening to the same things as you, and some have completely abolished the statute of limitations. Everyone has become aware of the difficulty and trauma that survivors experience by trying to report this crime, but these laws are not retroactive. Passing a look-back law and abolishing the statute of limitations gives us a chance to seek the justice we all deserve. It is another step in our healing process. I am here today to encourage you to vote yes on S.B. 129 and allow it to move forward.

SABRINA LUBLIN:
I am 15 years old and here in support of S.B. 129. Eight years ago in November, my mother went to the Las Vegas police station and filed a report of sexual assault. Her case was dismissed because of the statute of limitations. To face the truth, pain and memories that happened, victims must come and dump it into a case file within four years. What happens if someone comes forward within 5 years after being sexually assaulted, or 10 years or 20 years? How can we ignore a plea for help? This person has come forward asking for justice after knowing or learning that one's own body has been violated. No one wants to be violated, but because of the law, the victim cannot find the justice one deserves. Ten minutes with a predator can impact ten years of someone's life or even more. It can change and mold that person into something completely new, creating a shell of oneself, a hollow, empty shell of a person. Give the opportunity for girls like me and women like my mother to always have a chance. All they need is a chance to get justice. I am here fighting for the chance they need.

Senate Committee on Judiciary
February 21, 2023
Page 13

AMANDA VASKOV (Associated Students of the University of Nevada, Reno):
Across a multiyear survey at the University of Nevada, Reno (UNR), 58 percent of students reported experiencing sexual coercion in their first year. One-third of these students chose to go forward. Among the reasons for not going forward were sentiments like no one would believe me, or I was in a relationship and did not realize that coercion could happen with a partner. These reasons can persist for a long time. More profoundly, the pain can last a lifetime. The Associated Students at UNR supports this bill and efforts to allow victims to come forward, seeking damages should they choose to in their own time.

SIMON LUBLIN:
I am here in support of S.B. 129. When my parents first found out about the sexual assault my mother faced, it was a hard time. What made it the hardest though was finding that the statute of limitations would bar my mother from seeking any form of justice.

I have always looked up to my parents. When faced with this obstacle, they overcame. They worked to change laws for the better for both adults and children. Rather than giving up, they decided to help others. It is easy to say that sexual assault is bad and to know the abuse is not a good thing, but it is much more difficult to understand what it does to a person. The emotional impact from it requires someone strong enough to persevere. The few who do persevere are rewarded with the ability to take their abusers to court.

However, some find it hard to revisit this terrible moment in their lives. They wait and in doing so make justice harder to find. They torment themselves with what has happened to them. When they are finally ready to speak, they are told nothing can be done because of the statute of limitations. Their one hope for retribution is ripped from them. This has happened to my mother and no doubt has happened to other men and women. Everyone talks about their sympathies and wishes something could be done. Now is the time that something can be done. The chance to take control can be given back to victims so they can hope again.

SUSAN REED:
I am a lifetime resident of Reno, and I have known Janice Baker-Kinney for over 30 years. I stand by her and urge you to pass this bill.

Senate Committee on Judiciary
February 21, 2023
Page 14

JANINE HANSEN (State President, Nevada Families for Freedom):
I am here today to support this bill. This is an emotional issue. My dear friend's husband was repeatedly raped when he was a little boy. When he confronted his mother about it, she denied it and refused to accept what he was saying. He is a grown man, over 40 years old now, but he does not have any relationship with his mother. He is still dealing with the trauma of this issue. It has been a blessing in my life that he calls me mom, and I have been a part of the healing in this tragedy. We appreciate the thoughtfulness of bringing this bill for those who it will help, and we support it.

HEIDI THOMAS (Health Through Music):
I am from Castle Rock, Colorado. By supporting S.B. 129, I am one of millions of people who have endured sexual assault and rape. I now know that I suffered from the classic symptoms of victims of sexual assault. I told no one because I could not even process it myself. I did not want to believe it. I dealt with years of panic attacks and a variety of counselors and therapies. I have no idea how much money I spent getting myself together. Thanks to the Internet, when I came forward, it was a public story and people found me.

These people just needed to tell their stories. They would contact me, a stranger, through the Internet because they knew I would understand. These were women and men from every conceivable demographic. Most of them sobbed on the phone as they struggled to tell me their stories. Most were telling it for the first time. Most of the people who contacted me were between the ages of 60 and 80 years old. They were broken human beings. Many of their lives have been destroyed. They turned to drugs or alcohol to ease the pain. Many had served prison time due to activities spurred on by their addictions. Some of both genders had gone into prostitution, feeling like that was all they were good for. Many could not maintain any relationships with their families, partners or even friends. They were isolated and revictimized by that isolation.

The process for recovery is often as emotionally traumatic as the crime when a victim needs to report horrific details, relive the assault and speak in front of strangers about the intensity of this violation. Having to do this within some arbitrary time frame is yet another assault. If they are not emotionally capable of the necessary steps in the process, they forfeit their right to justice.

In addition, we are now becoming increasingly aware of drug-facilitated sexual assault. My assault and rape occurred a few miles from where we are sitting

Senate Committee on Judiciary
February 21, 2023
Page 15

right now. I cannot tell you where it was because I was kidnapped and drugged. Victims of this crime like myself have a doubly difficult time reporting because we cannot remember the details. We only know we have been assaulted. Perpetrators of this crime count on this. It is known as the perfect crime. Having investigated this crime for decades, these perpetrators honestly do not think what they are doing is all that bad. They do not realize it will scar for life.

You may hear others assert that this bill violates somebody's liberties or someone's right to a swift trial. Having any kind of limits placed on a crime that will affect the victim for the rest of his or her life does not honor the liberties and the rights of those who have already endured a crime. You may also hear that this will flood the courts. Keep in mind, every case will still need to have evidence to proceed to trial. Many of these crimes will not produce evidence. But as Dr. Cotton pointed out, the choice is theirs. Should a witness come forward who can testify, they have the opportunity for justice. I tell you from personal experience that victims of sexual assault spend every day for the rest of our lives putting ourselves back together—every morning, every day. We deserve the right to justice when we are emotionally strong enough for the fight. Please give us that opportunity. I ask you to support S.B. 129.

LISE-LOTTE LUBLIN:
I am in support of S.B. 129. My children just came up and shared their support for the bill. Thank you for the opportunity to express my deepest concerns for the adults of our community. My struggle began in November 2014 when I discovered I had been a victim of a sexual assault. I was unaware of my assault for 24 years. My assailant used drugs to incapacitate me, and that strategy restricted my ability to fight for my right to say no. One of the side effects of being drugged is the inability to recall all the events of the assault. But through this journey, I have suffered a slow recall of those events. My only recourse today is to fight the laws that delay my healing process.

My brother was also assaulted by his teacher when he was in middle school. He and several other students were verbally, mentally, physically and sexually abused. He could not recover from the damage done to him. I watched my brother struggle in school, fail everyday issues, and attempt relationships he could not hold onto. Ultimately, he self-destructed. No one deserves that kind of life.

Senate Committee on Judiciary
February 21, 2023
Page 16

As a survivor of sexual assault, I have experienced a loss of control over the events in my life; I have random remembrances that haunt me and continue to derail my life. With my commitment to advocate for change, I continue to nourish the healing of many survivors and to preserve the spirit for our lives and our self-worth. This is one of the only places I can do that. I bring my family and survivor sisters who spoke earlier to plead our case for an equal, fair and equitable opportunity with the justice system. I am asking you to equalize the law to include the opportunity to protect our human rights as adults by eliminating the statute of limitations. Please consider the great service you would afford survivors by giving power to the justice system through supporting this bill.

BENJAMIN LUBLIN:
I was born and raised in Las Vegas. I will read my statement in support of S.B. 129. My wife, Lise-Lotte, and I have been fighting for victims' rights since 2015 with our first bill, A.B. No. 212 of the 78th Session, which extended the statute of limitations for sexual assault from 4 to 20 years. Recently, the statute of limitations for children of sexual assault in Nevada has been abolished in civil court. As survivors of sexual assault, we ask for equity within the law, but the statute of limitations ensures the law is not equitable and works in favor of the perpetrator. After two years, the perpetrator gets away with rape or sexual assault with no repercussions, but the victim is left distraught, a life in disarray with mental and physical health devastated. It could take years if not decades of therapy just to put the pieces back together.

Sexual assault and rape are considered among the most heinous criminal and civil offenses with only murder trumping them. But in civil court, the damage to personal property has a longer statute of limitations at three years than sexual assault and rape. Is that equity? I get asked this question all the time. Why does a victim of sexual assault not come forward when it happened? Why does it take so much time for one person to let the authorities know about an assault or rape? I can tell you firsthand because I am a survivor of sexual assault.

It took me 25 years to feel brave enough to tell one person in my life, and that was my wife, Lise-Lotte. I have lived with this guilt and shame of being a victim the entirety of my adult life. Now, as a 46-year-old man sitting in front of all of you, I feel embarrassed, ashamed and the need to hide what has happened to me. The need to hide has been ingrained in every fiber of my being. I am living proof. Not only does the psychological damage follow victims through life, but

Senate Committee on Judiciary
February 21, 2023
Page 17

the need for self-preservation is real. This is not about money; this is about justice. If I had the ability to take my perpetrator to court, whether criminal or civil, I would want justice. I ask each one of you to give me that chance I do not have. The statute of limitations has robbed me of this. I urge you to pass S.B. 129 and allow survivors the ability to find justice.

SCOTT JOHNSTON:
I am in support of S.B. 129 and submit my written testimony (Exhibit C).

SHERRY POWELL (Ladies of Liberty):
I have been following these bills for decades. I am the founder of the Ladies of Liberty, which is a victims' rights group. I have been the victim as a minor and an adult. The statute of limitations protects the perpetrator. I was not drugged. I did not wear fancy clothes. In fact, the last assault on me was in 2016. At that time, I was a fat old lady like right now. It had nothing to do with how I was dressed, where I was or what I was doing. Perpetrators know what they are doing.

My daughter was a victim. You can look it up because I was not quiet. I spoke out. I have discussed with many district attorneys that our prosecution rate is less than 1 percent for violent crime in Nevada. I could bring back the black eye of Nevada: the 1991 release of Phillip Garrido who walked right up to his victim the minute he got out of prison, announced to her that he was out and proceeded to kidnap Jaycee Lee Dugard. Thank goodness for kidnapping statute of limitations: there is none. But if she wanted to be heard as an adult victim of sexual abuse, her statute of limitations would have been up before she was ever found. Anybody who has a sister, brother, mother, or child would never conceive of the fact that these victims do not deserve a trial or civil restitution.

After my sexual assault at the age of seven, I thought I would never see that man again. I was supported by a wonderful grandma and my mother. I saw him only two years ago at the funeral of my brother. He was allowed to proceed with his life and became prosperous. What if I would have taken money from him? Unfortunately, at that time the statute of limitations in Nevada was two years. The assault occurred in California. Thank you for letting me know of that extension because I am 61 years old.

This is what a 61-year-old looks like with a fabulous support system which is rare. I did not tell anybody about my assault in Washoe County two years ago

Senate Committee on Judiciary
February 21, 2023
Page 18

because I did not want anybody to know. When I finally told somebody, I was shown a backpack and told there was a firearm in there. Had I known at the time that it might be necessary to carry a gun, the perpetrator would not be here. That is how I feel about it. I did not tell the organizer or head of that organization the assault happened until later, and they chose to call the police. When the police came in, the first question I was asked was why did not you report this? How come you waited so long? How come you did not call us? The reason I did not call you is because I did not feel like being interrogated. Something horrible happened to me, and anybody who knows me knows I am not a weak person at all. I do not get embarrassed. That is part of it. My mother and my grandmother always let me know that it was not my fault. I never believed it was my fault. I never believed "those people" had power over me. I have spoken out mostly for others who somewhere lose that self-assuredness. They lose that hope, they lose that spark and that spirit. I would hope that all of you would give them at least a little bit of a spark and pass S.B. 129.

RICK MCCANN (Nevada Association of Public Safety Officers):
Nevada Revised Statutes 11 outlines statutes of limitations. Wrongs that can be aggrieved civilly include motor vehicle accident, two-year statute of limitations; libel or slander, two years; simple assault, two years; trespass of real property, three years; damage to personal property, three years; fraud, three years; breach of an unwritten contract, four years; deceptive trade practices, four years; breach of a written contract; six years; rape, two years.

The statute of limitations in Nevada within which a civil action must be filed by a victim of rape or sexual assault is like that of a car accident or trespassing on your property. Through your actions in this Committee and the future committees on this bill, we ask that you hold perpetrators of sexual assault to remain civilly liable until justice can be served. Please support S.B. 129.

BETH SCHMIDT (Las Vegas Metropolitan Police Department):
I am here to testify in support of S.B. 129. The Las Vegas Metropolitan Police Department believes the extension of the civil action time frame is an important resource for victims of sexual assault.

JOHN JONES, JR. (Nevada District Attorneys Association):
We are in support.

Senate Committee on Judiciary
February 21, 2023
Page 19

JASON WALKER (Washoe County Sheriff's Office, Nevada Sheriffs' and Chiefs'
    Association):
On behalf of the Washoe County Sheriff's Office and the Nevada Sheriffs' and
Chiefs' Association, I am testifying in support for S.B. 129.

LEONARDO BENAVIDES (City of North Las Vegas):
The City of North Las Vegas supports S.B. 129.

BARRY COLE:
As a psychiatrist, I have been trained to ask each of my patients if he or she
has ever been touched in a way or a place that now looking back seems
inappropriate. I always expect a positive answer. My colleague Judy Turner at
the University of Washington who is a pain specialist says one in every
three women with chronic pain has been sexually assaulted. My experience
confirms that as well. This is an important bill because it is going to allow
resources. One of the limitations we see in psychiatry is—despite the alleged
parity in insurance—that something about psychiatry, like substance use
disorders, always comes with caps and limitations. We need to get rid of this.
This might allow people to have those resources.

I want to leave you with an interesting idea. My mother was an actress in the
1950s. Few of us remember the 1950s, but you probably saw my mother if you
watched television in those years. To transition from television to film, she had
to sleep her way into that work. This is before Harvey Weinstein. This is before
the famous situations we are hearing about, but that was the norm in the
1950s. My mother left her favorite profession to become a schoolteacher. She
did not know what else to do. This is a real bill with real teeth to it. S.B. 129
needs to pass.

AMBER MARTIN:
I am here to support S.B. 129.

KIM SMALL (CEO, Signs of Hope):
Signs of Hope, formerly known as the Rape Crisis Center, is a Clark County
nonprofit of 49 years that serves survivors in the immediate aftermath and
long-term recovery following sexual abuse and assault, for as long as it takes, at
no cost. Signs of Hope supports S.B. 129 as an avenue for victim survivors to
hold their perpetrators accountable in instances when the criminal justice
system is not an option or fails them in connection to their criminal case. We

Senate Committee on Judiciary
February 21, 2023
Page 20

also support this bill for abolishing the statute of limitations for when a victim survivor of sexual violence may pursue civil action against the perpetrator as we often serve clients who come to us for the first time years, and sometimes decades, after the abuse has occurred.

BETSY AGUILAR (Nevada Justice Association):
I am here today in support of S.B. 129. Rape and sexual assault are serious, ongoing issues that can affect anyone, any gender, any age, any religion and any socioeconomic background. Victims who come forward later in life are silenced due to this statute of limitations. These victims should not be silenced because of the amount of serious life-changing trauma they have experienced, including but not limited to memory, memory suppression or repression. We need to help survivors of abuse have an expanded access to justice due to the seriousness of these acts and the horrible effects on the victims. The statute of limitations should be removed for civil proceedings. As you can see, these types of cases are different than your typical run-of-the-mill motor vehicle accident, slip and fall or breach of contract case. This bill encourages victims who have experienced past harm to come forward and obtain various remedies which include the ability to hold their assailants accountable to consequences as well as give the victims the opportunity to finally tell their story. This bill is crucial for victims of sexual violence as it provides them a way to seek redress for harm suffered, hold assailants accountable and promote the public policy goal of expanding justice for these Nevadans. Please unlock the courthouse doors for them.

LINDA KIRKPATRICK:
I like sports. I am part of a team of millions of sexual assault victims. I am one in a million. I am 1 in a 12- to-14-million victim team. That is the number of Americans, both male and female, who are victims of sexual violence and rape every year. I was six years old when I was forced onto this heinous team. My 18-year-old perpetrator faced no jail time. I dubbed it team shame at ten, the age my sister was when she was forced onto the same team. Her perpetrator, same 18-year-old, faced no jail time again.

When I was the age of 13, it happened again. The perpetrator was a 60-year-old neighbor. He said no one would believe me and threatened violence on my family. I kept silent, maintaining my position on team shame. By the age of 24, I thought the years of team shame were behind me. In my 20s, I became a high-level tennis player, competing in a tournament at a local club in

Senate Committee on Judiciary
February 21, 2023
Page 21

Las Vegas. During that tournament, I unfortunately beat a famous comedian
who was staying at the Las Vegas Hilton. He is now an infamous convicted sex
offender in Pennsylvania, although he is out of jail. I woke up the following
morning in my own bed completely soaked with urine. This comedian's
comment was he thought that is what I wanted. Back to team shame I went.
I like sports but not when they end in a rate where 25 of 1,000 rapists go to
jail. An American is forced into team shame every 68 seconds. Males and
females are victims of sexual assault or rape.

So much of my life has been successful. I have beautiful children and amazing
grandchildren. I have owned several businesses in Nevada as well as other
states. I am a national champion and certified instructor for pickleball. All that
sounds great. But team shame keeps me from having a loving, successful
marriage. I have failed five times at the altar. Intimacy escapes me. I suffer from
post-traumatic failure to trust when it comes to male-female relationships. That
puts me as the captain of team shame. I am tired of being on the underdog
team of 12 million victims in this Country versus 25 rapists in jail. In Nevada
where sports betting is legal, no sports book would take those odds.

Team shame up until this time has been bound to lose. Nevada has the power
to give us a chance in court. A level playing field against our perpetrators gives
us a chance of success. Pass S.B 129 and let us work together at becoming
part of a no-limit generation. We are 100 percent putting our faith in you
Nevada. Get justice for victims. Pass S.B. 129.

SENATOR KRASNER:
Thank you, Chair Scheible and members of the Judiciary Committee for hearing
this bill today. Please keep the courtroom doors open. Please allow justice
victims of sexual assault. I would appreciate your support of S.B. 129.

DR. COTTON:
I challenge each one of you in this room to find one person in your life who has
not been touched by sexual violence. You cannot do it. Thank you for hearing
these comments.

CHAIR SCHEIBLE:
That concludes the hearing on S.B. 129 and brings us to an introduction of
Bill Draft Request (BDR) 15-802.

Senate Committee on Judiciary
February 21, 2023
Page 22

**BILL DRAFT REQUEST 15-802**: Revises provisions relating to the liability of certain persons for protecting or removing a child or pet from a motor vehicle. (Later introduced as Senate Bill 190.)

SENATOR OHRENSCHALL MOVED TO INTRODUCE BDR 15-802.

SENATOR STONE SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

* * * * *

Remainder of page intentionally left blank; signature page to follow.

Senate Committee on Judiciary
February 21, 2023
Page 23

CHAIR SCHEIBLE:
The meeting is adjourned at 2:30 p.m.

RESPECTFULLY SUBMITTED:

_____
Sally Ramm,
Committee Secretary

APPROVED BY:

_____
Senator Melanie Scheible, Chair

DATE:_____

Senate Committee on Judiciary
February 21, 2023
Page 24

| | | | EXHIBIT SUMMARY | |
|---|---|---|---|---|
| **Bill** | **Exhibit Letter** | **Introduced on Minute Report Page No.** | **Witness / Entity** | **Description** |
| | A | 1 | | Agenda |
| | B | 1 | | Attendance Roster |
| S.B. 129 | C | 17 | Scott Johnston | Support Testimony |
| | | | | |
| | | | | |
| | | | | |

# EXHIBIT 5

Brown v. Chicago Title Insurance Company, Not Reported in Fed. Supp. (2022)

2022 WL 16553003
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Edward BROWN, Plaintiff(s),
v.
CHICAGO TITLE INSURANCE
COMPANY, et al., Defendant(s).

Case No. 2:22-CV-1186 JCM (NJK)
|
Signed October 31, 2022

**Attorneys and Law Firms**

Darren T. Brenner, Lindsay Dragon, Wright, Finlay & Zak, LLP, Las Vegas, NV, for Plaintiff(s).

Kevin Samuel Sinclair, Sinclair Braun LLP, Encino, CA, Scott E. Gizer, Sophia Shunwan Lau, Early Sullivan Wright Gizer & McRae LLP, Las Vegas, NV, Gary L. Compton, Las Vegas, NV, for Defendant Chicago Title Insurance Company.

Kevin Samuel Sinclair, Sinclair Braun LLP, Encino, CA, Scott E. Gizer, Sophia Shunwan Lau, Early Sullivan Wright Gizer & McRae LLP, Las Vegas, NV, for Defendant Chicago Title Agency of Nevada.

ORDER

James C. Mahan, UNITED STATES DISTRICT JUDGE

**\*1** Presently before the court is plaintiff Edward Brown's ("plaintiff") motion to remand. (ECF No. 8). Defendant Chicago Title Insurance Company ("Chicago Title") filed a response. (ECF No. 11). Plaintiff replied (ECF No. 13).

Also before the court is Chicago Title's request for judicial notice.[1] (ECF No. 12).

**I. Background**

The instant action is one of many title insurance suits currently pending in Nevada courts. Plaintiff is the alleged beneficiary of the deed of trust encumbering property located at 9338 Wilderness Glen Avenue, Las Vegas, Nevada 89178

(the "property") and brings this action against Chicago Title and Chicago Title Agency of Nevada ("Chicago Agency") (collectively "defendants") pursuant to a title insurance policy dispute.

Non-party borrowers purchased the property in 2005 and, to secure a loan, executed a deed of trust naming their lender, Bank of America, N.A. ("BANA"), as the beneficiary. BANA entered a contract with Chicago Title to insure the deed of trust over competing liens (the "policy").[2] In 2014, the deed of trust—including the benefits of the policy—was assigned to Wilmington Savings Fund Society ("Wilmington"). The non-party borrowers eventually failed to pay Homeowners Association ("HOA") fees, and the HOA executed a nonjudicial foreclosure on the property in 2016. The property was sold to Saticoy Bay LLC Series (the "buyer").

Wilmington subsequently filed a quiet title against the buyer to which the buyer filed an answer and counterclaim, asserting its interest was superior to that of the deed of trust. Wilmington filed a claim with Chicago Title requesting legal defense and indemnification under the policy. Chicago Title denied the claim, and Wilmington assigned the deed of trust —again, including the benefits of the insurance policy—to plaintiff.

Plaintiff then filed the instant litigation in Nevada state court on July 22, 2022. (ECF No. 1-1 at 35). Chicago Title removed the action to this court two days later before any defendant was served. (ECF No. 1).

**II. Legal Standard**

A defendant can remove any civil action over which the district court has original jurisdiction. 28 U.S.C. § 1441(a). Yet federal courts are courts of limited jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). That is why there is a strong presumption against removal jurisdiction. *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009). The "burden of establishing federal jurisdiction is on the party seeking removal, and the removal statute is strictly construed against removal jurisdiction." *Prize Frize, Inc. v. Matrix Inc.*, 167 F.3d 1261, 1265 (9th Cir. 1999).

Brown v. Chicago Title Insurance Company, Not Reported in Fed. Supp. (2022)

A plaintiff can challenge removal with a motion to remand. 28 U.S.C. § 1447(c). To avoid remand, the removing defendant must show by a preponderance of the evidence that there is complete diversity and that the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). The court will resolve all ambiguities in favor of remand. *Gaus v. Miles*, Inc., 980 F.2d 564, 566 (9th Cir. 1992); *Hunter*, 582 F.3d at 1042.

 **\*2**  But even if the diversity jurisdiction requirements are met, a diversity case nonetheless cannot be removed if "*any of the parties in interest properly joined and served as defendants is a citizen of the [s]tate in which such action is brought.*" 28 U.S.C. § 1441(b)(2) (emphasis added). This is the forum defendant rule, a waivable procedural rule yet still one of the "more substantive removal defects." *Lively v. Wild Oats Mkts., Inc.*, 456 F.3d 933, 936 (9th Cir. 2006).

### III. Discussion

#### A. Fraudulent Joinder

The court disregards fraudulently joined defendants when determining if there is complete diversity. *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001). A joinder is fraudulent if "the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state." *Id.* (quoting *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987)). If there is even a possibility that a Nevada state court could find that the complaint states a claim for relief against the allegedly fraudulently joined defendant, the court must remand the case. *Hunter*, 582 F.3d at 1044–46. "Fraudulent joinder must be proven by clear and convincing evidence." *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007).

Federal Rule of Civil Procedure 20 allows the permissive joinder of multiple defendants in a single lawsuit when (1) a right to relief is asserted against each defendant that relates to or arises out of the same transaction or occurrence or series of transactions or occurrences; and (2) some question of law or fact common to all parties arises in the action. Fed. R. Civ. P. 20(a)(2). The rule "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977). "[T]he impulse

is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

Plaintiff properly joined Chicago Agency in this suit. The claims against defendants arise out of the same series of transactions or occurrences and there are common questions of law or fact.

The "same transaction prong" of Rule 20 "refers to the similarity in the factual background of" the claims at issue. *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997). Claims are part of the same transaction or occurrence if they "arise out of a systematic pattern of events." *Id.* at 7.

Plaintiff's relevant causes of action for deceptive trade practices and unfair claims practices assert that defendants acted in concert to make misrepresentations as well as deny coverage under the title insurance policy. Specifically, the claims posit that defendants presented public descriptions of coverage that they knew were incorrect and that defendants failed to "adopt and implement reasonable claims handling procedures to provide coverage" under the policy. *See* (ECF No. 1-1 at 32–33). Thus, the "same transaction" prong of permissive joinder is met. *See Coughlin*, 130 F.3d at 1350.

Further, there are common questions of law or fact. Plaintiff's claims present questions as to, *inter alia*, whether specific insurance forms provided coverage and whether Chicago Title and Chicago Agency wrongfully denied claims arising from the HOA sales. These questions present more than the "single question of law or fact" necessary to permit joinder. *See Bank of Am. v. Fidelity Nat'l Title Grp., Inc.*, No. 2:21-cv-00348-CDS-BNW, 2022 WL 2819847, at \*6 (D. Nev. July 18, 2022).

#### B. Snap Removal

 **\*3**  Because Chicago Agency is a properly joined forum defendant, the forum defendant rule in 28 U.S.C. § 1441(b)(2) applies. The court must now consider if Chicago Title's snap removal was proper.

Snap removal is the tactic of removing a diversity case before a forum defendant has been served. The Second, Third, Fifth, and Sixth Circuits endorse the tactic, [3] but the Ninth has not

Brown v. Chicago Title Insurance Company, Not Reported in Fed. Supp. (2022)

___

squarely addressed it. Snap removal is performed against the backdrop of the forum defendant rule, which "is a procedural, or non-jurisdictional, rule." *Lively v. Wild Oats Mkts., Inc.*, 456 F.3d 933, 936. Unlike jurisdictional rules, procedural rules may not be addressed *sua sponte* by the court. *Skranak v. Castenada*, 425 F.3d 1213, 1216 (9th Cir. 2005). The forum defendant rule's characterization as a procedural, rather than jurisdictional, rule has led to this new form of jurisdictional gamesmanship in litigation. [4]

Chicago Title relies on circuit cases outside the Ninth Circuit for its position, *see supra* n.2, and mentions Judge Navarro's position in this district allowing snap removal under a "plain reading" of § 1441(b)(2). *See MetLife Home Loans, LLC v. Fid. Nat'l Title Grp., Inc.*, Case No. 2:20-cv-017980-GMN-VCF, 2021 WL 4096540 at *4 (D. Nev. Sept. 8, 2021); (ECF No. 21 at 2, 6). Plaintiff contends that the Ninth Circuit has rejected snap removal, explaining "[a] nonresident defendant cannot remove a 'non-separable' action if the citizenship of any codefendant, joined by the plaintiff in good faith, destroys complete diversity, regardless of service or nonservice upon the codefendant." *Preaseau v. Prudential Ins. Co. of Am.*, 591 F.2d 74, 79 (9th Cir. 1979) (quoting *Clarence E. Morris, Inc. v. Vitek*, 412 F.2d 1174, 1176 (9th Cir. 1969)); (ECF No. 8 at 6). [5]

This is not the court's first impression of snap removal. The court adopts its prior reasoning from *U.S. Bank Trustee, Wells Fargo Bank*, and *Carrington*. [6] *See U.S. Bank Trustee,* 2020 WL 7360680, *Wells Fargo Bank*, 2020 WL 5898779; *Carrington,* 2020 WL 3892786. In short, the word "any" in "any parties in interest properly joined and served" necessarily means "that the [removal] statute assumes *at least one party has been served.*" *Carrington*, 2020 WL 3892786, at *3 (emphasis added) (citing *Gentile v. Biogen Idec, Inc.*, 934 F. Supp. 2d 313, 316 (D. Mass. 2013)). And snap removal contravenes the removal statute's purpose

of preserving a plaintiff's choice of a state court forum when suing a proper forum defendant. *Accord Wells Fargo Bank*, 2020 WL 7388621, at *4 ("The purposes underlying § 1441(b)(2) are better served by disallowing removal before any defendant is served.").

**\*4** Chicago Title asserts that this court errantly relied on *Gentile* to remand recent "snap" removed cases because *Gentile* is inconsistent with a First Circuit ruling. (ECF No. 23 at 2). Even assuming *arguendo* that this is true, the First Circuit's decisions are not binding on this court.

The court reiterates its prior reasoning that "Congress would not have wanted to stop gamesmanship by plaintiffs by allowing gamesmanship by defendants." *U.S. Bank Trustee,* 2020 WL 7360680, at *4. To the extent there is ambiguity here —including uncertainty and unsettled law in the Ninth Circuit —the court resolves the ambiguity in favor of remand. *Gaus*, 980 F.2d at 566; *Hunter* 582 F.3d 1039.

Accordingly, because no defendant had been served prior to Chicago Title's removal, this case must be remanded.

**IV. Conclusion**
Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that plaintiff's motion to remand (ECF No. 8) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that the clerk shall REMAND this case back to the Eighth Judicial District Court for Clark County, Nevada, and CLOSE this case.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 16553003

___

## Footnotes

1    Chicago Title's request is GRANTED. The court takes judicial notice of the offered record as a matter of public record.

___

Brown v. Chicago Title Insurance Company, Not Reported in Fed. Supp. (2022)

2     Chicago Title is the underwriter of the policy. Whether Chicago Agency is also a party to the policy is disputed. It is undisputed, however, that Chicago Agency played at least some role in the policy's existence.

3     *See Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 701 (2d Cir. 2019); *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147 (3d Cir. 2018); *Texas Brine Co., L.L.C. v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482 (5th Cir. 2020); and *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001).

4     The ubiquity of electronic docketing has also contributed to the rise in snap removals. *See, e.g., Perez v. Forest Labs., Inc.*, 902 F. Supp. 2d 1238, 1243 (E.D. Mo. 2012) ("Pre-service removal by means of monitoring the electronic docket smacks more of forum shopping by a defendant, than it does of protecting the defendant from the improper joinder of a forum defendant that plaintiff has no intention of serving.") (emphasis added).

5     *Preseau* did not explicitly consider "snap removal;" it interpreted 28 U.S.C. § 1441(b) in the context of nondiverse doe defendants and timeliness.

6     The court's reasoning has been endorsed by Judges Dorsey and Gordon. *See HSBC Bank USA, Nat'l Ass'n,* 2020 WL 7625233; *Wells Fargo Bank,* 2020 WL 7388621.

---

**End of Document**             © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

JENNIFER BONJEAN (*pro hac vice*)
ASHLEY COHEN (*pro hac vice*)
BONJEAN LAW GROUP, PLLC
750 LEXINGTON AVE., 9TH FL.
NEW YORK, NY 10021
Office: (718) 875-1850
Fax: (718) 230-0582
Email: jennifer@bonjeanlaw.com
        ashley@bonjeanlaw.com

Attorneys for Defendant
William Cosby, Jr.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LISA LOTTE-LUBLIN, LILI BERNARD, JANICE BAKER-KINNEY, REBECCA COOPER, LINDA KIRKPATRICK, JANICE DICKINSON, ANGELA LESLIE, PAM JOY ABEYTA, AND HEIDI THOMAS,<br><br>        Plaintiffs,<br><br>        vs.<br><br>WILLIAM COSBY, JR.<br><br>        Defendant. | Case No. 2:23-cv-932<br><br>**REPLY MEMORANDUM TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** |

**REPLY ARGUMENT**

**A.    Plaintiffs' Sexual Assault Claims Must Be Dismissed As SB 129 Did Not Create a New Common Law Tort of "Sexual Assault" But Rather Abolished the State of Limitations for Traditional Causes of Actions that *Arise* from a Sexual Assault as Defined by the Nevada's Criminal Code.**

Plaintiffs seemingly agree, as they must, that SB 129 did not create a new tort of "sexual assault" but rather created a new limitations period for *common law torts* that arise out of sexual assault. Plaintiff's separate claim of "sexual assault" must be dismissed.

**B.    Plaintiff Leslie's Claims Are Barred by the Statute of Limitations As They Do Not Allege Sexual Assault As Defined in Nevada Revised Statutes 200.366**

Without citation to a single case, Plaintiff Leslie insists that "sexual penetration" includes an act whereby Defendant grabbed her hand and placed it on his penis and forced her to masturbate him. [Pl. Opp. at 29] Plaintiff engages in a tortured reading of the statute that literally no Nevada state court has ever adopted.

NRS 200.364 defines "sexual penetration" as "cunnilingus, fellatio, or any intrusion, however slight, of any part of a person's body or any object manipulated or inserted by a person *into the genital or anal openings of the body of another*, including sexual intercourse in its ordinary meaning. This term does not include any such conduct for medical purposes." *State v. Solander,* 132 Nev. 1033 (2016) (emphasis added). Plaintiff apparently agrees that Defendant's alleged conduct toward her did not involve cunnilingus or fellatio but insists that there was an intrusion of Defendant's penis into Plaintiff Leslie's hand which meets the "sexual penetration" requirement. Not so. Plaintiff completely ignores that the statute requires that the intrusion (however slight) must be "into the genital or anal openings of the body of another." A hand is not a genital or anal opening.

Plaintiff further argues that "to accept Cosby's narrow definition of SB 129 would be to deprive Ms. Leslie of her chance at the very justice and healing which is the intention of SB 129 merely because Cosby did not complete the heinous acts he began to Cosby's satisfaction."

1

Cosby did not define "sexual penetration," the Nevada legislature did. There is nothing unclear or ambiguous about it. Every single Nevada court that has interpreted the statute understands that "sexual penetration" requires an intrusion, however slight, into the genital or anal openings. There is a reason Plaintiff cannot cite a single case to support her twisted reading of the statute. Accordingly, Plaintiff Leslie's claim must be dismissed.

That said, Defendant agrees with Plaintiff's contention that SB 129 illogically would deprive Leslie of the opportunity to bring her claims of battery but not the other Plaintiffs who allege penetration. Plaintiffs' Complaint underscores exactly why SB 129 constitutes unconstitutional special legislation as it does not even apply to all victims of sexual abuse.

## C.     Plaintiffs' Claims Must Dismissed Where SB 129 Violates the Special Legislation Clause of the Nevada Constitution.

The Plaintiff argues that SB 129 did not create special legislation because it applies to all sexual assault perpetrators and survivors. SB 129 does *not* apply to all victims of sex offenses or all perpetrators of sex offenses. It does not even apply to one of the Plaintiffs in this case. Indeed, SB 129 applies to a small subset of sex offenses that involve penetration, underscoring Defendant's point that SB129 created a right for a subset of sexual abuse victims while excluding other victims of sexual misconduct and other forms of interpersonal violence. In so doing, the Legislature violated the Special Legislation clause of the Nevada Constitution.

Contrary to the Plaintiff's contention, Defendant does not argue that the "relevant class" is "all heinous crimes." [Pl. Opp. at 23] Rather, Defendant maintains that the Legislative history of SB 129 reflects that the legislation was designed to revive common law torts for victims of "interpersonal violence." Rape and sexual assault involving penetration are surely not the only the only types of "interpersonal violence" that result in stigmatization and shame such that a victim may not timely sue. If the Legislature sought to pass legislation that permitted the revival of common law torts such as battery that arose out of crimes involving "intimate interpersonal violence and trauma" as the lawmakers claimed, there was no logical or sound reason for limiting that Legislation to a small sub-group of victims of a particular type of sexual assault.

The Legislation is unconstitutional because it could have been made general to all victims and perpetrators of "interpersonal violence" or even to all victims and perpetrators of sexual crimes. Because SB 129 was passed in violation of the Nevada Constitution, this Court must consider Plaintiffs' claims under the two-year statute of limitations. Accordingly, the Plaintiffs' Complaints must be dismissed as untimely.

**D.**   **SB 129 Violates Due Process Under the United States and Nevada Constitutions Where It Retroactively Deprives Defendant Of His Statute Of Limitations Defense, A Vested Right.**

Defendant acknowledged out of the gate that the United States Supreme Court in *Campbell v. Holt,* 115 U.S 629 (1885) held 140 years ago that statutes of limitations are "arbitrary enactments" not "vested rights." Defendant will not argue the issue further, recognizing that it is an issue that only the United States Supreme Court can revisit. To be clear, Defendant is not abandoning the issue as he must fully preserve it for subsequent appellate review.

That said, Plaintiff fails to appreciate that the question of whether SB 129 violated the Due Process clause of the Nevada Constitution is a separate and unresolved matter governed only by the Nevada Constitution and Nevada case law interpreting the state constitution. Thus, the New Jersey District Court's holding in *Bernard v. Cosby* is irrelevant to the question before this Court, namely whether Defendant enjoyed a vested right in his statute of limitations defense under Article 4, Section 1 of the Nevada Constitution.

Plaintiff has failed to cite a single Nevada case which holds that statutes of limitation are not vested rights under Nevada law or that the Nevada constitution is in lockstep with the federal constitution on this issue. As argued in Defendant's moving papers, in *Esser v. Spaulding,* 17 Nev. 289, 306 (Nev. 1883), the Nevada Supreme Court acknowledged that a "legal exemption from a demand made by another" is a vested right. As discussed in Defendant's opening papers, the framers of the Nevada constitution understood that Due Process required Courts to enforce statutes of limitations as vested rights. Defendant reiterates that while not binding, the holding in *Mitchell v. Roberts,* 469 P. 3d 901, 908 (UT 2021) offers persuasive authority concerning the

original understanding of the Due Process clause at the time Nevada's constitution was ratified and its limitation on a legislature's ability to revive expired statutes of limitation.

Utah is not alone in finding that its state constitution prohibits statutes that revive expired statutes of limitations. Indeed, a majority of state courts to address the issue have held that once a statute of limitations has run, the defense of an expired statute of limitations is a vested right that cannot be taken away through legislative action.[1] This Court should hold that Nevada's Constitution, like many of its sister states, deems statutes of limitations vested rights and that SB 129 violated the Due Process clause of the Nevada Constitution where it retroactively deprived Defendant of his statute of limitations defense.

**E.**     **SB 129 Violates The *Ex Post Facto* Clause Enshrined in both the United States and Nevada Constitutions Where It Retroactively Extends The Statute Of Limitations And Ties Liability To Criminal Conduct.**

Defendant relies on his opening motion and memorandum of points and authority.

**F.**     **If This Court Denies Defendant's Motion to Dismiss, It Must Sever All Plaintiffs and Their Causes of Action Which Do Not Arise From the Same Occurrence or Series of Occurrences**

Citing a Southern District of New York case, Plaintiffs argue that that their cases should be joined because Defendant employed the same *modus operandi* with each of them. Clearly a Southern District case is not binding on this Court, but Plaintiff's reliance on *Ardolf v. Weber,*

---

1 *Johnson v. Garlock, Inc.*, 682 So.2d 25, 27-28 (Ala. 1996); see also *Johnson v. Lilly*, 823 S.W.2d 883, 885 (Ark. 1992) ("[W]e have long taken the view, along with a majority of the other states, that the legislature cannot expand a statute of limitation so as to revive a cause of action already barred."); *Frideres v. Schiltz,* 540 N.W.2d 261, 266- 67 (Iowa 1995) ("[I]n the majority of jurisdictions, the right to set up the bar of the statute of limitations, after the statute of limitations had run, as a defense to a cause of action, has been held to be a vested right which cannot be taken away by statute, regardless of the nature of the cause of action."); *Dobson v. Quinn Freight Lines, Inc.*, 415 A.2d 814, 816-17 (Me. 1980) ("The authorities from other jurisdictions are generally in accord with our conclusion" that running of the statute of limitations creates a vested right); *Doe v. Roman Catholic Diocese*, 862 S.W.2d 338, 341-42 (Mo. 1993) (recognizing constitutional prohibition of legislative revival of a time-barred claim "appears to be the majority view among jurisdictions with constitutional provisions"); *State of Minnesota ex rel. Hove v. Does*, 501 N.W.2d 366, 369-71 (S.D. 1993) ("Most state courts addressing the issue of the retroactivity of statutes have held that legislation which attempts to revive claims which have been previously time-barred impermissibly interferes with vested rights of the defendant, and this violates due process."); *Roark v. Crabtree*, 893 P.2d 1058, 1062-63 (Utah 1995) ("In refusing to allow the revival of time-barred claims through retroactive application of extended statutes of limitations, this court has chosen to follow the majority rule.").

332 F.R.D. 467 (S.D.N.Y. 2019) is misplaced in any event. There, four plaintiffs brought suit against an "influential" fashion photographer. In each case, the plaintiffs were aspiring male models and that between 2008 and 2011, the defendant photographer sexually molested them by "forcibly touching and grabbing different parts of their bodies" during photoshoots. *Id.* at 472. The Southern District denied the defendant's motion to sever, finding that the claims were logically related and presented substantially common questions of law and fact. The court found that the defendant's *modus operandi* was a common thread that logically tied Plaintiffs' claims.

Here, the Plaintiffs' claims span a decade and do not involve an identifiable *modus operandi.* All of the alleged assaults/abuse occurred in different locations and different circumstances. Some of the Plaintiffs were aspiring actors who allegedly sought mentorship from the Defendant while others met Defendant during other social activities, such as playing tennis, at a health club, or at a party. Some of the Plaintiffs "believe" they ingested unknown intoxicants that were spiked into their drinks while others admit that they voluntarily took narcotics offered to them by the Defendant. All of the Plaintiffs describe different conduct on the part of the Defendant. The conduct described by the Plaintiffs, if true, might describe a serial assaulter, it does not articulate a *modus operandi* that supports joinder of the causes of action.

Contrary to the Plaintiff's claims, there will be no overlapping evidence in connection with these cases. Apart from the Defendant himself, Plaintiff cannot identify a single common witness between the 10 cases. "Nothing unites all of these Plaintiffs but the superficial similarity of their allegations and their common choice of counsel." *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013). While joinder of these cases may result in judicial economy, it will guarantee that Cosby does not receive a fair trial as to any of them. It is inconceivable that Defendant could defend all 10 cases simultaneously and receive a fair trial. No jury instruction could cure the incredible prejudice that will result from a joint trial of 10 different women who share nothing in common other than that they all claim that at some point in 1980s or early 1990s, they were sexually abused/assaulted by the Defendant. This Court must grant severance. If not as to each case, the cases must be severed in a logical fashion such that Defendant is not

forced to defend the claims of 10 separate women at once. To hold otherwise would be to simply direct a verdict in favor of the Plaintiffs.

DATED: February 20, 2024                    Respectfully submitted,

                                            BONJEAN LAW GROUP, PLLC

                                    By:     _____
                                            Jennifer Bonjean
                                            Ashley Cohen
                                            Attorneys for Defendant

# Exhibit E

1   Jordan K. Merson, Esq., (Admitted *Pro Hac Vice*)
2   jmerson@mersonlaw.com
3   Jordan K. Rutsky, Esq., (Admitted *Pro Hac Vice*)
4   jrutsky@mersonlaw.com
5   Nathan E. Werksman, Esq., NV bar No. 15117
6   nwerksman@mersonlaw.com
7   Alice A. Bohn, Esq., (Admitted *Pro Hac Vice*)
8   abohn@mersonlaw.com
9   Manraj S. Sekhon, Esq., (Admitted *Pro Hac Vice*)
10  msekhon@mersonlaw.com
11  Merson Law, PLLC.
12  950 Third Ave, 18th Floor
13  New York, NY 10022
14
15  Brian J. Panish, Esq., NV Bar No. 16123
16  panish@psbr.law
17  Rahul Ravipudi, Esq., NV Bar No. 14750
18  ravipudi@psbr.law
19  Robert Glassman Esq., (Admitted *Pro Hac Vice*)
20  rglassman@psbr.law
21  Julya Armendariz, Esq, NV Bar No. 15865
22  jarmendariz@psbr.law
23  Panish, Shea, Boyle, Ravipudi LLP.
24  300 South Fourth Street, Suite 710
25  Las Vegas, NV 89101
26  Attorneys for Plaintiffs
27
28              **UNITED STATES DISTRICT COURT**
29          **DISTRICT OF NEVADA, SOUTHERN DIVISION**
30
31  **LISE-LOTTE LUBLIN, LILI BERNARD,**
32  **JANICE BAKER-KINNEY, REBECCA**          **CASE NO.: 2:23-CV-00932-GMN-DJA**
33  **COOPER, LINDA KIRKPATRICK, JANICE**
34  **DICKINSON, ANGELA LESLIE, PAM JO**      **PLAINTIFFS' RECOMMENDED**
35  **ABEYTA, HEIDI THOMAS, AND JANE**        **CONTENT FOR THE**
36  **FAZZARI,**                              **CERTIFICATION ORDER**
37                                            **PURSUANT TO N.R.A.P. RULE 5**
38                  **PLAINTIFFS,**
39
40      **VS.**
41
42  **WILLIAM COSBY, JR.,**
43
44                  **DEFENDANT.**
45
46
47  */ / /*

                          1

# INTRODUCTION

Plaintiffs, by their counsel Merson Law, PLLC, submit this brief recommending the contents of this Court's Certification Order to the Nevada Supreme Court pursuant to this Court's Order, dated September 16, 2024. (ECF No. 53).

## (1) QUESTION OF LAW TO BE ANSWERED

The United States District Court of the District of Nevada should certify to the Supreme Court of Nevada the following question:

> Whether forced masturbation, in which the perpetrator intrudes his penis into the hand of his victim without that victim's consent and manipulates the victim's hand on his penis for the perpetrator's sexual gratification, constitutes sexual assault under SB 129.

## (2) STATEMENT OF FACTS

This certification order pertains to legal questions surrounding Angela Leslie's claims of sexual assault, perpetrated by defendant William Cosby Jr., brought pursuant to SB 129.

In the Amended Complaint, Ms. Leslie alleges that Mr. Cosby drugged her, and "without Ms. Leslie's consent, grabbed her hand…forced Ms. Leslie's hand onto his penis and forced her to masturbate him, by holding and moving her hand on his penis." (ECF Doc. No. 26, ¶¶113-114). Cosby then attempted to climb atop Ms. Leslie, but she was able to fight him off. (ECF Doc. No. 26, ¶115).

Defendant moved to dismiss Ms. Leslie's claims, arguing, in part, that forcing a woman to touch a man's genitals does not constitute sexual assault under Nevada

1    State Law. (ECF Doc. No. 39). This motion was reviewed by a federal Magistrate

2    Judge who recommended that the Court rule that the alleged conduct constitutes

3    sexual assault. (ECF Doc. No. 50). The parties were then given an opportunity to

4    object to the recommendation of the Magistrate Judge. After Defendant's objection

5    and Plaintiffs' response, the District Court agreed with the recommendation of the

6    Magistrate Judge that the allegations of Ms. Leslie are within the definition of sexual

7    assault under Nevada State Law. (ECF Doc. No. 53). The District Court, however,

8    also offers the Nevada Supreme Court an opportunity to determine the interpretation

9    of its own state's law.

10    <center>(3) <strong><span style="font-variant: small-caps">The Nature of the Controversy</span></strong></center>

11    This question of law arises from the parties' differing interpretations of the

12    term "sexual penetration," as defined by NRS § 200.364(9), which led to a dispute as

13    to whether Mr. Cosby's act of forcing his penis into Ms. Leslie's hand without her

14    consent and then manipulating her hand to unwillingly simulate sex on his penis

15    constitutes sexual assault under SB 129.

16    As outlined in the District Court's Order, Plaintiffs contend that the answer to

17    this question is yes, this is sexual assault, because Defendant intruded his penis into

18    a part of Plaintiff's body – her hand – without Plaintiff's consent. Defendant contends

19    that the answer is no, and that forced masturbation of a penis without consent is not

20    sexual assault under Nevada law because there was no penetration of an anal or

21    genital opening.

<center>3</center>

1   NRS § 200.364(9) defines "sexual penetration" as "cunnilingus, fellatio, or any

2 intrusion, however slight, of any part of a person's body or any object manipulated or

3 inserted by a person into the genital or anal openings of the body of another…"  The

4 issue in controversy is whether the language, "manipulated or inserted by a person

5 into the genital or anal opening of the body of another," modifies the immediately

6 preceding term "any object," as Plaintiffs contend, or modifies the language "any

7 intrusion" from earlier in the sentence, as Defendant contends.

8   Plaintiffs contend that forced masturbation of a penis constitutes an

9 "intrusion, however slight, of any part of a person's body," under NRS § 200.364 based

10 on a plain reading of the statutory language. It is uncontestable that Ms. Leslie's

11 hand was a "part of [her] body." Therefore, when Defendant forced his penis into Ms.

12 Leslie's hand, this constituted an "intrusion, however, slight, of any part of [Ms.

13 Leslie's] body."

14   Plaintiffs further contend that the modifying language, "manipulated or

15 inserted by a person into the genital or anal openings of the body of another," is

16 applicable to the immediately preceding language, "any object" because it is intended

17 to clarify that the use of an object can also be sexual assault, provided that the object

18 is inserted into a genital or anal opening. In other words, it is not sexual assault to

19 insert "any object," such as a pen, into a person's hand, but if that same object (pen)

20 was "inserted by a person into the genital or anal openings of the body of another,"

21 such an act constitutes sexual assault. In contrast, if one were to place one's penis in

22 the hand of another without consent, such conduct would constitute, "any intrusion,

4

1    however slight, of any part of a person's body" and be deemed sexual assault both in

2    common parlance and the law, despite the lack of insertion, "into a genital or anal

3    opening".

4          Defendant argues that the term "manipulated or inserted into the genital or

5    anal openings of the body of another" is not intended to modify "any object" but rather

6    intended to modify, "any intrusion, however slight," such that it is not sexual assault

7    under SB 129, NRS § 200.364, and NRS § 200.366 if he forced his penis into Ms.

8    Leslie's hand without her consent and then forced her to masturbate him, because he

9    did not insert anything into Ms. Leslie's genital or anal openings or have Ms. Leslie

10    penetrate his genital or anal openings.

11          The District Court agreed with Plaintiffs' and the Magistrate Judge's

12    interpretation of the statute, stating "The Court believes this conduct likely does fall

13    within the definition of Nevada's sexual assault statute." (ECF Doc. No. 53, p. 4).

14                    **(4) DESIGNATION OF THE PARTIES**

15          Plaintiffs recommend that Plaintiffs be designated as respondent, and that

16    Defendant be designated as appellant, as Plaintiffs are not inclined to change the

17    outcome of the District Court's decision denying Defendant's motion to dismiss.

18

1             **(5) N<small>AMES AND</small> A<small>DDRESSES OF</small> C<small>OUNSEL</small>**

2        Jennifer Bonjean, Esq., Ashley Cohen, Esq., Bonjean Law Group, PLLC,
3        303 Van Brunt Street, 1st Floor, Brooklyn, NY 11231, for appellant
4        William Cosby, Jr.

5        Jordan K. Merson, Esq., Jordan K. Rutsky, Esq, Nathan E. Werksman,
6        Esq., Alice A. Bohn, Esq., Manraj S. Sekhon, Esq., Merson Law, PLLC,
7        950 Third Ave, 18th Floor New York, NY 10022, and Brian J. Panish,
8        Esq., Rahul Ravipudi, Esq., Robert Glassman Esq., Julya Armendariz,
9        Esq., Panish, Shea, Boyle, Ravipudi LLP, 300 South Fourth Street, Suite
10       710, Las Vegas, NV 89101, for respondents Lise-Lotte Lublin, Lili
11       Bernard, Janice Baker-Kinney, Rebecca Cooper, Linda Kirckpatrick,
12       Janice Dickinson, Angela Leslie, Pam Jo Abeyta, Heidi Thomas, and
13       Jane Fazzari.

14      (6) **How the Certified Question of Law May Be Determinative of**
15                   **the Case Pending Before the Court**

16     The question of law – whether forced masturbation of a penis constitutes sexual

17 assault under SB 129 – is determinative of Defendant's motion to dismiss the claims

18 of Angela Leslie, because her claims arose when Mr. Cosby forced his penis into Ms.

19 Leslie's hand without her consent, and then manipulated her hand to masturbate

20 him.

21                     **R<small>ELEVANT</small> D<small>ECISIONS</small>**

22     Plaintiffs are unaware of any decisions that specifically address a situation in

23 which a perpetrator forced an *adult* victim to touch and masturbate the perpetrator's

24 penis, making this an issue of first impression. However, in *Bernal v. State,* 507 P.3d

25 1241, fn. 15 (Nev. App. 2022) the Court held, "The Legislature has broadly defined

26 sexual penetration, and without authority suggesting otherwise, we accord the

27 Legislature substantial deference." Further, in *Sampson v. State,* 121 Nev. 820, 122

28 P.3d 1255 (2005), the defendant was found guilty of sexual assault of a minor despite

1    the only allegations being that the defendant forced his victim to masturbate the

2    defendant's penis, the defendant touched plaintiff's crotch and buttocks, and the

3    defendant "placed his penis near the victim's face, touching the victim's nose and

4    repeatedly instructing him to suck his penis [to which the] victim refused." As such,

5    the defendant in *Bernal* was found guilty of sexual assault of a minor under the age

6    of 14 (and other charges) despite the lack of insertion into an anal or genital opening.

7        To quote the District Court Order,

8        Case law makes it clear that the touching of a hand or digit to a genital
9        meets the definition of sexual penetration. In *Rose v. State*, the
10       defendant was guilty of sexual assault where he touched the victim's
11       genitals with his fingers. *See* 163 P.3d 408, 412–16 (Nev. 2007).

12                  \*     \*     \*

13        "Indeed, the act of a hand touching a genital without consent is sufficient
14       to establish an intrusion of a person's body into the genital of the body
15       of another, which is sufficient to allege sexual penetration occurred. *See*
16       *Rose*, 163 P.3d at 412–16."

17    [ECF Doc. No. 53, 5:4-7, 5:15-17].

18                  **OTHER RELEVANT MATTERS**

19        The legislative intent of SB 129, from which Ms. Leslie's claim arose, is to

20    address the formerly short statute of limitations for civil actions arising from sexual

21    assault, based on the understanding that survivors of sexual assault often need years,

22    if not decades, to process the trauma of their experiences. Under this context, creating

23    a loophole in which a perpetrator can touch a survivor's penis or force a survivor to

24    manually masturbate him without consequence is entirely counter to the legislative

25    intent of the law.

7

1    As explained by Senator Lisa Krasner at a Senate Committee on Judiciary

2   meeting on February 21, 2023:

3        Sexual assault survivors will tell you that it can take many years, if not
4        most of one's life, for a victim to gain the strength and the courage to
5        come forward and report the abuse if he or she ever feels safe coming
6        forward at all. Dr. Allison Cotton is an expert witness who can speak to
7        the trauma involved in sexual assault and sexual abuse and to the years
8        of work it takes to heal those wounds and start to become whole.

9   (ECF Doc. No. 42-4, p. 3).[1]

10    Dr. Allison Cotton explained further:

11        Rape and **sexual assault** are uniquely intimate crimes. Perpetrators of
12        rape **forcefully engage their victims in sex acts** to the point that the
13        victims are too terrorized to resist.

14                              *      *      *

15        The good news is there is hope for healing. Trauma is incredibly
16        treatable if the victim has the resources and the ability to participate in
17        treatment. **Part of treatment for sexual assault victims is to give
18        them back the power surrounding the assault**, giving a victim the
19        ability to choose whether to pursue legal action, even 50 years later, is
20        incredibly important in the healing process.

21   (ECF Doc. No. 42-4, pp. 5-6)(emphasis added).

22    As per Senator Jeff Stone:

23        **This is healing**. And this is cathartic to let these women speak for the
24        first time in 36 years about a traumatic event that touched their lives. I
25        am grateful the committee agreed to hear all this testimony. A lot of this
26        is suppressed for many years, and a two-year statute of limitations does
27        not suffice. **Bringing this forward gives victims justice and the
28        resources they need to get the appropriate health care.**

---

[1] Page numbers citing ECF Doc. No. 42-4 refer to the page numbers in the document itself, and do not
refer to the PDF page numbers, as shown on the E-Filing header.

1  (ECF Doc. No. 42-4, p. 9)(emphasis added).

2         Against this backdrop, the Court should give deference to the Legislature who,

3  as per their own words, intended to provide an avenue for women like Angela Leslie

4  to address the effects of sexual assault. There is no reason, then, to interpret the law

5  as having a select carveout for the particular sexual act of forced masturbation or

6  non-consensual touching of a penis, as the penis is without question a sexual organ

7  and the act of touching a penis without consent or forcing one to touch a penis without

8  the toucher's consent is a sex act. As such, the Court should not create a loophole to

9  SB 129 that would permit sexual predators to engage in certain forced sex acts

10  without consequence.

11                            CONCLUSION

12         Plaintiffs respectfully request that this Court take their recommendations into

13  consideration when drafting the Certification Order pursuant to N.R.A.P. 5.

14                                    Respectfully submitted,

15                                    /s/ Jordan Rutsky
16                                    /s/ Jordan Merson
17                                    Merson Law, PLLC
18                                    950 Third Avenue
19                                    New York, New York 10022
20                                    Email: jrutsky@mersonlaw.com
21                                           jmerson@mersonlaw.com
22

9

# Exhibit F

JENNIFER BONJEAN (*pro hac vice*)
ASHLEY COHEN (*pro hac vice*)
BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
Office: (718) 875-1850
Fax: (718) 230-0582
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com
*Attorneys for Defendant William Cosby, Jr.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LISA LOTTE-LUBLIN, LILI BERNARD, JANICE BAKER-KINNEY, REBECCA COOPER, LINDA KIRKPATRICK, JANICE DICKINSON, ANGELA LESLIE, PAM JOY ABEYTA, AND HEIDI THOMAS, | Case No. 2:23-cv-932 |
| Plaintiffs, | **DEFENDANT'S RECOMMENDATION BRIEF PURSUANT TO NRAP 5(c)** |
| vs. | Hon. Gloria M. Navarro |
| WILLIAM COSBY, JR. | Magistrate Judge Daniel J. Albregts |
| Defendant. | |

Pursuant to this Court's September 16, 2024 order and Rule 5(c) of the Nevada Rules of Appellate Procedure, Defendant William Cosby, Jr. submits the following recommendation concerning the contents of the certification order to be submitted by this court to the Nevada Supreme Court. Defendant states as follows:

## I.    Questions of Law to Be Answered

Whether sexual penetration as defined by NRS 200.364(9) includes forced masturbation.

## II.    Statement of Facts Relevant to the Question Certified

Nine individual Plaintiffs brought suit against Defendant William Cosby, Jr. pursuant to what is now NRS 11.217, as amended an enacted by SB 129 (2023), alleging state tort claims of

1

sexual assault, battery, assault, intentional infliction of emotional distress, negligent infliction of

emotional distress, and false imprisonment. The certified question at issue here involves the

claims of only one of those nine Plaintiffs, Plaintiff Angela Leslie. Plaintiff Leslie alleges she

met Defendant in "the late 1980s or early 1990s" when he invited her to Las Vegas, Nevada to

mentor her and help her with acting. [Complaint. at ¶ 106]. Leslie claims that she arrived at

Defendant's suite and he instructed her to act like she was intoxicated. [*Id.* at ¶ 107]. Defendant

allegedly offered Leslie an alcoholic beverage so that she would perform better. [*Id.* at ¶ 108].

Leslie claims that she went to wet her hair at the direction of the Defendant and when she

returned from the bathroom, Defendant was sitting on the bed wearing only a white robe. [*Id.* at ¶

111]. Leslie claims that Defendant grabbed her hand, covering it in lotion, and proceeded to

masturbate using her hand. [*Id.* at ¶ 113]. Leslie claims Defendant tried to climb atop her but she

fought him off. [*Id.* at ¶ 114]. Defendant went to the bathroom and when he returned, he told

Leslie she needed to leave because he had a phone call. [*Id.* at ¶ 115]. Leslie claims she then left

the hotel room. [*Id.*].

In order for Plaintiff Leslie's claim to survive, she must allege that she was a victim of a

sexual assault, as defined by NRS 200.366.

## III.    Nature of the Controversy

Per Nevada law, a person is guilty of sexual assault if the person, in relevant part:

Subjects another person to sexual penetration, or forces another person to make a sexual
penetration on themselves or another, or on a beast, against the will of the victim or under
conditions in which the perpetrator knows or should know that the victim is mentally or
physically incapable of resisting or understanding the nature of the perpetrator's conduct;

NRS 200.266(1)(a). Sexual penetration is further defined as:
cunnilingus, fellatio, or any intrusion, however slight, of any part of a person's body or
any object manipulated or inserted by a person into the genital or anal openings of the
body of another, including sexual intercourse in its ordinary meaning. The term does not
include any such conduct for medical purposes.

NRS 200.364(9). While Plaintiff alleges that a forced masturbation meets this definition, Defendant Cosby argues otherwise. Defendant argues that, interpreting the statute as Plaintiff does renders it incomplete and illogical. Defendant's position is that "any person's body" refers to the perpetrator's body, not the victim's body. The logical reading is that a penetration is an intrusion, by way of the perpetrator's body *or* the perpetrator's use of an object, into the victim's genital or anal opening. Defendant argues that the Court's and the Plaintiff's interpretation of the statute, would mean that the legislature intended "intrusion, however slight, of any part of a person's body" to mean something by itself. Defendant argues that by itself, this language is vague and if the legislature intended this part of the sentence to cover a forced masturbation, they would have defined the word "intrusion" to account for forced masturbation or other types of touching. Defendant argues that in this context, the rule of the last antecedent, heavily relied on by the Plaintiff, is superseded by the need to consider the context and the spirit of the entire writing, otherwise the statute is vague and borderline nonsensical.

Furthermore, a person is guilty of sexual assault if the person: "subjects another person to sexual penetration or forces another person to make a sexual penetration on themselves or another, or on a beast..." Defendant argues, contrary to the district court's opinion, that the language "forces another person to make a sexual penetration on themselves or another" means that the perpetrator would have to force the victim to penetrate the victim themselves, or penetrate "another" meaning the perpetrator or a third person. It is the defendant's position that this is the obvious, plain and clear meaning of the words. Any other interpretation involves creativity, imagination and stretching of clear definitions of words. This, together with the definition of sexual penetration, discussed in the paragraph above, leads one to the conclusion that a forced masturbation does not fall within the definition of sexual assault.

The district court referenced two cases in support of the fact that a forced masturbation constitutes sexual assault. The first is *Rose v. State*, about which the Court states the defendant was guilty of sexual assault where he touched the victim's genitals with his fingers. This conduct clearly satisfied the statutory definition as it involved a slight intrusion of the victim's genitals. Moreover, in that case, the defendant was alleged to have touched the victim's genitals with his tongue, which is considered cunnilingus,[1] an act explicitly stated in the definition of sexual penetration. *Rose v. State*, 163 P.3d 408, 412 (Nev. 2007). The second case is *Sampson v. State*, wherein the criminal defendant was found guilty of both attempted sexual assault on a minor and sexual assault of a minor after touching the minor victim's buttocks and penis, rubbing lotion on the victim, and asking the victim to perform oral sex on him. 122 P.3d 1255,1257-1262 (Nev. 2005). *Sampson* appears to be an outlier–or maybe further evidence that the Nevada Supreme Court needs to chime in–where case law overwhelmingly holds that *touching*, whether it be an adult or a child, is the offense of lewdness, not sexual assault which involves penetration of an orifice or fellatio, or cunnilingus. See NRS 201.210 (Open or gross lewdness [adult]); NRS 201.230 (lewdness with child under 16 years [minor]). The conduct described by Plaintiff Leslie would constitute open and gross lewdness and several criminal cases support this understanding. *See, e.g., Crowley v. State*, 83 P.3d 282, 285 (Nev. 2004)(finding that touching was predisposing minor victim to subsequent fellatio such that a separate lewdness conviction for the touching could not stand where the crimes of sexual assault and lewdness are mutually exclusive); *Townsend v. State*, 734 P.2d 705, 710 (1987)(charging criminal defendant with lewdness for fondling and stimulating minor's breasts, but charged for sexual assault for rubbing lubricant in and around victim's vaginal opening and penetrating victim's vagina with the defendant's finger);

---

[1] Merriam-Webster's dictionary defines cunnilingus as "oral stimulation of the vulva or clitoris."

*Ranson v. State,* 670 P.2d 574, 575 (Nev. 1983)(charging criminal defendant with open or gross lewdness where he forced adult victim to undress at gunpoint and then fondled her buttocks and breasts, and at one point bit her buttocks). several other criminal cases make it clear that sexual assault covers the conduct that is obviously described in the definition (some sort of penetration of some orifice of a person's body or fellatio, or cunnilingus) and It appears the regular practice of the criminal courts that a touching is considered "lewdness" and that sexual assault means either penetration or fellatio or cunnilingus, which are arguably not really "intrusions" but nevertheless fall under the definition created by the legislature.

Separately, *Maes v. Sheriff, Clark County* may provide insight into the history of the definition of "sexual penetration." 582 P.2d 793, 793 (Nev. 1978) The defendant in *Maes* challenged his conviction for sexual assault, arguing that he only "licked" the victim's penis, and that the record did not reflect that the boy's penis *entered* his mouth, such that a penetration would occur. *Id.* The court nevertheless found that fellatio, defined by Black's Law Dictionary as "offense committed with the male sexual organ and the mouth," was part of the disjunctive definition laid out in the applicable Nevada statute. *Id.* The majority did not acknowledge that this did not necessarily constitute an intrusion but nevertheless concluded that it constituted a sexual penetration because it was part of the definition. *Id.* Judge Gunderson, dissenting, stated that the real question before the court was "shall this court redefine "sexual penetration" so as to make sexual penetration unnecessary?" *Id.* at 794. Judge Gunderson concluded that because the defendant did not place the victim's penis inside of his mouth, that the state failed to prove a necessary element and that the "lewdness" count should have proceeded to trial. *Id.* at 795.

Defendant concedes that that the courts in *Rose* and *Sampson*, infra, were "never squarely requested to address whether forced masturbation of another is a crime of sexual assault in

Nevada." However, it is Defendant's position that plain the language of the statute answers that question. Sexual assault requires penetration of a genital or anal opening *or* fellatio or cunnilingus. Conduct that does not fall into this definition constitutes lewdness. However, where litigants are attempting to change the course of Nevada jurisprudence on this topic, now may be the time for the Supreme Court to step in and set the record straight.

IV.     Party Designation

      Appellant: William Cosby, Jr.

      Respondent: Angela Leslie

V.      Names and Addresses of Counsel

      Counsel for Appellant:

      Jennifer Bonjean
      Ashley Cohen
      Bonjean Law Group, PLLC
      303 Van Brunt Street, 1st Floor
      Brooklyn, New York 11231
      718-875-1850

      Counsel for Respondent:

      Jordan K. Merson, Esq., (Admitted Pro Hac Vice)
      jmerson@mersonlaw.com
      Jordan K. Rutsky, Esq., (Admitted Pro Hac Vice)
      jrutsky@mersonlaw.com
      Nathan E. Werksman, Esq., NV bar No. 15117
      nwerksman@mersonlaw.com
      Alice A. Bohn, Esq., (Admitted Pro Hac Vice)
      abohn@mersonlaw.com
      Manraj S. Sekhon, Esq., (Admitted Pro Hac Vice)
      msekhon@mersonlaw.com
      Merson Law, PLLC. 950 Third Ave, 18th Floor
      New York, NY 10022

      Brian J. Panish, Esq., NV Bar No. 16123
      panish@psbr.law
      Rahul Ravipudi, Esq., NV Bar No. 14750
      ravipudi@psbr.law

Robert Glassman Esq., (Admitted Pro Hac Vice)
rglassman@psbr.law
Julya Armendariz, Esq, NV Bar No. 15865
jarmendariz@psbr.law
Panish, Shea, Boyle, Ravipudi LLP.
300 South Fourth Street, Suite 710 25
Las Vegas, NV 89101

VI.     Other Relevant Matters

        N/A

Dated: September 30, 2024          Respectfully Submitted,
                                   /s/ JENNIFER BONJEAN
                                   *Attorney for Plaintiff*

                                   Jennifer Bonjean
                                   Ashley Cohen
                                   BONJEAN LAW GROUP
                                   303 Van Brunt Street, 1st Fl.
                                   Brooklyn, NY 11231
                                   Tel: 718.875.1850
                                   Fax: 914.462.3483
                                   jennifer@bonjeanlaw.com
                                   ashley@bonjeanlaw.com